UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
TAE H. KIM et al.,
                                    :
             Plaintiffs,            MEMORANDUM & ORDER
                                    :
      -against-                     12 Civ. 6344 (MHD)
                                    :
KUM GANG, INC. et al.,
                                    :
             Defendants.
------------------------------x

MICHAEL H. DOLINGER
UNITED STATES MAGISTRATE JUDGE:


     Plaintiffs in this lawsuit seek compensation for the alleged
failure by defendants to pay them minimum wage and overtime, as
required by the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201
et seq., and the New York Labor Law, § 190 et seq., as well so-
called spread-of-hours payments mandated under the Labor Law and
N.Y.C.R.R. tit. 12 §§ 146-1.6 (formerly §§ 137-1.7 & 142-2.4). They
further seek recovery for a variety of other alleged violations by
defendants of the pertinent labor regulations.


     The eleven plaintiffs remaining in the case[1] consist of eight
waiters, two bussers and one kitchen worker, all of whom worked in
one or both of the two restaurants -- one in Flushing, Queens and

_____

     [1] The original complaint listed nine individual plaintiffs,
and the amended complaint listed fourteen.

1

the other in Manhattan -- owned or managed by some or all of the defendants.[2] The periods of their employment vary, but the earliest start date, for several of the plaintiffs, was 1997.

In early June 2014 we conducted a four-day bench trial on plaintiffs' claims. We have since received post-trial briefing from both sides, and now issue findings and conclusions premised on those proceedings.

The Claims

Plaintiffs press claims for a variety of alleged violations by defendants of both federal and state law. They assert (1) that they were not paid the applicable minimum wages specified under the FLSA and the New York Labor Law (JPTO [docket no. 101] § IV(A) at ¶¶ 1(a), 2(a)), (2) that they were not paid the required overtime under both sets of laws (id. at ¶¶ (1)(b), (2)(b)), (3) that they were not paid spread-of-hours compensation under State law (id. at ¶ 2(c)), (4) that defendants unlawfully shared in their tip pools

---

[2] Nine of the eleven plaintiffs worked only at the Flushing branch. (C. Park Decl. ¶ 4; Choi Decl. ¶ 5; Ju Decl. ¶ 4; Morales Decl. ¶ 4; Shen Decl. ¶ 5; Song Decl. ¶ 3; T. Kim Decl. ¶ 3; Ventura Decl. ¶ 4; Y. Kim Decl. ¶ 4). The other two worked at both (H. Kim Decl. ¶ 4; J. Park Decl. ¶ 5), although predominently in the Flushing restaurant.

and required some of the tip money to be distributed to the kitchen staff, who were not tipped employees (<u>id.</u> at ¶¶ 1(d), 1(d), 2(d), 2(e), 2(f)), and (5) that defendants required them to perform work for other businesses owned by defendants and failed to compensate them for that work. (<u>Id.</u> at ¶¶ 2(e), 2(g)). Plaintiffs further contend that defendants failed to provide notice of their rights under the respective labor statutes and regulations and that by virtue of their failure to do so, their improper diversion of tip income, and their failure to provide wage statements, they were not entitled to a tip credit. (<u>Id.</u> at ¶¶ 1(c), 2(d)). Based on defendants' failure to provide required advance wage notices and contemporaneous wage statements, plaintiffs also seek additional liquidated damages under the New York State Labor Law. (<u>Id.</u> at ¶ 2(h)). Plaintiffs further allege that defendants failed to keep legitimate wage-and-hour records, and indeed falsified time records, apparently in response to a New York State Labor Department investigation. (<u>See</u> Pls.' Post-Trial Memorandum [hereinafter "Pls.' Mem."] [docket no. 123] 13). Asserting as well that the concealment of their rights and other misdeeds by defendants demonstrate a basis for equitable tolling of the federal and state statutes of limitations, plaintiffs seek recovery for unpaid wages and liquidated damages extending back to the first dates on which each plaintiff commenced employment with defendants.

3

(Pls. Mem. 28-34).

In plaintiffs' amended complaint, they named the corporate owner, Kum Gang Inc., as well as five individuals as defendants. (See JPTO § I). At the time of trial, they dropped their claims against two individual defendants -- Yi Yong Yoo and Myungja Lee -- but seek to impose liability against the corporation and the remaining three defendants -- Messrs. Ji Sung Yoo, Kyung Le Yoo and Chunsik Yu. (JPTO § IV(B) at ¶¶ 6-7).

The Facts

A. An Overview of Restaurant Operations

The plaintiffs all worked at various periods at one or both branches of the Kum Gang San Restaurant, a Korean-cuisine business owned by defendant Kum Gang Inc. (See JPTO § VII; Tr. [docket nos. 128-132] 32). The corporation is owned by defendant Ji Sung Yoo, who was present at one or the other of the restaurants seven days a week and maintained close control over their operations. (J. Yoo Decl. ¶ 3; Tr. 376-77). Ji Sung Yoo's younger brother, defendant

4

Kyung Le Yoo[3], was in charge of financial matters at both restaurants, passed on pay rates for restaurant staff, maintained surveillance of the performance of the work staff, signed the company's tax returns, dealt directly with the State Labor Department during its investigations of labor practices at the restaurants and supervised the falsification of records in connection with that investigation. (E.g., J. Park Decl. ¶ 34; Choi Decl. ¶ 30; Ju Decl. ¶ 29; T. Kim ¶¶ 28-33; H. Kim Decl. ¶ 27; Y. Kim Decl. ¶ 24; C. Park Decl. ¶ 40; Song Decl. ¶¶ 23, 26; Morales Decl. ¶¶ 40, 43[4]; Pls.' Exs. 37, 41 – Answer ¶ 3(c); Tr. 237; see also K. Yoo Decl. ¶¶ 5, 8-10, 12-20). Since 2001 defendant Chunsik Yu has been the general manager of the Flushing branch, and by virtue of that position has been in charge of all customer-serving personnel (including waiters and bussers) at that branch. (C. Yu Decl. ¶¶ 12, 15; J. Yoo Decl. ¶ 7; Tr. 91, 102, 134, 181-82, 291). As part of that role, he had hiring-and-firing authority. (Tr. 324, 340, 376).[5]

---

[3] Kyung Le Yoo was erroneously sued as Kyung Rae Yoo. (K. Yoo Decl. ¶ 1).

[4] The effort to falsify records is specifically described at Song Dec. ¶ 23 and Morales Decl. ¶ 40.

[5] While it is abundantly clear from the trial transcript -- including from the testimony of Mr. Ji Sung Yoo -- that Mr. Yu indeed had hiring-and-firing authority, we note that Mr. Yoo attested to the contrary in his declaration in anticipation of trial. (Compare Tr. 376 with J. Yoo Decl. ¶ 15).

Both restaurants were open 24 hours a day. (J. Yoo Decl. ¶ 4; C. Yu Decl. ¶ 3; Tr. 153). The Flushing branch was quite large, encompassing a main Dining Hall, four so-called Special Rooms -- apparently used for private parties -- and a Banquet Room. (See J. Yoo Decl. ¶¶ 34, 42-43; Tr. 36; JPTO § VII at ¶ 17). The Flushing branch employed about thirty waiters, captains and head captains, six bussers and forty kitchen staff. (J. Yoo Decl. ¶ 42; see also T. Kim Decl. ¶ 16; Choi Decl. ¶ 21; Tr. 181). The Manhattan venue had only a public dining room and employed about twenty waiters, five bussers and twenty kitchen staff. (J. Yoo Decl. ¶¶ 38-39; Tr. 151).

The Flushing branch of the restaurant also undertook an active business of off-premises catering. (See, e.g., J. Yoo Decl. ¶¶ 54-56).[6] For such events, restaurant employees would prepare food, transport the food and serving equipment to the event venue, serve the food and then return all equipment to the Flushing restaurant. (J. Yoo Decl. ¶¶ 54-55; Ju Decl. ¶ 14; H. Kim Decl. ¶ 14; Tr. 188-89; T. Kim Decl. ¶ 12). Defendants catered events as far away as Boston and Washington D.C., with such parties involving hundreds of

---

[6] Two employees also reported working catering events when assigned to the Manhattan location, although this may have been in connection with events operated principally out of the Flushing restaurant. (See Tr. 158-59; H. Kim Decl. ¶ 6).

6

guests and as many as fifteen employees of the restaurant. (H. Kim Decl. ¶¶ 10, 14; C. Park Decl. ¶ 12; JPTO § VII at ¶ 20).[7]

During busy seasons, the restaurant would hold between 20 and 30 banquets and catering events monthly, and in the slow season perhaps fifteen such events. (C. Park Decl. ¶ 35; Tr. 158, 188; Attach. C to Pls.' Mem.). Banquets involved, on average, 150 to 200 guests, and catering events averaged about 200 guests, but could involve as many as 400 to 500 people. (C. Park Decl. ¶¶ 36-37).

Defendant Kum Gang also operated a take-out food outlet, called Janchi Janchi, which was connected to the Flushing branch. (JPTO § VII at ¶ 19). The food sold there was prepared in one of the restaurant's three kitchens (e.g. Tr. 35-36, 38)[8], and some of the plaintiffs were occasionally assigned to work at Janchi Janchi. (T. Kim Decl. ¶ 21; Choi Decl. ¶ 10; Ju Decl. ¶ 9; Tr. 123). In addition, the restaurant had a sales booth located in a Queens shopping mall, referred to as Assi Plaza. (Tr. 260, 370-71). A few

---

[7] The largest catered event described at trial was an affair in Washington, D.C. for the Korean Embassy, which approximately 500 guests attended. (Tr. 252-53).

[8] Of the other two kitchens, one served the Dining Hall and the other handled food preparation for the Banquet Room, Special Rooms and off-premises catering. (Shen Decl. ¶ 7).

7

of the plaintiffs were also occasionally assigned to work there. (See, e.g., T. Kim Decl. ¶ 20; Tr. 260). Furthermore, on a few occasions employees were required to work on their days off, going to a farm to pick vegetables, such as bok choy or cabbage. (Choi Decl. ¶ 7;Tr. 207-09; 283-85; see also Morales Decl. ¶ 12[9]).

Defendants did not maintain legitimate time records. For much of the relevant period the only system was a sign-in sheet on which the employees noted whether they were working a full shift or a half shift, but they did not record hours worked because they were being paid only on a daily basis. (Tr. 82-84, 139). Indeed, the system of daily payments was not changed to hourly wages until defendants' accountant told them that they were required to do so, a piece of advice that he assertedly provided in 2012. (Id. at 83, 118, 257, 272-73, 275; accord C. Park Decl. ¶¶ 16, 20).[10] Even then, it appears that defendants continued to pay the bussers only on a daily rate. (Morales Decl. ¶¶ 28-31 (plaintiff never received

---

[9] Mr. Morales also reported other work entirely disconnected from his work as a busser, including assisting Ji Sung Yoo's son move to a new apartment, weeding Mr. Yoo's garden, and shoveling snow. (Morales Decl. ¶ 12).

[10] There is some confusion about the timing of this switch, with some plaintiffs recalling that it occurred in 2011 or even 2010. (T. Kim Decl. ¶ 14; J. Park Decl. ¶ 19; Song Decl. ¶ 14; Tr. 121, 170-71, 236). Characteristically, defendants offer no documentation on this question.

hourly pay while working for defendants into 2014); Ventura Decl. ¶ 26 (same)).

At some point defendants installed a time card system, but it did not work most of the time. (<u>E.g.</u>, Y. Kim Decl. ¶ 12; Tr. 82-84, 118, 139-40). Moreover, it appears to have had little significance while defendants paid plaintiffs on a daily basis, which was not affected by the number of hours worked. (<u>E.g.</u>, Tr. 139-40, 240).

Strikingly, in this lawsuit defendants produced only a handful of time cards and only for a handful of the plaintiffs,[11] and the cards cover only a few weeks scattered mostly in 2006 and 2008 and frequently list only the employee's start time <u>or</u> his departure time. (<u>See</u> Defs.' Exs. Q & R). Indeed, most of what defendants have alluded to as time records were created after the fact and simply invented by them under the direct supervision of defendant Kyung Le

---

[11] In the list of defendants' relevant exhibits, they describe the provided time cards as belonging solely to plaintiffs Tae Kim and Chul Park. At trial, defendants' counsel clarified that these exhibits also included time cards for Hong Kim and Jin Park. (Tr. 362). A perusal of the documents reveals that defendants' Exhibit R also includes time cards for plaintiffs Ju and Yoon Kim, although the two "time cards" provided for Mr. Ju are mostly handwritten. (<u>See</u> <u>also</u> Pls.' Mem. 16 n. 8). For testimony at trial surrounding a series of excuses provided by defendants for the dearth of time cards, <u>see</u> Tr. 360-68.

Yoo in an effort to forestall a Labor Department investigation of non-payment of overtime at the Manhattan restaurant. (See Song Decl. ¶ 23; Tr. 237-40, 398-400 (false time records were created for the period 2007 to 2010); see also Morales Decl. ¶ 40). That investigation was conducted in 2010 and 2011, and ended with findings of extensive underpayments of required wages and imposition of substantial reimbursement and penalties. (Pls.' Ex. 40).[12]

It was not until 2011 or 2012 that the Flushing restaurant installed a different system, utilizing fingerprint technology, but according to the defendants' accountant, it was not a reliable system. (Tr. 21, 280-81). At about the same time, defendants also shifted to an hourly wage system and utilized an Excel spreadsheet program to calculate wages due based on hours purportedly worked by the employees. (Tr. 271-75, 278-81).

---

[12] That proceeding named defendant Ji Sung Yoo and the related corporation Kum Kang, Inc., referred to also as "T/A KumGangSan". (Pls.' Ex. 40 at 1). As noted, it apparently concerned violations at the Manhattan restaurant. (See id. (citing address as 49 West 32nd Street in Manhattan); J. Yoo Decl. ¶ 4 (confirming address of Manhattan restaurant as 49 West 32nd Street)). We note that the findings and proposed relief reflected in Pls. Ex. 40 were on appeal during the pendency of this case, but the New York State Industrial Board of Appeals has since upheld that decision. See State of New York Ind. Bd. of App., Resolution of Decision, Dkt. No. PR 11-174, at http://labor.ny.gov/iba/decisions/pdf/pr-11-174.pdf.

The hours actually worked by plaintiffs are best estimated based on their credible testimony. In general terms the employees were required to work twelve-hour shifts, starting at either 10:30 a.m. or 10:30 p.m., with variable breaks that ranged -- depending on the employee's assignment that day in the restaurant, and other circumstances -- from zero to two and one-half hours (see, e.g., Y. Kim Decl. ¶¶ 6-9; T. Kim Decl. ¶¶ 9-10; J. Park Decl. ¶ 15; H. Kim Decl. ¶¶ 11-12; Tr. 16, 34, 131, 155, 186, 232, 385), and more recently, probably in 2011, to as much as three to four hours. (See, e.g., Tr. 386-88; 396-98).[13] With some frequency, servers and bussers in the Dining Halls of the two restaurants, and particularly in the Flushing Banquet Room and Special Rooms, were required to work more than twelve hours at a stretch. (See, e.g., T. Kim Decl. ¶ 11; Ju Decl. ¶ 12; Song Decl. ¶ 8). Moreover, when

---

[13] There is some disagreement in the testimony of the plaintiffs as to when the defendants switched to an eight-hour shift. Most say 2011 (e.g., T. Kim Decl. ¶ 10; J. Park Decl. ¶ 15; Song Decl. ¶ 12), which appears to have coincided with the change to an hourly pay rate of $5.00 and a three-to-four hour break between two four-hour work segments. (See, e.g., Tr. 122, 157, 170-71, 236, 272). We note that several plaintiffs stated that the switch to hourly pay occurred in either 2010 or 2012. (See, e.g., Y. Kim Decl. ¶ 15 [2010]; J. Park Decl. ¶ 19 [2010]; C. Park Decl. ¶ 16 [2012]; see also Tr. 272-73 [2012]). Still, we infer that these changes did not occur until sometime in 2011, after the issuance of the most recent findings of Labor Law violations by the New York State Department of Labor. (Pls. Ex. 40). This assumption as to timing is shared by plaintiffs, as reflected in their damages calculations. (Pls.' Damages St. at 4-5).

the restaurant handled off-premises catered events, the employees who traveled to those affairs had to put in far more than twelve hours, including travel to and from the site, set-ups, service and packing up. (Ju Decl. ¶ 14; H. Kim Decl. ¶¶ 13-14; T. Kim Decl. ¶ 12). In addition, some employees who remained at the restaurant on the day of such events waited until the catering workers returned and then helped them to clean and put away supplies and equipment, a process that often lasted well into the morning hours. (Ju Decl. ¶ 13; T. Kim Decl. ¶ 11).

Plaintiffs were paid a daily rather than hourly wage until at least 2011 (J. Park Decl. ¶ 18; T. Kim Decl. ¶ 10), and the bussers remained on daily rates until they left the job in 2014. (Morales Decl. ¶¶ 4, 23; Ventura Decl. ¶¶ 4, 19). Daily rates of pay ranged from $25.00 (e.g., H. Kim Decl. ¶ 16; J. Park Decl. ¶ 19) to $65.00 per day, depending on the employee's job assignment and length of service.[14] (E.g., Ventura Decl. ¶ 23). When the defendants switched to an hourly rate, it was set at $5.00. (E.g., T. Kim Decl. ¶¶ 13-14; C. Park Decl. ¶¶ 16-20; Song Decl. ¶¶ 13-14; J. Park Decl. ¶¶ 18-19).

---

[14] One plaintiff, a cook, reported that he was paid on a weekly basis. (Shen Decl. ¶¶ 13-25).

B. <u>The Plaintiffs' Account of Working Conditions</u>

The eleven remaining plaintiffs each testified at trial. Their testimony about working conditions and compensation was generally quite consistent and very credible, and was not meaningfully contradicted by defendants.[15]

1. <u>Tae Kim</u>

Mr. Tae Kim worked at the Flushing location throughout his more than thirteen-year employment by defendants, a relationship that began in March 1999 and ended on June 17, 2012. (T. Kim Decl. ¶ 3; Tr. 93, 119). For a period of about seven years, ending in 2006, he worked as a waiter in the Dining Hall. (<u>Id.</u> at ¶¶ 5-6). He was promoted to Captain there in 2006, leading to his supervising two or three waiters in one of the seven sections of the Dining Hall. (T. Kim Decl. ¶¶ 5-6; Tr. 95). He remained in that position until 2009, when he was promoted to Head Captain. (T. Kim Decl. ¶

---

[15] We assess separately the testimony of defendants Ji Song Yoo, Kyung Le Yoo and Chunsik Yu. None of what they say directly addresses, much less contradicts, the specific testimony of the plaintiffs as to their hours, their pay and the practices of management in dealing with the tip pools. <u>See</u> <u>infra</u> pp. 58-66.

6).[16] In 2010 he was switched to the Banquet Room, where he worked as a waiter until mid-2011. (Id. at ¶¶ 5-6). At that time he was switched back to the Dining Hall, where he again served as a Head Captain, but he also was required to work on catering events. (Id.; Tr. 115). Throughout his time with the restaurant, he was also required on occasion to work in the Special Rooms, which were used for private parties. (T. Kim Decl. ¶ 8; Tr. 113).

As for Mr. Kim's work schedule, the standard shift for all employees was twelve hours, in Mr. Kim's case from 10:30 a.m. to 10:30 p.m., with work usually required six days per week, Monday being his off-day. (Kim Decl. ¶ 9; Tr. 114).[17] The principal exception was in the case of major holidays, in which event he was required to work seven days a week. (Kim Decl. ¶ 9; see also Tr. 104-05). In addition, about 90 percent of the time on Fridays and Saturdays he was required to work an additional 30 minutes to one hour, a pattern that ended only in 2009, when business slowed

---

[16] During the trial, Mr. Kim at first appeared confused about whether or when he was promoted to Head Captain. (See Tr. 99-100). However, he eventually confirmed that he had obtained this position in 2009. (Id. at 100).

[17] Mr. Kim noted that the Dining Hall was divided into seven sections and that in several of those sections the official work week was five days, but he testified that waiters rotated weekly from section to section and that the norm was a six-day work week. (Tr. 103-05).

somewhat. (Kim. Decl. ¶ 9; see also Tr. 104). According to Mr. Kim, in the Spring of 2011 defendants shifted to an hourly pay system from their prior daily-pay practice, and in the course of that alteration they also reduced Mr. Kim's daily shift to eight hours. (Kim Decl. ¶ 10; Tr. 397).

During the workdays in the Dining Hall, until 2007 Mr. Kim received a break that officially was to last two and one-half hours, although the break often was shorter. (T. Kim Decl. ¶ 10). Starting in 2007, the break was reduced to one and one-quarter hours. (Id.). Moreover, throughout his tenure at the restaurant, the break was only one hour on Fridays, Saturdays, and Sundays. (Id.).

As for Mr. Kim's work in the Banquet Room, although his official start time was 10:30 a.m., in the case of large parties he would start sometime between 9 a.m. and 10 a.m. and would often have a break of only 30 minutes. (Id. at ¶ 11; see also Tr. 104). When working on banquets or catering events, he would have no set end to his shift. (T. Kim Decl. ¶ 11; Tr. 117-18). Indeed, for catering events, his workday would usually not end until after midnight. (T. Kim Decl. ¶¶ 11-12). Sometimes it ended a little earlier, between 11 p.m. and midnight, and other times it extended

until the early morning, reflecting a shift of up to 18 hours. (T. Kim. Decl. ¶¶ 11-12; see also Tr. 117).

When Mr. Kim was assigned to the Banquet Room, during the busy seasons -- identified as mid-March to early June and mid-September to early November -- there would usually be five to six banquets or catering events per week that he was required to cover. (T. Kim Decl. ¶ 11).[18] In the slower seasons, there would typically be two or three. (Kim Decl. ¶ 11). Additionally, even when not specifically assigned to the Banquet Hall, Mr. Kim was repeatedly called upon to work a banquet or catering event if the restaurant was particularly busy or the staff shorthanded. (Tr. 104, 114-15).

As for Mr. Kim's wages, when he started work at the restaurant in 1999, he was paid $25.00 per day. (T. Kim Decl. ¶ 14; Tr. 119). In 2002 or early 2003 he was raised to $30.00 a day. (T. Kim Decl.

---

[18] There are somewhat contradictory impressions as to when the "busy seasons" took place. (Compare T. Kim. Decl. ¶ 11 (mid-March to early June and mid-September to early November); C. Park Decl. ¶ 10 (same) H. Kim Decl. ¶ 6 (same) with H. Kim Decl. ¶ 11 (describing another busy time "at graduation time and again during the month long holiday season at the end of the year"); Ju Decl. ¶ 10 (October to December and May to July); Tr. 72 (plaintiff Morales describing the busy season as taking place "[s]ometimes in the summer or December"); Tr. 231 (plaintiff Song describing the busy season as surrounding holidays such as "Christmas, New Years, Valentines Day, Mothers Day, Fathers Day, Independence Day, [and] more importantly, Korean holidays")).

16

¶ 14). In 2006, when he was promoted to Captain, his daily pay was increased to $50.00. (Id.; Tr. 120). Then, in 2008 he received a $5.00 increase, to $55.00. (T. Kim Decl. ¶ 14; Tr. 120-21). In 2010, when he was sent to the Banquet Room, his pay was reduced to $50.00. (Id.). In 2011, when the restaurant converted to hourly pay, he was compensated at a rate of $5.00 per hour. (T. Kim Decl. ¶¶ 13-14; Tr. 121-22).[19]

Plaintiff was a tipped employee, but the defendants failed to justify paying him at tipped pay rates. First, Mr. Kim testified that the cashier subtracted 8.25 percent of the credit-card tip pool from the Dining Hall, and these monies apparently went to the restaurant management. (T. Kim Decl. ¶ 15; Tr. 107-08). Second, some of the tip pool from the Dining Hall -- totaling $35.00 per day -- was diverted to the so-called "panchan lady" or "panchan worker", a kitchen employee who prepared side dishes for the customers and "to-go boxes", but who worked only in the kitchen and was thus not a tipped employee. (T. Kim Decl. ¶ 17; Tr. 121-22). Similarly, eight percent of the pooled tips from the Banquet Room

---

[19] At trial, while Mr. Kim did testify to the $5.00 per hour figure for 2011 and on (Tr. 121-22) -- which is confirmed by the information provided in his declaration (see T. Kim Decl. ¶ 14) -- he earlier suggested that, when his employment was terminated in 2012, he was earning $50 per day (Tr. 119), presumably implying a ten-hour workday.

was diverted to the banquet kitchen staff. (T. Kim Decl. ¶ 18; Tr. 122-23). Third, until at least 2010, Mr. Kim was not advised of any of his rights under the applicable labor laws, or about the intention of the defendants to pay him a lower wage as a tipped employee, and he never saw a poster with a notice of rights in the restaurant. (T. Kim. Decl. ¶¶ 19, 25). Fourth, he was never given a wage statement by his employers (T. Kim Decl. ¶ 23), which would have told him how much defendants calculated his tips to be and thus how they calculated a tip credit.

Apart from his regular work routines, Mr. Kim mentioned that he was required once or twice a month to work at Janchi Janchi for one and one-half to two hours during his break time. (T. Kim Decl. ¶ 21; see also Tr. 123-24). On one occasion, in March 2012, he was assigned to work at the restaurant outlet at Assi Plaza for eight hours for which he was not paid. (Kim Decl. ¶ 20).[20]

---

[20] Mr. Kim also mentioned that he was pressured by senior management (specifically by defendant Chunsik Yoo) to pay for food for the staff at on-site Sunday religious services organized by management, which staff were strongly encouraged to attend. He reports that he spent between $120.00 and $150.00 for this purpose on three or four occasions. (T. Kim Decl. ¶ 22; Tr. 95-96). A number of other plaintiffs echoed this testimony, stating that they felt coerced into agreeing to participate and make payments. (E.g., Ju Decl. ¶ 24; H. Kim Decl. ¶ 22; C. Park Decl. ¶ 29; Shen Decl. ¶ 27). Nonetheless, plaintiffs are not pursuing relief for this conduct by management (Pls.' Damages St. at 6), and in fact it is not at all clear that plaintiffs were coerced

2. <u>Young Mi Choi</u>

Ms. Young Mi Choi worked at the Flushing restaurant as a waitress from March 2006 to August 2010. (Choi Decl. ¶ 5; Tr. 207). Although originally hired to work in a kimchi "plant" located in the basement of the restaurant[21], within three months she was put to work waiting tables. (Tr. 210-11). Throughout her time at the restaurant, she was assigned to the Dining Hall, but occasionally worked as well in the Banquet Room as needed. (Choi Decl. ¶ 9; Tr. 212). In addition, she would sometimes -- she estimates once every five months -- substitute for the panchan worker in the kitchen, preparing side dishes and take-out boxes. (Choi Decl. ¶ 9; Tr. 212-15). She also was sometimes required to work at Janchi Janchi for a portion of her shift. (Choi Decl. ¶ 10; Tr. 213-14).

She usually worked either five or six days a week. (Choi Decl. ¶ 11; Tr. 215). She estimates that she had to work six days once every four weeks, as well as when she was performing panchan-worker duties, which she stated took place about once every five months.

---

into participation in these activities. (<u>See</u> Tr. 48-49).

[21] The kimchi operation was apparently owned by defendant Kum Gang Inc., and was devoted to preparing kimchi for use in the restaurant. (Tr. 210-11).

(Choi Decl. ¶¶ 11-13; Tr. 215). Approximately every seven weeks she was compelled to work a seven-day week, and also did so when the restaurant was short-staffed or particularly busy. (Choi Decl. ¶ 13; Tr. 215). Her shifts ran from 10:30 a.m. to 10:30 p.m., but she would have to work an additional hour once a week -- on weekends -- when the restaurant was very busy. (Choi Decl. ¶ 14; Tr. 215). She had a single break of approximately one and one-half hours, although it was sometimes shortened to less than an hour during busy days. (Choi Decl. ¶ 15; Tr. 216). She reported that when the time-card system was working, she would punch in her hours. (Choi Decl. ¶ 16; Tr. 216).

As for plaintiff's pay, it was solely on a daily basis. (Choi Decl. ¶ 17). At the start she received $30.00 per day. (Choi Decl. ¶ 18; Tr. 217). In May 2007 she was raised to $35.00 daily, and her pay remained at that level until she quit. (Choi Decl. ¶¶ 18; Tr. 217-18). She reiterates Mr. Kim's report that the management deducted a portion of the Dining Hall credit-card tip pool, which she estimates as 10 percent of the pool. (Choi Decl. ¶ 20).[22] When

---

[22] Shedding some light on this issue, plaintiff Yoon Kim explained as follows:

During the night shift there was no cashier so the waiters, including me, always swiped the credit cards for customers. I would take the tips from the cash register, leaving 9 to

she complained to the manager, he told her -- obviously falsely -- that the deduction was "a tax" and invited her to quit if she did not wish to acquiesce. (Id.). She also testified that a portion of the Dining Hall tip pool was allocated to the panchan worker even though that kitchen employee never dealt with customers. (Choi Decl. ¶ 22; Tr. 220). Thus, when she substituted for the panchan worker, she would receive $40.00[23] from one of the Dining Hall tip pools. (Tr. 220).[24]

Plaintiff also noted that she was never advised by management that the restaurant was paying her a lesser wage based on her receiving tips. (Choi Decl. ¶ 23). Defendants also did not advise her that the restaurant's invasion of the tip pool would entitle her to an undiminished minimum wage. (Choi Decl. ¶¶ 23, 26). She further reports that she never saw a posted notice about her rights under the law to receive a minimum wage and overtime and never

---

10 percent for the Restaurant. This was the way it was done since the time I started on night shifts.

(Y. Kim Decl. ¶ 16; see also Tr. 142-43).

[23] According to Mr. Tae Kim, the panchan worker received $35.00 per day. (T. Kim Decl. ¶ 17; Tr. 121-22).

[24] As both Ms. Choi and Mr. Kim testified, there were separate tip pools for each of the seven sections in the Dining Hall. (Tr. 106-07, 220). The payment to the panchan worker came from the tip pool of one of the sections, identified by Ms. Choi as section B, at least in certain circumstances. (Tr. 220).

21

received a wage statement. (Choi Decl. ¶¶ 25-27).

According to plaintiff, in August 2010 she was ordered to go to a farm on her day off to harvest bok choy or cabbage for the restaurant. (Choi Decl. ¶ 7; Tr. 207-09). She refused to do so and was suspended for a month by order of the owner, defendant Ji Sung Yoo. (Choi Decl. ¶ 7; Tr. 207). Upset with that sanction, she quit her job. (Choi Decl. ¶ 7; Tr. 207).

### 3. Dong M. Ju

Plaintiff Dong M. Ju worked as a waiter, and then as a Captain, at the Flushing restaurant, from November 2005 until July 2010. (Ju. Decl. ¶¶ 4, 7, 10; Tr. 283, 288).[25] During this time he had two five-day paid vacations, one in 2006 and one in 2007, and two unpaid five-day vacations, one in 2008 and the other in 2009. (Ju Decl. ¶ 4). His employment ended in similar fashion to that of Ms. Choi, as he was ordered to go to a cabbage farm on his day off -- apparently at the same time as she was -- and he also declined to do so, resulting in a six-week unpaid suspension. (Tr. 283-85).

---

[25] We note that the transcript of Mr. Ju's testimony at trial is labeled both as that of plaintiff "Ju" and, incorrectly, that of "D. M. Tu." (Tr. 290-97).

He then quit his position. (Id.).

During his tenure, he worked mainly in the Dining Hall, first as a waiter and then, apparently beginning in late 2007, as a Captain. (Ju Decl. ¶¶ 4, 7; Tr. 287-89). He also worked as a waiter approximately once per month in the Special Rooms, and during a four-month period from March to July 2006 he worked there continuously. (Ju Decl. ¶ 7; Tr. 290). As for the Banquet Room, he worked there between two and six times a year. (Ju Decl. ¶ 7; Tr. 290-91).

When working in the Dining Hall, his shift was from 10:30 a.m. to 10:30 p.m. (Ju Decl. ¶ 11; Tr. 295-296). He usually took a brief, 15-to-20 minute lunch break and an afternoon break that was commonly one and one-half hours. (Ju Decl. ¶ 11; Tr. 295-97). He typically worked six days a week during the busy seasons (October to December and May to July), and five days a week at other times. (Ju Decl. ¶¶ 10-11). He usually worked all three weekend days -- that is, Friday to Sunday -- but for two weeks out of seven he worked only one weekend day. (Id. at ¶ 10).

When plaintiff was assigned to the Special Rooms, his shift normally lasted longer than twelve hours, since he was required to

23

remain there until the customers had left. (Id. at ¶ 12) Thus, his day in the Special Rooms usually ended only around midnight and sometimes did not end until 1:00 or 2:00 a.m. (Id.). If he worked past 10:30, he would be paid an additional $5.00 for each later hour. (Id.). As for breaks in the Special Rooms, he usually got one and one-half hours each weekday and no breaks on the weekends. (Id.).

On the occasions when Mr. Ju worked in the Banquet Room -- typically if there were two or more parties and the Banquet staff was shorthanded --  he would start work between 8:00 and 9:00 a.m. and leave at midnight or 1:00 a.m. (Id. at ¶ 13). If a catering event was being held off-site and Mr. Ju was working in the Banquet Room, he would have to wait to leave until as late as 3:00 a.m., to help the catering team unload their equipment and clean up. (Id.). During his Banquet Room assignments, there were no specified break times, and often he had no break other than for a cigarette. (Id.) Most commonly, he would have a break of 30 minutes each for lunch and dinner. (Id.).

Mr. Ju worked on off-site catering events one to three times a year, either in New York or in New Jersey. (Id. at ¶ 8; Tr. 292). On those occasions he would start at 8:00 or 9:00 a.m. loading the

food, and the day could last up to 18 hours. (Ju Decl. ¶ 14).  He
would usually get only a 30-minute lunch break, and would not
finish his work back at the restaurant until 2:00 or 3:00 a.m.
(Id.).

In addition to these other assignments, plaintiff worked for
a month at Janchi Janchi, making tofu. In that period he worked the
night shift, from 10:00 p.m. to 10:00 a.m. (Ju Decl. ¶ 9; Tr. 293).

When Mr. Ju started work as a waiter, his pay was $30.00 a
day. In mid-2006 it was raised to $35.00. When he was promoted to
Captain in 2007, his compensation rose to $55.00 and remained at
that level until his departure. (Ju Decl. ¶¶ 15-16; Tr. 286-87).

Like the other plaintiffs, Mr. Ju reports that the restaurant
deducted a portion of the tip pool for waiters in the Dining Hall
insofar as it was derived from credit-card payments. He learned of
this practice because he was responsible for obtaining from the
cashier the credit card tips for his section. He estimates the
deduction as about nine percent. (Ju Decl. ¶¶ 17-18; see also Tr.
294-95). He also confirmed that portions of the tip pool were
distributed to non-tipped employees. Specifically, he confirms that
$40.00 a day from the Dining Hall tip pools was paid to the panchan

worker, and that, at the direction of the Captains, five to seven percent of the Banquet Room tip pool was shared with staff who worked in the banquet kitchen. (Ju Decl. ¶¶ 20, 22; Tr. 294). He reported, consistently with other witnesses, that management never told him that the restaurant was taking a tip credit or that its invasion of the tip pool disqualified it from lawfully doing so. (Ju Decl. ¶ 23).

Plaintiff reports that he never received a wage statement, and that he never saw a poster advising of the employees' wage-and-hour legal rights until one was placed on each of the two refrigerators in the Dining Hall kitchen.[26] (Id. at ¶¶ 25-26). He goes on to note,

---

[26] Mr. Ju estimated that the posters appeared in 2008 (Ju Decl. ¶ 26), but the testimony of other plaintiffs dates their appearance in 2011 or possibly 2010. (Ventura Decl. ¶ 30 (no poster till 2011); J. Park Decl. ¶ 31; Choi Decl. ¶ 27 (no posters as of when she left in August 2010); Morales Decl. ¶ 36 (first poster in 2011); Shen Decl. ¶ 30 (first poster "[a]fter a Department of Labor investigation," presumably in 2011); Y. Kim Decl. ¶ 21 (first saw poster in 2010); C. Park Decl. ¶ 32 (never saw poster; left in 2012); T. Kim Decl. ¶ 25 (same)). The dating of the posting of this information in 2011 -- consistent with the predominant testimony -- appears more credible, as it coincides with the end of a Labor Department investigation. In any event, the posters were not in Korean (Shen Decl. ¶ 30; Song Decl. ¶ 22; J. Park ¶ 31), the only language in which all but two of the plaintiffs were literate. (C. Park Decl. ¶ 3; Choi Decl. ¶¶ 2, 4; H. Kim Decl. ¶¶ 1, 3; J. Park Decl. ¶¶ 2, 4; Ju Decl. ¶¶ 1, 3; Shen Decl. ¶¶ 2, 4; Song Decl. ¶ 2; T. Kim Decl. ¶ 2; Y. Kim Decl. ¶¶ 2-3). As for the remaining two, they spoke and read Spanish, and whatever posters were seen were apparently in English. (Morales Decl. ¶¶ 1, 36 (adding that, in August 2013,

however, that the posters were in English, which he could not readily read, although he apparently understood that they contained a reference to a minimum wage. (Id. at ¶ 26). He also noted, without contradiction, that the area in which the posters were placed was not generally accessed by the wait staff, and that no notices were placed on the bulletin board routinely used by the restaurant management to communicate with staff. (Id.). He also observed that no Korean-language posters were ever installed anywhere. (Id.).

### 4. Hong Sik Kim

Hong Sik Kim worked as a waiter, and then a Captain, starting in June or July 2001 and ending in about March 2009. (H. Kim Decl. ¶ 5; Tr. 177). He first worked at the Manhattan site, which has only a Dining Hall, and no Special Rooms or Banquet Room. (H. Kim Decl. ¶¶ 5-6; Tr. 177). Mr. Kim initially worked there from June 2001 to early 2003. (H. Kim Decl. ¶ 6; Tr. 177-78). While there, he also was required on occasion to work in the Flushing Banquet Room and on off-site catering events. (H. Kim Decl. ¶ 6). The frequency of these non-Manhattan assignments varied between the

Spanish-language posters were put up); Ventura Decl. ¶¶ 1, 30 (same)).

busy seasons and quieter times. (H. Kim Decl. ¶ 6; see also Tr. 186-87). During busy seasons (mid-March to early June and mid-September to early November), he would work in the Flushing Banquet Room or doing catered events about three or four times a month; in the slower periods such assignments were made only once or twice a month. (H. Kim ¶ 6).

When Mr. Kim shifted to the Flushing restaurant in 2003, he worked principally in the Dining Hall. He would still be reassigned to the Banquet Room or to catering with the same frequency as when he had worked at the Manhattan location. (H. Kim Decl. ¶ 7; Tr. 182, 186-87).

In April or May 2005 Mr. Kim was reassigned back to the Manhattan restaurant, where he continued to work until 2009. (H. Kim Decl. ¶ 8; Tr. 177). Upon his return to the Manhattan location -- that is, in 2005 -- he was promoted to Captain. (H. Kim Decl. ¶ 9; Tr. 182). He continued to help out at the Flushing Banquet Room and on catering events, with those assignments continuing at the same pace as in the past. (H. Kim. Decl. ¶ 8).

At both the Manhattan and the Flushing locations, Mr. Kim's official shift when he was in the Dining Hall was from 10:30 a.m.

to 10:30 p.m. (H. Kim Decl. ¶ 11; Tr. 184), but he would work another half hour to an hour during graduation time in June, during the end-of-the-year holiday season and whenever the restaurant was busy, which was usually on weekends. (H. Kim Decl. ¶ 11; Tr. 194-95). Although he had an official one and one-half hour break (H. Kim Decl. ¶ 12; Tr. 185-86), that interval was shortened during busy times, particularly on weekends. (H. Kim Decl. ¶ 12). If the restaurant was not busy, this break -- which served as Mr. Kim's meal time -- was slightly lengthened. (Tr. 185).

When plaintiff worked in the Banquet Room -- which occurred perhaps three to four times a month (H. Kim Decl. ¶ 6; Tr. 187) -- work usually started by 10:00 a.m. and sometimes by 9:30 a.m., with breaks of an hour to an hour and one-half. (H. Kim Decl. ¶ 13; Tr. 186). There were no set end times to these shifts, and the timing depended on how long the event lasted, since the staff was required to clean up after the guests had left. (H. Kim Decl. ¶ 13; Tr. 186). If he worked in the Banquet Room on a given day and there was also an off-site catering event, the Banquet Room staff waited for the return of the catering crew to assist in unloading the trucks, and in those instances the shift often did not end until 3:00 a.m.. (H. Kim Decl. ¶ 13).

Mr. Kim faced a similar schedule when assigned to a catering event, which occurred 20 to 25 times a year. (H. Kim Decl. ¶ 14; Tr. 188). Those events -- which he covered both in New York and as far away as Boston and Philadelphia (H. Kim Decl. ¶ 10; Tr. 188) -- were typically very large, usually involving service of more than 200 guests. (H. Kim Decl. ¶ 14). In those instances the shift could last more than 18 hours, since the workers had to start early in the morning to load food and equipment, reload after the event, travel back from the site of the event and unload and clean up. (H. Kim Decl. ¶ 14; Tr. 188-89).

Mr. Kim usually worked five or six days a week, but from 2001 to 2003 he would work a full seven-day work week for one or two months each year. (H. Kim Decl. ¶ 11; Tr. 184-85). On average he worked about six days a week. (Tr. 185).

As for his pay, he received $25.00 a day from 2001 to mid-2002, when he was raised to $30.00. In March 2003, when he was reassigned to Flushing, his pay was increased to $35.00. About one year later it went up to $40.00. In 2005, when he was promoted to Captain, he received a raise to $50.00, and that remained his compensation until he left in 2009. (H. Kim ¶¶ 15-16; Tr. 190-92).

Mr. Kim confirmed that the restaurant diverted a portion of the Dining Hall tip pools derived from credit-card payments. He estimated the diversion as 8.5 percent of the gross. He based that testimony on his personal experience in bringing the tip pool from his section to the cashier, who deducted that percentage and then gave him cash for the remainder. (H. Kim Decl. ¶ 17; Tr. 193). He also reiterated the testimony of other plaintiffs to the effect that a portion of the Dining Hall tip pool was directed to the panchan worker, whose work was confined to the kitchen. (H. Kim Decl. ¶ 19). In addition he recounted that when he worked in the Banquet Room, eight percent of the tip pool was distributed to the staff in the kitchen that serviced the Banquet Room. (H. Kim Decl. ¶ 20).

Mr. Kim was never told by management that it was paying him a reduced wage to account for his receiving tips. Defendants also never posted information about employees' rights under the pertinent labor laws and never distributed to him any wage statement. (H. Kim Decl. ¶¶ 21, 24; see also Tr. 191).

5. Yoon C. Kim

Plaintiff Yoon C. Kim worked as a waiter in the Flushing

restaurant during two periods. The first spanned early 1997 to November 2000. The second began in the Spring of 2005 and lasted through August 2010. He worked the day shift during the first period, and the night shift on his second go-round with the restaurant. (Y. Kim Decl. ¶ 4; Tr. 132, 135-36).

On the day shift he worked from 10:30 a.m. to 10:30 p.m. either five or six days a week. During that time he worked exclusively in the Dining Hall except for a period of three or four months when he worked in the Special Rooms. (Y. Kim Decl. ¶¶ 5-6; Tr. 135, 138-39). He estimated that during the day shift he worked five days about half the time and otherwise worked six days per week. (Y. Kim Decl. ¶ 6; Tr. 135). He also observed that on busy days -- particularly on weekends -- he ended up working as late as 12:30 a.m. (Tr. 135). He reported that he had breaks of between one and one-half and two hours (Y. Kim Decl. ¶ 7; Tr. 136-37), though his meal break generally lasted only twenty minutes. (Y. Kim Decl. ¶ 7; Tr. 137).

When he was on the night shift, he worked six days a week. He would have a full shift -- from 10:30 p.m. to 10:30 a.m. -- half the time, and the rest of the time he worked a half shift. The half shift would normally end at 3:00 a.m., but he sometimes had to work

later. If he worked a full shift, he took a break of two and one-half hours, but on a half shift he took no break. (Y. Kim ¶¶ 8-9; Tr. 137-38).

He reports that three to four months before he left the restaurant -- presumably in the Spring of 2010 -- management switched to an hourly pay-rate system. (Y. Kim ¶ 10).[27] From then until his departure about four months later, he worked five and one-half days a week, amounting to approximately 48 hours each week. (Id.). Thus, five times a week he worked from 12:30 a.m. to 10:30 a.m., and on Sunday he worked a half shift, usually from midnight to 4:30 a.m. and sometimes from 6:00 p.m. to 12:30 a.m. During this period, as before, he received a two and one-half hour break on full shifts and none on half shifts. (Id. at ¶¶ 10-11).

Until the change to hourly pay, Mr. Kim kept track of his full and half shifts, but not the specific hours that he worked. He

---

[27] As noted, see supra p. 11 n.13, the testimony of a number of other witnesses was that this change was made in 2011, a date that seems more plausible since it postdates the Department of Labor investigation that triggered findings of widespread violations by defendants. (See Pls.' Ex. 40; Y. Kim Decl. ¶ 13). Defendants' accountant offered still another time frame, testifying that he had alerted defendants to the requirement of hourly pay in 2012, and that they made the switch at that time. (Tr. 272-73). The 2011 date seems most plausible.

notes that during his first stint with defendants, they had no time-card system. They installed one during his second tour with the restaurant, but it rarely worked. (Y. Kim Decl. ¶ 12; Tr. 139-40). After the switch to per-hour pay -- which apparently was instituted following a Labor Department investigation -- he did keep track of his hours. (Y. Kim Decl. ¶¶ 12-13).

As for Mr. Kim's pay, he received $35.00 a day when he worked the day shift. On the night shift, he received $50.00 per day for the first year and then was raised to approximately $55.00.[28] (Y. Kim Decl. ¶¶ 14-15; Tr. 141-42). After the shift to hourly pay, his effective compensation was reduced to about $50.00 a day. (Y. Kim Decl. ¶ 15).

As for tip income, Mr. Kim reported that during the night shift, 9 to 10 percent of credit card tips was allocated to the restaurant. He explains that this had been restaurant practice since before he started work there. (Y. Kim Decl. ¶ 16; Tr. 142-43). Similarly, on the day shift about $200.00 of the weekly tip pool was allocated to the panchan worker even though she had no

---

[28] In Mr. Kim's declaration, he attests to having receiving "approximately $55 to $60 per day" during this period; however, at trial, he stated that he never received $60. (Compare Y. Kim Decl. ¶ 15 and Tr. 141-42).

contact with customers. (Y. Kim Decl. ¶ 17). He also observed what other plaintiffs have confirmed -- that the Banquet Hall tip pool was shared with the banquet kitchen chef. (Id. at ¶ 19).[29]

As was the case with other plaintiffs, Mr. Kim confirmed that no one in management told him that the restaurant was paying him a lower wage because of his tip income or that the sharing of the wait-staff tips with the restaurant triggered his right to an undiminished minimum wage. (Id. at ¶ 20). Until 2010 he never saw any poster to inform staff of their rights under the labor laws. Sometime in 2010 he saw the arrival in the mail of such a poster -- apparently as a result of a Department of Labor inspection -- but management did not promptly put it on the wall. Shortly before he left at the end of August 2010, he saw several posters attached to a refrigerator in the kitchen. (Id. at ¶¶ 21-22). Since plaintiff is not fluent in English (id. at ¶¶ 2-3), it appears that he could not understand them since they were in English. (See, e.g., H. Kim

---

[29] There is some discrepancy in the plaintiffs' testimony as to who in the banquet kitchen received these payments. Some of the plaintiffs reported that the tips were shared with the banquet kitchen chef (e.g., Y. Kim Decl. ¶ 19), the banquet kitchen staff (e.g., T. Kim Decl. ¶ 18; Ju Decl. ¶ 22; H. Kim Decl. ¶ 20), or both. (E.g., C. Park Decl. ¶ 24; J. Park Decl. ¶ 22). Likely, "kitchen staff" is inclusive of chefs. According to one plaintiff, the money was used by the banquet kitchen staff to pay for a monthly party. (Id.).

Decl. ¶ 31; Ju Decl. ¶ 26; Morales Decl. ¶ 36).

6. <u>Chul Gon Park</u>

Plaintiff Chul Gon Park worked at the Flushing restaurant from March 1997 until the end of September 2012, with the exception of one year -- 2002 -- when he was away.[30] (C. Park Decl. ¶ 4; Tr. 243-44). He did take paid one-week vacations on seven occasions through 2008, and on three occasions he was on one-week unpaid vacations. Finally, he was on unpaid one-month vacations in 2007 and 2012. (C. Park ¶ 4).

From 1997 until 2003 or 2004, he worked principally in the Dining Hall. During that time he was a waiter, and at some point he became a team leader for one of the seven sections of the Dining Hall. (C. Park Decl. ¶ 7; Tr. 245). Thereafter he worked mainly in the Banquet Room, where, at some point, he became a team leader. When assigned to the Banquet Room, he would also work in the Dining Hall if no banquets were scheduled. (C. Park Decl. ¶ 7; Tr. 245-46). In the same period Mr. Park also served as a waiter for defendants' outside catering events, which were held as far away as

---

[30] Mr. Park also helped out on a handful of occasions at the Manhattan venue. (Tr. 245).

Philadelphia, Boston and Washington D.C. (C. Park Decl. ¶ 8). From 2007 until his departure in 2012, he was the banquet and catering manager. (C. Park Decl. ¶¶ 7, 25; Tr. 248, 251, 258). At an earlier period, about ten years ago, he was also rotated into the Special Rooms approximately every three weeks for a period of six months. (C. Park Decl. ¶ 9; Tr. 245-55).

Except for a period from September 2010 to December 2011, Mr. Park worked full-time. In the Dining Hall, this involved twelve-hour shifts -- from 10:30 a.m. to 10:30 p.m. -- for five to seven days a week. During the busy seasons -- between mid-March and early June and from mid-September to early November -- he would work six-day weeks twice a month and seven-day weeks once a month. In slower times he worked mostly five days a week, but would have to work six days a week about once a month. (C. Park Decl. ¶¶ 10, 12; Tr. 253-56). On weekends -- approximately twice a month -- his shift would exceed the typical twelve-hour work day by up to an hour and a half. (Tr. 254, 262-63).[31] While working full-time in the Dining Hall, he had a one-and-one-half-hour break and a ten-minute meal break. In 2010 or 2011, when the restaurant switched to hourly wages, his breaks expanded to two and one-half to three hours. (C.

---

[31] This is echoed in other workers' declarations. (See, e.g., Choi Decl. ¶ 14; Song Decl. ¶ 8).

Park Decl. ¶ 12).

During the period of his part-time employment, he worked about eight hours on Fridays and twelve-hour shifts in the Banquet Room on Saturdays and Sundays. In addition, on weekdays he worked either one or two days for four to five hours -- without a break -- in the Dining Hall. (C. Park Decl. ¶ 11; see also Tr. 257).

When plaintiff worked in the Special Rooms ten or so years ago, he would start work at 10:30 a.m. His work day ended only after all the guests had left. On weekdays this usually meant ending at 10:30 or 11:00, but on Fridays through Sundays, he usually did not leave until 1:00 or 2:00 a.m. His break in the Special Rooms usually lasted two and one-half hours. (C. Park Decl. ¶ 13; see also Tr. 254-55).

When plaintiff worked in the Banquet Room, the restaurant held approximately twenty banquets or catering events per month during the busy season and twelve or thirteen monthly during the slow season. During that period he would always work in the Banquet Room on weekends and some weekdays. He also usually worked in the Dining Hall once a week in the busy season and two times a week in the slow season. (C. Park Decl. ¶ 14).

Plaintiff's work day in the Banquet Room was somewhat longer than elsewhere. On weekdays, he started work at 10:30 a.m. and typically ended about 11:00 p.m. or midnight. On weekends, he usually started earlier, at 9:30 or 10:00 a.m., and the work did not end until 2:00 a.m. (Id.). Also, if there was an off-site catering event, the banquet staff would often wait for the catering crew to return and thus not leave till about 3:00 a.m. This typically occurred once a month in slow seasons and five times monthly in the busy season. (Id.). As for breaks, they were usually two and one-half hours on weekdays and one and one-half hours on weekends. (Id.).

When plaintiff worked on catering events, his work day could last up to 18 hours, starting at 9:00 a.m., or even as early as 6:00 a.m., and not ending until 2:00 a.m. or even later. (C. Park Decl. ¶ 15; Tr. 252-53) He was typically involved in these events five or six times a month during the busy season and once monthly in the slow season. (C. Park Decl. ¶ 15).

Plaintiff's pay started in 1997 at $30.00 a day. In 1999 his wage was increased to $35.00. In 2000, it rose to $40.00. He did not work most of 2002, and in 2003 he was paid $45.00 daily. The next year his wage was $45.00 or $50.00. In 2005 and 2006 he was

paid $50.00 and for the years 2007 to 2010 his wage was $55.00. The next year he was raised to $60.00. In 2012 he was switched to an hourly wage of about $5.00 for work in the Dining Hall, but he continued to be paid a daily rate of $60.00 for the Banquet Room on weekends. On Fridays during that period, he worked only part of the day and was paid only $30.00. (C. Park Decl. ¶¶ 16-20; Tr. 256-58).

With regard to tips, as was testified by other plaintiffs (e.g., Tr. 193), Mr. Park credibly reported that the restaurant appropriated about 8.5 percent of the credit-card tip moneys from the Dining Hall. He observed this practice when he delivered the tip pool to the cashier for his section. He also confirmed that a portion of the tip pool from the Dining Hall was paid over to the panchan worker in the kitchen. He reports that she received about $30.00 daily Mondays through Thursday and otherwise about $45.00. (C. Park Decl. ¶¶ 21, 23; Tr. 260). In addition, he echoed the reports of other plaintiffs that the tip pool from the Banquet Room was shared with the banquet chef or a colleague. (C. Park Decl. ¶ 24; Tr. 258). He indicates his understanding -- possibly on a hearsay basis -- that these funds were used for a monthly dinner party for the kitchen staff. (C. Park Decl. ¶ 24).[32]

---

[32] Defendant Ji Sung Yoo also testified that "I remember the head chef saying that there was a collection of some tips which

As banquet and catering manager, Mr. Park was familiar with the contractual arrangements with customers. These included a standard 10 percent service charge for tipping the banquet and catering staff, though customers usually added another five percent for this purpose. (C. Park Decl. ¶ 25; see also Tr. 248, 250-51, 259).[33]

Management never advised plaintiff that the restaurant was taking a tip credit or that it could not do so if it was sharing in the tip pool. (C. Park Decl. ¶ 26). Even if he had known of his rights, he would not have complained because the restaurant punished workers who sought better conditions. (Id. at ¶ 27). He also never saw a poster in the restaurant advising employees of their labor rights, and he confirms that he never received a pay statement. (Id. at ¶¶ 31-32).

According to plaintiff, on one occasion he was required to work at Assi Plaza, but was not paid for his work. (Id. at ¶ 28; Tr. 260-61).

───────────────

the chef saved for a couple of months and the chef wanted to take the kitchen staff out for a meal with that money." (Tr. 382).

[33] At some point the restaurant increased the service charge to 15 percent. (Pls.' Ex. 7).

7. <u>Jin H. Park</u>

Plaintiff Jin H. Park worked as a waiter at the two restaurants. From August 2004 to 2007 he was assigned to the Manhattan location and from 2007 to June 2012 to the Flushing venue. The first three years in Flushing, he worked in the Banquet Room and the remainder mainly in the Dining Hall. (J. Park Decl. ¶¶ 5, 8-10; Tr. 149-51, 153-54). At both restaurants, while assigned to their Dining Halls, he worked the vast majority of the time six days a week, and for the balance his work week was five days. (J. Park Decl. ¶¶ 8-9; Tr. 152, 160-61). From 2007 to 2010, he worked mainly in the Flushing Banquet Room, and in that period his job responsibilities included dealing with potential customers who wanted to reserve space in that room. (J. Park Decl. ¶ 9; Tr. 167-69). Typically during that period, he worked four days a week on banquets and the rest of the time in the Dining Hall. (J. Park Decl. ¶ 9; Tr. 161). Generally, if there were no parties taking place in the Banquet Room, he would assist in the Dining Hall. (J. Park Decl. ¶ 9; Tr. 156). From 2010 until his employment ended in 2012, he worked principally in the Dining Hall in Flushing, with his work week usually extending to six days. (J. Park Decl. ¶ 10; Tr. 161). Plaintiff also occasionally worked in the Special Rooms. (J. Park Decl. ¶ 11; Tr. 161).

42

Apart from these assignments, Mr. Park worked on outside catering events for the defendants with some frequency. He reports that he did so between 2004 and 2007 approximately once a week most of the time, but occasionally twice a week. When he shifted to the Flushing location, he more commonly covered catering events twice a week and sometimes three times a week until 2010. Between 2010 and 2012, the frequency of these events declined somewhat, varying between once and twice a week. (J. Park Decl. ¶ 12; Tr. 158).[34]

Plaintiff's shift when assigned to either of the two Dining Halls was 10:30 a.m. to 10:30 p.m. (J. Park Decl. ¶ 15; Tr. 153, 157). During busy times, however, the shift could last as late as 12:30 a.m., which occurred about once a month on weekends. (Tr. 157, 174-75). He received a break of one and one-half hours and a ten-minute meal break. (J. Park Decl. ¶ 15; Tr. 157-58). In 2011 the Flushing restaurant switched to an eight-hour shift; from then on, he worked from 10:30 a.m. to 2:30 p.m. and from 6:00 p.m. to

---

[34] Mr. Park's testimony at trial conflicts a bit with the substance of his declaration, in that he testified that, at the Manhattan location, he worked outside catering events "[p]robably once a week," and that, at the Flushing location, he worked them "[o]nce or twice a week." (Tr. 158). Still, this minor discrepancy was unexplored during cross-examination, and his trial testimony generally accords with his declaration, in that it reflects an increased frequency in his working such events once he transferred to Flushing. (Compare J. Park Decl. ¶ 12 with Tr. 158).

10:00 p.m. (J. Park Decl. ¶ 15; Tr. 157). Although this schedule
implied a three-and-one-half-hour break, half the time he had to
work one and one-half hours during the "break". (J. Park Decl. ¶
15).

When Mr. Park worked in the Banquet Room, he usually worked
from around 10:00 a.m. until 1:00 or 2:00 a.m. (Id. at ¶ 16; Tr.
155-56). Although he sometimes had no break on this assignment (J.
Park Decl. ¶ 16; Tr. 158), usually he had two or three hours off on
weekdays and one and one-half hours on the weekend. (J. Park Decl.
¶ 16).

On catering events, the workday could exceed eighteen hours,
particularly for events requiring long-distance trips. (J. Park
Decl. ¶ 17). On these, he would start as early as 6:00 a.m. and
worked until as late as 2:00 or 3:00 a.m. (Id.; Tr. 159). Even
events as near as New Jersey required a start of 7:00 a.m. or 8:00
a.m. (J. Park Decl. ¶ 17).

Plaintiff was paid at the outset of his employment at a rate
of $25.00. Two years later he was raised to $35.00. In 2007 he was
raised to $50.00. He reports that in 2011 he was switched to an

hourly rate of $5.00. (J. Park Decl. ¶¶ 18-19; Tr. 169-71).[35]

Mr. Park reiterates what all the other plaintiffs confirm -- that the restaurant appropriated a portion of the credit-card tip pool from the Dining Hall. He estimates the amount of the restaurant's take at eight to nine percent. (J. Park Decl. ¶ 20; Tr. 174). He also echoes the reports of the other plaintiffs that the Banquet Room tip pool was shared with the banquet kitchen staff, at a rate of ten percent (J. Park Decl. ¶ 22; Tr. 173), and that a portion of the Dining Hall tip pool (after subtraction of the restaurant's share) was paid over to the panchan worker despite her role being limited to work in the kitchen. (J. Park Decl. ¶ 23; Tr. 171-72).

Like the other plaintiffs, Mr. Park reports that management never informed him of his rights under the labor laws, including the effect on his pay of his receiving a share of tips and his

---

[35] At trial, Mr. Park testified that the switch to hourly pay took place in 2011. (Tr. 170-71). In his declaration, he is slightly inconsistent, stating both that he was paid at a daily rate "until 2011 when we were given an hourly pay" (J. Park Decl. ¶ 18) and that "[i]n the beginning of 2010, when I stopped working in the Banquet Hall and moved to the Dining Hall, I received an hourly rate." (Id. at ¶ 19). Without belaboring this point, see supra pp. 11 n.13 & 33 n.27, we simply note that it is mostly likely that Mr. Park began receiving an hourly wage in 2011.

right to full minimum wage if the restaurant shared in his tips. He also never received a pay statement from the restaurant. He further reports that he never observed any aspect of the Department of Labor investigation of the defendant in 2010 or later, although at one point defendant Chunsik Yu told the restaurant employees not to tell state officials what hours they worked and their pay. (J. Park Decl. ¶¶ 26, 28-30). Later, in 2011 he saw a poster on a kitchen refrigerator but did not know what it said, since it was in English and Spanish. (Id. at ¶ 31). Moreover, no one in management directed his attention to that poster. (Id.).

On June 12, 2012 Mr. Park attended a meeting with defendant Ji Sung Yoo, who addressed the recently filed lawsuit and warned the employees that he would not pay them anything in consequence of the lawsuit. About one week later, he fired Mr. Park. (J. Park Decl. ¶ 27).

8. Eutemio Morales

Mr. Eutemio Morales worked as a busser at the Flushing restaurant starting in March 2006 and continuing until May 31, 2014, just before the start of the trial. (Morales Decl. ¶¶ 4, 6; Tr. 69). For the period from 2006 to the summer of 2009, he worked

46

in the Dining Hall, and subsequently he was assigned to the Banquet Room, where he worked until November 2013, when he was sent back to the Dining Hall. (Morales Decl. ¶¶ 6-8, 21; Tr. 69, 71). He was also required on certain days to work in the Special Rooms. (Morales Decl. ¶ 10; Tr. 77-79). As part of his job, he was also sent on about 25 occasions to service off-premises catering events. (Morales Decl. ¶ 11; Tr. 73-77). On a few occasions he was also required to perform personal services for defendant Ji Sung Yoo and his son, as well as to go to a farm to pick vegetables. (Morales Decl. ¶ 12). Additionally, Mr. Morales was also regularly asked by defendant Chunsik Yoo to perform services outside those of a busser, such as "construction tasks," cleaning the Flushing location's basement when flooded, and cleaning the Janchi Janchi location. (Id. at ¶ 42).

Plaintiff worked a six-day week until December 2012, although he occasionally worked seven days. (Id. at ¶¶ 14, 26). Subsequently, his week was shortened to four, and then five, days. (Id. at ¶¶ 15, 28-29; Tr. 79-80). In the Dining Hall his shift lasted from 10:30 a.m. to 10:30 p.m., with a one-hour break, and a twenty-minute meal break, although, starting in 2008, his break was about one and one-half hours on weekdays. (Morales Decl. ¶¶ 16-17; Tr. 81-82). In the Banquet Room, starting in the summer of 2009,

his workday began at 10:30 a.m. and on one of two weekdays he worked till 10:30 p.m. and on the other till 9:00 p.m. Occasionally his weekday shift ended as early as 6:00 p.m.. On Fridays through Sundays, he usually worked till midnight and sometimes as late as 1:30 a.m., although on two Sundays a month his day ended at 6:00 p.m. (Morales Decl. ¶ 18; Tr. 81-82).

When Mr. Morales worked at off-site catering events, his day usually started at 9:00 a.m.. If the event was within New York State, his day usually ended at midnight. If the event was outside New York, as occurred perhaps 70 percent of the time, his day would not end until at least 2:00 a.m. (Morales Decl. ¶ 19; Tr. 74-76).

When plaintiff worked in the Banquet Hall, he typically received breaks of one hour, plus a ten-minute meal break, although occasionally -- he estimated twice a month -- he received a break of as much as two hours, and occasionally -- most often on the weekends -- he had no break. (Morales Decl. ¶ 20; Tr. 82). If there were no banquet reservations and he was therefore working in the Dining Hall -- which occurred about 20 percent of the time -- he would have a break of one and one-half hours. If at an off-site event, his break was limited to 10 or 15 minutes. (Id. at ¶ 20).

In November 2013 Mr. Morales was reassigned to the Dining Hall. He worked either four or five days per week, with a shift from 10:30 a.m. to 10:30 p.m., and with a break of one and one-half hours. (<u>Id.</u> at ¶¶ 21, 30).

When he began work at the restaurant in 2006, he was paid $280 for a six-day week. In March 2007 his pay was raised to $50.00 per day, and in the summer of 2009 it was raised to $56.00 daily. (<u>Id.</u> at ¶¶ 24-26; Tr. 84). Since November 2013, when he was reassigned to the Dining Hall, his daily pay was raised to $64.00 for days when he worked past 10:30 p.m. (Morales Decl. ¶ 30).

Mr. Morales shared in the tip pool. (<u>Id.</u> at ¶ 34; Tr. 86-88). He reports, however, that management never told him that the restaurant was taking a tip credit, reducing his wage below the statutory minimum pay level, or that it was not allowed to do so if it shared in the tip pool. (Morales Decl. ¶ 35; <u>see</u> <u>also</u> Tr. 91). He was also never told by management of his rights under the labor laws, and only learned of his legal rights in 2011, when he first observed a Spanish-language poster in the restaurant, which advised that the minimum wage was $7.25 per hour. (Morales Decl. ¶¶ 36-37. <u>But</u> <u>see</u> <u>id.</u> ¶ 36 (indicating that he first saw a Spanish language poster in 2013)). He also never was given a pay statement. (<u>Id.</u> at

¶¶ 38-39).

Mr. Morales reported that the restaurant originally had a sign-in sheet for employees but that it did not list hours since the workers were paid a daily rate. Later the defendants had a time clock, but it did not always work. (Tr. 82-84).

He also stated that around 2010 -- apparently as a result of a State Labor Department investigation of the restaurant -- he was instructed by defendant Chunsik Yu to take a box of blank time cards to an apartment near the restaurant. According to plaintiff, defendant Kyung Le Yoo was at the apartment and took the box from him. At that moment he observed approximately five waiters in the apartment engaged in filling out what were plainly false time records. (Morales Decl. ¶ 40).[36]

### 9. Jong H. Song

Plaintiff Jong H. Song was a waiter at the Flushing restaurant from February 2009 until about February 2012. (Song Decl. ¶ 3; Tr.

---

[36] Mr. Morales's surmise that the waiters were creating falsified time records was confirmed at trial by the testimony of plaintiff Jong H. Song, who was one of those involved in the falsification process. (Song Decl. ¶ 23; Tr. 237-40).

227, 230). He worked exclusively in the Dining Hall. (Song Decl. ¶ 5) His shift was from 10:30 a.m. to 10:30 p.m., for five or six days per week. (Song Decl. ¶ 6; Tr. 230-31). He generally worked five-day weeks three out of every four weeks. (Song Decl. ¶ 6; Tr. 230-31). Although his shift ended officially at 10:30, he would stay until midnight when the restaurant was busy. He estimates that in 2009 and 2010 he did so every weekend. (Song Decl. ¶ 8; Tr. 232). In 2011 and 2012, he estimates, this occurred on average three times a month. (Song Decl. ¶ 8). Although he was supposed to get a break of one and one-half hours plus ten to twenty minutes for a meal, often this break was reduced to thirty minutes or one hour when the restaurant was busy. (Song Decl. ¶ 10; Tr. 233).

In the Fall of 2011, his shift was reduced to eight hours -- from 10:30 a.m. to 2:30 p.m. and from 6:00 p.m. to 10 p.m. On that schedule he had a break of three and one-half hours until he left in February 2012. (Song Decl. ¶ 12; Tr. 231-32).

When plaintiff started work in 2009, he was paid a daily wage of $35.00. In the Fall of 2011, the restaurant switched to an hourly rate, which was $5.00. (Song Decl. ¶¶ 13-14; Tr. 235-36).

As a waiter Mr. Song was a tipped employee. (Song Decl. ¶¶ 15-

51

18; Tr. 236). He reports, as do all of the other plaintiffs involved with obtaining cash for the credit-card tip pool, that the restaurant took a portion of that pool -- he estimates the diversion at 10 percent -- and that $35.00 from the Dining Hall tip pool was allocated to the panchan worker, even though she did not interact with customers. (Song Decl. ¶¶ 15-16, 18).

Mr. Song was never advised by the restaurant management that it was calculating his minimum wage based on his receiving tips or that the diversion of tips to the restaurant precluded defendants lawfully doing so. He also never received a pay statement. (Id. at ¶¶ 19-20). He reports that it was only in September 2011 that management informed the employees that their pay would be calculated in the future on an hourly basis, although he did not understand the explanation. (Id. at ¶ 21; see also Tr. 236). He once saw a poster on a refrigerator in the restaurant but did not understand it, since it was in English. (Song Decl. ¶ 22).

Mr. Song recounts -- consistent with the declaration of Mr. Morales -- that in January 2010 he was instructed to go with three other waiters to a Flushing apartment apparently owned by a relative of defendant Ji Song Yoo, and that when they arrived he saw several punch card machines, which defendant Kyung Le Yoo

52

ordered them to use to fill in false time records for the restaurant's employees. He reports credibly that he and the others spent a week or two in that apartment filling out cards to make it appear that the employees had worked only eight hours a day for five days weekly, and that by the time that they had finished they had created cards for all employees for the period from 2007 to 2010. (Song Decl. ¶ 23; Tr. 237-40; see also Tr. 398-400).

Mr. Song further recounted that sometime after this episode -- presumably in 2011 -- he witnessed the return to the restaurant of the boxes containing the time cards that had apparently been given to the Labor Department. He assisted in unloading them, and observed that the contents were indeed those time records. (Tr. 398-99). This testimony demonstrates that, prior to the filing of this lawsuit, defendants had regained possession of a large volume of ostensible time cards -- a fact that defendant Ji Sung Yoo ultimately conceded at his deposition and on cross-examination at trial (id. at 358-60) -- which they never turned over to plaintiffs in this lawsuit and never proffered at trial. (See Defs.' Exs. Q & R).

10. <u>Zhe Y. Shen</u>

Plaintiff Zhe Y. Shen started working at the Flushing restaurant as a cook in April 2000 and stayed for about one month. He then returned in July 2000 and remained at the restaurant until April 2008. (Shen Decl. ¶ 5; Tr. 33).

Plaintiff worked principally in the basement kitchen of the restaurant, which serviced events in the Banquet Room and Special Rooms and also provided foods for Janchi Janchi. (Shen Decl. ¶¶ 7-8; Tr. 35-36, 38). He also worked on occasion in the kitchen that provided food for the Dining Hall. (Shen Decl. ¶ 8; Tr. 36).[37]

Plaintiff worked a six-day week, with his off-day coming on a weekday. (Shen Decl. ¶¶ 9-10; Tr. 40). In April 2000 he worked a night shift, from 10:30 p.m. to 10:30 a.m., with a two-hour break starting at about 3:00 a.m. (Shen Decl. ¶ 11; Tr. 39).[38] When he returned in July 2000, he was placed on a day shift, which lasted

_____

[37] Mr. Shen implied that his role was solely that of a cook for parties or events and that, even when he worked out of the Dining Hall kitchen, those occasions were related to parties being held in that space. (<u>See</u> Tr. 36).

[38] At trial, Mr. Shen also stated that the night shift ran from 10:00 p.m. to 10:00 a.m. (Tr. 34). He likely misspoke, or else was referencing the apparent fluidity of his start-times, which was hinted at but not explored on the record. (<u>See</u> Tr. 42).

from 10:30 a.m. to 10:30 p.m. (Shen Decl. ¶ 12; Tr. 33-34, 41).
During his first year on this shift, he had no breaks. (Shen Decl.
¶ 12; Tr. 51-52). Subsequently he got a break of about one and one-
half hours from Monday to Thursday, but none from Friday to Sunday.
(Shen Decl. ¶ 12; Tr. 42-43, 54).

Defendants paid Mr. Shen a weekly wage. (Shen Decl. ¶ 13; Tr.
45-46). In April 2000, he received $350.00 a week. When he returned
that July, he was paid $400.00 per week. Defendants raised his wage
to $450.00 in July 2001, to $500.00 in January 2003, to $520.00 in
January 2004, to $550.00 in December 2004, to $600.00 sometime
before August 2006, to $650.00 by August 2006, to $700.00 in
January 2007, to $750.00 in the summer of 2007, and to $800.00 in
December 2007. (Shen Decl. ¶¶ 13-25; Tr. 45-48). He never received
a tip. (Shen Decl. ¶ 26; Tr. 48).

Plaintiff was never given a wage statement. After the last
investigation of the restaurant by the Department of Labor --
presumably some time in 2011 -- he observed a poster in English on
the staircase between the basement kitchen and the ground-floor
kitchen. He was able to understand that it said that the minimum
wage was $7.25 an hour, but he could not understand the balance of
the writing. (Shen Decl. ¶¶ 28-30).

11. <u>Rosalino Julian Ventura</u>

Plaintiff Rosalino J. Ventura worked as a busser at the Flushing restaurant from June 2006 through May 11, 2014. (Ventura Decl. ¶¶ 4, 6, 9; Tr. 5, 20). From his initial hiring until October 2007 he worked in the Dining Hall, and thereafter he worked in the four Special Rooms. (Ventura Decl. ¶¶ 7-8; Tr. 5-7). In November 2013 he was again assigned to the Dining Hall. (Ventura Decl. ¶ 9; Tr. 7).

Plaintiff worked six days a week, with his shift in the Dining Hall running from 10:30 a.m. to 10:30 p.m. (Ventura Decl. ¶ 11; Tr. 13-14). He had one break each day, which lasted one and one-half hours, plus a meal break of 15 to 20 minutes. (Ventura Decl. ¶ 12; Tr. 16-17). When he worked in the Special Rooms, his shift also started at 10:30 a.m. but its end-time varied. On weekdays it ended at 10:30 p.m., but on weekends it usually lasted till about 11:30 p.m. (Ventura Decl. ¶ 13; Tr. 14). While working in the Special Rooms, he also had breaks of one and one-half hours, except on the weekends, when he generally had breaks of half an hour to an hour or, as happened approximately twice a month, no break at all. (Ventura Decl. ¶ 17; Tr. 16).

In October 2012 his work week was shortened to five days for a few months, then increased to six days in December 2012, and then again reduced to five days until November 2013. (Ventura Decl. ¶¶ 14-16; Tr. 19-20). At that point he began working four and five days on alternating weeks. (Ventura Decl. ¶¶ 16, 18; Tr. 18-19, 31). He received breaks of one and one-half hours during this period, until his departure from the restaurant. (Ventura Decl. ¶ 18; Tr. 16).

When plaintiff started work in 2006, he was paid a daily rate of $50.00, or $300.00 for the week. (Ventura Decl. ¶ 20; Tr. 23). In June 2007 he was raised to $53.00 per day. (Ventura Decl. ¶ 21; Tr. 23). In November or December 2012 he received a raise to $65.00. (Ventura Decl. ¶ 23; Tr. 24). He remained at that pay level until he left. (Ventura Decl. ¶¶ 24-25; Tr. 24).

Although plaintiff shared in the tip pools (Tr. 24-25), he was never told by management that it was taking a tip credit or that the restaurant's diversion of tips disentitled it to claim a tip credit. (Ventura Decl. ¶¶ 28-29). Indeed, he did not learn of his right to a minimum wage and overtime until sometime during or after the Labor Department's investigation, and that information did not come from management. (Id. at ¶ 31; see also Tr. 29). Although he

first saw a poster in the restaurant in 2011, after the Labor Department's investigation, it was in English, which he could not read. (Ventura Decl. ¶ 30). It was only in 2013 that the restaurant put up posters in Spanish. (Id.). He also never received a wage statement from the restaurant. (Id.).

Plaintiff recounted that at one point the restaurant installed time clocks, but they apparently did not work properly. (Tr. 21-22). Later, possibly in 2011, the restaurant installed a fingerprint reader. (Tr. 21).

C. Defendants' Version of Events

Defendants proffered the testimony of three members of the restaurant's management -- defendants Ji Sung Yoo, Kyung Le Yoo and Chunsik Yu. Both in their direct testimony and on cross-examination they did not contradict the specific accounts by the plaintiffs of their compensation, nor did they directly challenge the plaintiffs' testimony regarding the hours that they had worked.[39] They also did

---

[39] In defendants' declarations, the most on-point asserted fact was that "[i]t is very rare that an employee would regularly work more than five days per week." (Yu Decl. ¶ 28; J. Yoo Decl. ¶ 26). Plaintiffs' counsel pressed Mr. Kyung Yoo repeatedly about his impression of the hours worked. (See, e.g., Tr. 320-23). However, although Mr. Yoo calculated payroll for at least

not meaningfully discuss, much less dispute, the testimony of the plaintiffs (1) that the restaurant had taken a portion of the credit-card tip pool that was derived from the Dining Hall,[40] (2) that a portion of that pool was diverted to the panchan worker,[41] and (3) that a portion of the Banquet Room tip pool was paid over to members of the banquet kitchen staff.[42] They also did not dispute

---

fourteen years, all he could answer to the question of "how many hours per week [did] a waiter work[]?" was "I'm over 60 years old, so I have difficulty remembering what happened yesterday or even this morning." (Id. 321-22). Mr. Ji Yoo's declaration also stated, in unabashedly conclusory fashion, that "[a]ll employees are compensated in accordance with the law for the hours worked at KGS." (J. Yoo. Decl. ¶ 56).

[40] According to Mr. Yu, the restaurant took three percent from credit-card tips. (Tr. 342-43). Mr. J. Yoo at first suggested that the restaurant took eight percent from credit-card tips for the purposes of a sales tax. (Id. at 377, 379). However, when pressed, he then said that the tax-related charge was in addition to whatever was allotted for tips and asserted that he knew nothing about tip withholding (id. at 380), implying -- contrary to the overwhelming weight of the record -- that customers tipped separate and apart from an eight percent charge for this tax.

[41] Both Mr. Yu and Mr. Ji Yoo explicitly acknowledged this in their declarations. (Yu Decl. ¶ 44; J. Yoo Decl. ¶ 46).

[42] In their declarations, both Mr. Yu and Mr. Ji Yoo denied -- at least in the present tense -- that kitchen staff share in the tip-pool. (Yu Decl. ¶ 45; J. Yoo ¶ 47). At trial, Mr. Yu was asked about tip-sharing with the banquet room chef and kitchen staff. (Tr. 343). At first, he said that he did not know whether such tip-sharing went on because "we don't instruct our staff to share the tips with the kitchen staff or not." (Id. at 343). Then, in the wake of being confronted with his own deposition to the contrary, he said that he "may not have known correctly because I didn't really get involved." (Id.). Mr. Ji Yoo did, however, testify that -- at least on certain occasions -- the

plaintiffs' testimony that the workers never received a wage statement. Strikingly, they were silent as well on the question of whether -- as two plaintiffs had testified -- defendant Kyung Le Yoo had arranged for the fabrication of time cards during the pendency of a State Labor Department investigation of the defendants. They also did not explicitly address the practices of the business prior to 2011, and instead couched their declaration testimony in the present tense (see, e.g., Yu Decl. ¶ 28; J. Yoo Decl. ¶ 20-29)[43] and regularly evaded questioning on past practices at trial. (See, e.g., Tr. 316, 342).

The gist of their testimony was to the effect (1) that the waiters and bussers initially decide their own work schedule, although their choices can be overridden by their supervisors, (J. Yoo Decl. ¶¶ 21-24; Yu Decl. ¶¶ 23-26), (2) that the standard work schedule calls for two four-hour work periods separated by three and one-half to four hours of break time, five days a week (J. Yoo Decl. ¶¶ 27-28; Yu Decl. ¶¶ 23-24, 28), (3) that management -- specifically Kyung Le Yoo or Chunsik Yu -- always informs new

_____

banquet chef and kitchen staff shared in the tip pool. (Tr. 381-82).

[43] Defendant K. Yoo addressed some asserted past practices, although none squarely relating to the hours worked by plaintiffs or the hourly or weekly wages earned by them for their work. (See, e.g., K. Yoo Decl. ¶¶ 9-20).

employees of the prevailing minimum wage and tells previously hired workers of any change in the legal minimum wage (K. Yoo Decl. ¶¶ 14-17; Yu Decl. ¶¶ 47-51; Tr. 325)[44]; (4) that management always had a system for keeping track of employees' work time, first through a sign-in sheet, then by a time clock and finally by a fingerprint system (J. Yoo Decl. ¶¶ 48-50; Yu Decl. ¶¶ 54-56), (5) that despite that asserted comprehensive record-keeping, the defendants were able to find only a handful of contemporaneous time cards reflecting the actual time clocked by four plaintiffs for a few weeks (Tr. 355-65) (addressing Defs' Exs. Q & R), (6) that defendants made sure that their employees had right-to-work

---

[44] At trial defendants appeared to concede that management did not actually tell the employees about the minimum wage but rather relied on unspecified posters hung in unspecified places in the restaurants. (Tr. 328, 341). We also note the following oddity in the declarations of Messrs. Yu and K. Yoo: They both identically stated as follows:

I advised the employees that the federal minimum wage for work performed prior to July 24, 2007 is $5.15 per hour. I advised employees that the federal minimum wage for work performed from July 24, 2007 to July 23, 2008 is $5.85 per hour. I advised employees that the federal minimum wage for work performed from July 24, 2008 to July 23, 2009 is $6.55 per hour.

(K. Yoo Decl. ¶¶ 15-17; Yu Decl. 49-51). Strangely, they both go on to subsequently add that "[t]he federal minimum wage for work performed on or after July 24, 2009 is $7.25 per hour" (K. Yoo Decl. ¶ 18; Yu Decl. ¶ 52), which suggests that even defendants do not assert that they maintained their practice beyond 2008 or 2009.

documentation and were well-behaved on the job (J. Yoo Decl. ¶ 18; C. Yu Decl. ¶ 16), and (7) that their employees were assisted by the restaurant and fellow employees in times of emergency or other need. (J. Yoo Decl. ¶¶ 18-19; C. Yu Decl. ¶ 16-17; <u>see also</u> Tr. 359-60, 375).

When we parse defendants' testimony, we note that their description of the standard work day is not, on its face, addressed to the actual working hours of plaintiffs or other employees in the past. Rather, both Ji Sung Yoo and Chunsik Yu appeared to be describing current practice at the restaurant, including the limitation of actual work times to eight hours, with an intervening break of up to four hours. (J. Yoo Decl. ¶ 27; Tr. 385-88). That testimony is in fact consistent with the account of a number of plaintiffs that, starting in or around 2011 -- directly after the Labor Department investigation that found major violations of State minimum wage and overtime requirements (<u>see</u> Pls.' Ex. 40) -- the restaurants altered their scheduling of shifts so that the employees received that substantial break time and were thus effectively limited to eight hours of work a day. (C. Park Decl. ¶ 12; J. Park Decl. ¶ 15; Song Decl. ¶ 12; Tr. 157, 296).[45]

---

[45] As we have mentioned, it appears that defendants also switched from a daily to an hourly rate of pay in 2011, <u>see</u> <u>supra</u>

Defendants did not testify directly or with any specificity that they had complied with applicable legal requirements on pay during the relevant period, except to conclusorily state -- in the present tense -- that "[a]ll employees are compensated in accordance with the law for the hours worked at KGS." (J. Yoo Decl. ¶ 56). Moreover, they did not address the factual underpinning for justifying or precluding their taking of a tip credit for any or all of the plaintiffs. In this respect, although Kyung Le Yoo initially claimed to have advised all employees of the current statutory minimum wage (K. Yoo Decl. ¶¶ 14-17), on cross-examination he retreated to saying that he had relied on Chunsik Yu to do so. (Tr. 328-29). Chunsik Yu also claimed to have "verbally notif[ied] the employees" of minimum wage increases (Yu Decl. ¶ 47), but on cross-examination he conceded that he had not done so and had simply relied on the purported presence of unspecified posters in the restaurant. (Tr. 341).[46] Moreover, even if Kyung Le Yoo's initial testimony were credited, it would reflect only advice

_____

pp. 11 n.13, 33 n.27, 45 n.35, albeit with the exception of the two busser plaintiffs and the partial exception of waiters Chul Gon Park and Jin J. Park, when performing work outside the Dining Hall. (Morales Decl. ¶ 31; Ventura Decl. ¶ 26; C. Park Decl. ¶¶ 16-20; J. Park ¶ 18; Tr. 257-58).

[46] Defendants never introduced any evidence as to when, if ever, posters were placed in the restaurant or as to what they said and in which language.

to the workers as to the undiminished minimum wage and not as to the availability or unavailability of a tip credit.[47] Further, although Kyung Le Yoo initially claimed to have told the workers what that unreduced minimum wage was -- an hourly figure that is periodically raised by federal and state law -- neither he nor any other witness for defendants disputed the plaintiffs' evidence that until at least 2011 defendants were paying only on a daily basis irrespective of the number of hours worked, and they also never disputed plaintiffs' uniform testimony that defendants had failed ever to provide wage statements to the employees -- whether weekly or annually -- statements that would have shown plaintiffs, <u>inter</u> <u>alia</u>, what they were earning for a given number of hours of work and the amount of tips calculated by defendants to justify their claim of entitlement to a tip credit.

Although defendants introduced into evidence a series of

---

[47] Perhaps in a nod to this reality, both Kyung Le Yoo and Chunsik Yu stated that they "notified the employees that the FLSA requires payment of at least the federal minimum wage to covered, nonexempt employees." (Yu Decl. ¶ 48; K. Yoo Decl. ¶ 14). Each then proceeded to explain that "[a]n employer of a tipped employee is only required to pay $2.13 an hour in direct wages if that amount plus the tips received equals at least the federal minimum wage, the employee retains all tips and the employee customarily and regularly receives more than $30 a month in tips." (<u>Id.</u>). Notably, neither Mr. Yu nor Mr. K. Yu suggested that they informed the employees of this latter legal standard.

charts purporting to show some aspect of payments to the employees of the restaurants (including tips) in the period from 2004 through 2009 and then in 2012 (Defs.' Exs. G-O), they were unable to explain how the figures in the charts were derived or what they represented. Instead, Ji Sung Yoo testified that these charts had been prepared at some point by an accountant for the restaurants, but that he was unsure what the numbers represented or how they had been calculated. (Tr. 348-54). In any event, these documents reflect nothing about the hours worked by the employees at any time.

Moreover, an additional two documents submitted by defendants, which reflect sign-in sheets for plaintiffs Ventura and Morales, contain no information about hours worked. (Defs.' Exs. A & P). Rather, they show only an amount of money for each day, with no explanation of what those sums were supposed to represent and, in any event, they reflect payroll from only 2013. (Id.). Indeed, the only documents containing any information about hours are the handful of time cards for a few weeks of work by four plaintiffs (Defs.' Exs. Q & R), and, when questioned about the location of the full range of daily time cards, Ji Sung Yoo was unable to offer any substantive answer even though in his pretrial deposition he had testified that they were all reposing in his home garage. (Tr. 357-

58, 363-65).

Finally, defendants offered a printout reflecting a calculation of underpayments to numerous employees of the restaurants mostly between the years 2005 and 2009, with a handful of lines dating from 2003 and 2010. (Defs.' Ex. V). The record is unclear as to whether this document was prepared by the Department of Labor or, as speculated by Ji Sung Yoo, by defendants' accountant. (Tr. 366-67). In any event, the record also contains a document listing the findings of the Department of Labor in 2011 that defendants had underpaid a large number of Manhattan-based employees in 2009 and 2010 in an amount exceeding $555,973.03 (Pls.' Ex. 40), and that they had failed, even as late as February 2011, to provide employees complete wage statements and had also failed to maintain accurate payroll records. (Pls.' Ex. 39).

## ANALYSIS

### I. The FLSA & New York Labor Law

#### A. The Payment Obligation & Tipping

Under the FLSA, employers covered by the statute are required

to pay their employees specified minimum hourly wages and time-and-one-half pay for work in excess of forty hours a week. 29 U.S.C. §§ 206, 207(a)(1). New York law provides comparable protections.  N.Y. Labor Law § 652(1); N.Y.C.R.R. §§ 142-2.1 & 142-2.2.

To trigger coverage under the FLSA, the employer must be shown to have "employees engaged in commerce or in the production of goods for commerce", or to have "employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person", and must have "annual gross volume of sales made or business done" that is "not less than $500,000." 29 U.S.C. §§ 203(s)(1)(A)(i)-(ii). New York law does not impose comparable limitations. N.Y. Labor Law § 160; N.Y.C.R.R. §§ 142-1.1; Amaya v. Superior Tile & Granite Corp., 2012 WL 130425, *6 (S.D.N.Y. Jan. 12, 2012) (New York's Labor Law "does not require a plaintiff to show either a nexus with interstate commerce or that the employer has any minimum amount of sales.") (quoting Chin Jie Yin v. Kim, 2008 WL 906736, *4 (E.D.N.Y. Apr. 1, 2008)).

There is no dispute in this case that defendant Kum Gang, Inc. was a covered employer under the FLSA from 2003 forward. (JPTO pp. 13-14, stip. ## 20-21, 25-34). As for the earlier period, from 1997 through 2002, defendants stipulated that their employees handled

foods imported from Korea and provided catering services outside New York. (id. at ## 20-21). As for the gross-revenue requirement, with defendants having stipulated that they had gross revenues in excess of $500,000.00 from 2003 onward (id. at ## 25-34), defendant Ji Sung Yoo testified that business was actually better in the years preceding 2007 and going back as far as 1997. (Tr. 372-73). This observation was also echoed by plaintiffs Chul G. Park and Tae H. Kim, who testified that the restaurant had more business before 2003 than later. (C. Park Decl. ¶ 5 ("[F]rom 1997 until 2003 we were even busier than in later years."); T. Kim Decl. ¶ 3 ("[F]rom 1999 to 2003, the restaurant was even busier than later years.")). Given this evidence, and the absence of any attempt by defendants to contradict it, we infer that the restaurants generated more than $500,000.00 in gross revenues annually from 1997 through 2002.[48]

---

[48] FLSA coverage is also alternatively established based on evidence that each of the plaintiffs employed by defendants between 1997 and 2002 were "engaged in commerce". See 29 U.S.C. §§ 206(a), 207(a)(1); 29 C.F.R. § 776.9; Bowrin v. Catholic Guardian Soc., 417 F. Supp. 2d 449, 465 (S.D.N.Y. 2006). Plaintiffs Chul G. Park, Yoon C. Kim, Tae H. Kim, and Hong S. Kim worked as waiters during the pre-2003 period, and they and other waiters reported that as part of their job they were required to process credit-card payments for guests and apparently did so with some regularity and frequency. (C. Park Decl. ¶ 21; T. Kim Decl. ¶ 15; H. Kim Decl. ¶ 17; Ju Decl. ¶ 18). That testimony was likely sufficient to satisfy the requirement that the employee's involvement in commerce was "regular or recurring", Bowrin, 417 F. Supp. 2d at 466, and hence sufficient to trigger individual coverage. See, e.g., id. at 466, 470-71 (addressing substantiality of contact with commerce); see also Owusu v.

As for the wage requirements of the federal and state laws, under the FLSA, as of 1997 the minimum wage was $5.15 per hour. It was increased as of July 24, 2007 to $5.85 and then to $6.55 on July 24, 2008, and to $7.25 on July 24, 2009. See 29 U.S.C § 206; Fair Minimum Wage Act of 2007, Pub. L. 110-28, 8102(a), 121 Stat. 112, 189; see also Galeano v. Lemongrass on Broadway Corp., __ F. Supp. 2d __, 2014 WL 1364493, *7 (S.D.N.Y. Apr. 4, 2014). New York law largely paralleled the federal minimum-wage requirements during the pertinent period, although its floor was $4.25 per hour in 1997. It was raised to $5.15 as of March 31, 2000, and was then raised in annual increments starting in 2005, until it reached $7.15 as of January 1, 2007, and then was increased to $7.25 as of July 24, 2009. See N.Y. Labor Law § 652(1); N.Y.C.R.R. tit. 12 §§ 137-1.2 (former), 146-1.2; see also Galeano, 2014 WL 1364493 at *7; Urtubia v. B.A. Victory Corp., 857 F. Supp. 2d 476, 481 (S.D.N.Y. 2012 (citing N.Y.C.R.R. tit. 12 § 146-3.1); Wicaksono v. XYZ 48

---

Corona Tire Shop, Inc., 2013 WL 1680861, *4-5 (E.D.N.Y. April 15, 2013) (credit-card processing is contact with commerce). But see Thorne v. All Restoration Servs., Inc., 448 F.3d 1264, 1266 (11th Cir. 2006) (questioning sufficiency of interstate contacts in credit-card processing); Joseph v. Nichell's Caribbean Cuisine, Inc., 862 F. Supp. 2d 1309, 1313 (S.D. Fla. 2012) (same). As for plaintiff Zhe Y. Shen, as a cook he regularly prepared food for banquets, presumably including catering events, which occurred routinely out of state. (Shen Decl. ¶ 8; see, e.g., C. Park Decl. ¶ 35). That too should satisfy the individual-coverage provisions of the FLSA.

Corp., 2011 WL 2022644, *3 (S.D.N.Y. May 2, 2011). For any period
when the state's minimum wage exceeded that of federal law, the
state-law requirement controls. 29 U.S.C. § 218.


If the employee is a tipped employee -- that is, one who
regularly receives tips paid by customers in the course of his
employment, see 29 U.S.C. § 203(t); Chan v. Triple 8 Palace, Inc.,
2006 WL 851749, *3 n.5 (S.D.N.Y. March 30, 2006) -- the employer
may take a tip credit under the FLSA. 29 U.S.C. § 203(m). To be
eligible to take a tip credit, however, the employer must satisfy
certain prerequisites. Preliminarily, he must inform the employee
of the statutory requirements governing tip credits. The
information that must be conveyed includes the following:

> [t]he amount of the cash wage that is to be paid to the
> tipped employee by the employer; the additional amount by
> which the wages of the tipped employee are increased on
> account of the tip credit claimed by the employer, which
> amount may not exceed the value of the tips actually
> received by the employee; that all tips received by the
> tipped employee must be retained by the employee except for
> a valid tip pooling arrangement limited to employees who
> customarily and regularly received tips; and that the tip
> credit shall not apply to any employee who has not been
> informed of these requirements in this section.

29 C.F.R. § 531.59(b). Apart from providing this information to the
employee, the employer must comply with the requirements that it
has communicated, including allowing the employee to retain his
share of the tips. 29 U.S.C. § 203(m); Chan, 2006 WL 851749 at *3;

accord Barenboim v. Starbucks Corp., 698 F.3d 104, 111 (2d Cir. 2012). It is the defendants' burden to demonstrate compliance with these requirements. See, e.g., Copantitla v. Fiskardo Estiatorio, Inc., 788 F. Supp. 2d 253, 288 (S.D.N.Y. 2011).

The availability of a tip credit under New York law is also subject to a set of preconditions that the employer must meet. Until January 1, 2011, the applicable regulations required the employer to provide the employee with a wage statement "with every payment . . . listing . . . allowances claimed as part of the minimum wage." N.Y.C.R.R. tit. 12 § 137-2.2 (former). The employer was also required to keep weekly payroll records for at least six years, "show[ing] for each employee . . . allowances . . . claimed as part of the minimum wage." Id. at § 137-2.1; see also Copantitla, 788 F. Supp. 2d at 290; Ke v. Saigon Grill, Inc., 595 F. Supp. 2d 240, 254-55 (S.D.N.Y. 2008). Starting in January 2011, the credit may be taken only if the employee receives enough tips so that his total pay equals or exceeds the unreduced minimum wage (now $7.25 per hour) and "if the employee has been notified of the tip credit as required in section 146-2.2". N.Y.C.R.R. tit. 12 § 146-1.3.[49] The notice required by sections 146-2.2 and 146-2.3

---

[49] Under this provision, the employer must pay the employee at least $5.65, with the tip credit not to exceed $1.60 per hour.

involves written notice at the time of hiring, both in English and in the hiree's principal language, specifying the pay rate and any tip credit, as well as a wage statement with every payment, listing "hours worked, rates paid, gross wages, credits claimed (for tips, meals and lodging), if any, deductions and net wages". N.Y.C.R.R. tit. 12 §§ 146-2.2 & 146-2.3.

B. <u>Defendants are Not Entitled to a Tip Credit</u>

The defendants premise a major portion of their defense on the notion that they were entitled to take advantage of the tip credit embodied in federal and state law. (<u>See</u>, <u>e.g.</u>, Defendants' Post-Trial Memorandum [hereinafter "Defs.' Mem."] [docket no. 126] 3-4). That is plainly not the case.

Defendants never advised any of the plaintiffs that they were applying a tip credit in the calculation of plaintiffs' wages or that the plaintiffs had the right to an undiminished wage if the restaurant diverted some of the tip pool. They also never provided plaintiffs with wages statements or any other means of calculating such a credit. (<u>See</u>, <u>e.g.</u>, C. Park Decl. ¶ 30; Choi Decl. ¶¶ 25-27;

N.Y.C.R.R. tit. 12 § 146-1.3(a).

72

J. Park Decl. ¶ 28). Both of these failings are sufficient to deprive defendants of access to the credit. See, e.g., Gunawan v. Sake Sushi Restaurant, 897 F. Supp. 2d 76, 84-84 (E.D.N.Y. 2012); Flores v. Anjost, 284 F.R.D. 112, 118 (S.D.N.Y. 2012). In addition, the defendants did in fact invade the Dining Hall and Banquet Room tip pools, taking moneys from the credit card Dining Hall tip pool for the restaurant, taking additional funds from the Dining Hall tip pools for the non-tip employee known as the panchan worker, and diverting a portion of the Banquet Room tip pool for the non-tip banquet kitchen workers. (See, e.g., J. Park Decl. ¶¶ 20-23; Ju Decl. ¶¶ 18-20; Song Decl. ¶¶ 15, 18). These diversions as well preclude defendants from relying on a tip credit. See, e.g., Azkour v. Little Rest Twelve, Inc., 2012 WL 402049, *6 (S.D.N.Y. Feb. 7, 2012); Shajan v. Barolo, Ltd., 2010 WL 2218095, *1 (S.D.N.Y. June 2, 2010).

C. Failure to Pay Minimum Wage and Overtime

Plaintiffs testified in some detail about their history of hours worked and their rates of pay. As noted, defendants did not retain records of plaintiffs' work hours other than a handful of time cards that pertain to a few weeks of work by four plaintiffs and that in part reflect only the employees' starting times. This

minimal production is consistent with the testimony of a number of plaintiffs that the time clock usually did not work and the additional credible testimony of two plaintiffs that defendants engaged in a large-scale falsification of time cards at or around the time of the Labor Department investigation in 2010. (See, e.g., Y. Kim ¶ 12; Song Decl. ¶ 23; Morales Decl. ¶ 40). Moreover, insofar as defendants seek to explain the absence of time cards as attributable to the purported failure of the Labor Department to return the time cards that the defendants had submitted to it (Tr. 359-60), that assertion is belied by the testimony of plaintiff Jong H. Song, who not only participated in the falsification of the time cards, but witnessed the return of many cartons of time cards from the Labor Department. (Tr. 398-400). It is equally belied by the deposition testimony of Ji Sung Yoo that he had retained time records in his garage, although he never produced them to plaintiffs in the course of this lawsuit. (Tr. 357-59).

Plaintiffs bear the burden of demonstrating the number of hours that they worked. Nevertheless, the employer is required to maintain records of wages and hours, and if he fails to do so, plaintiffs "will not be penalized due to their employer's record-keeping default." Reich v. S. New England Telecomm. Corp., 121 F.3d 58, 69 (2d Cir. 1997) (citing inter alia Anderson v. Mt. Clemens

Pottery Co., 328 U.S. 680, 687 (1946)); see also Yu Y. Ho v. Sim Enters., Inc., 2014 WL 1998237, *14 *(S.D.N.Y. May 14, 2014). In such a circumstance, the plaintiffs "need only prove that they performed work for which they were not properly compensated and produce 'sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference.'" Reich, 121 F.3d at 69 (quoting Anderson, 328 U.S. at 687). To this end, they may meet their burden of proof by testifying as to their own recollection in the absence of required employer record-keeping. See, e.g., Anderson, 328 U.S. at 687-88; Kuebel v. Black & Decker Inc., 643 F.3d 352, 362 (2d Cir. 2011) (citing cases); Ke, 595 F. Supp. 2d at 254-55. In the face of such testimony, which will presumptively establish the fact of a violation and injury, Reich, 121 F.3d at 69, the burden shifts to the employer "to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence." Id. (quoting Anderson, 328 U.S. at 687-88). If the employer fails to meet that burden, "the court may award damages, even though the result is only approximate." Reich, 121 F.3d at 69 (citing Anderson, 328 U.S. at 688); see also Hart v. Rick's Cabaret Intern., Inc., __ F. Supp. 3d __, 2014 WL 7183956, *5 (S.D.N.Y. Dec. 17, 2014) ("As the Court has explained, once liability for wage violations has been established,

'[t]he uncertainty lies only in the amount of damages arising from the statutory violation by the employer. In such a case it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amends for his acts.'") (quoting <u>Anderson</u>, 328 U.S. at 688).

In this case, the employer did not keep time records, or at least failed to produce them in the lawsuit. The only purported records offered in evidence were a handful of time cards that reflected little or nothing about even the few weeks that they covered for a handful of plaintiffs. (<u>See</u> Defs.' Exs. Q & R). Moreover, the credible evidence demonstrated that defendants had created a large volume of fraudulent time cards for use in connection with the Labor Department investigation, and those time cards were apparently hidden by defendants after their return by the Labor Department. (<u>See</u>, <u>e.g.</u>, J. Song Decl. ¶ 23; Tr. 237-40). In contrast, each of the plaintiffs offered detailed and credible accounts of the standard hours that they worked in different time periods, a showing that met their burden of proof, <u>see</u>, <u>e.g.</u>. <u>Kuebel</u>, 643 F.3d at 364, and defendants manifestly failed to rebut that showing. <u>See</u>, <u>e.g.</u>, <u>Ho</u>, 2014 WL 1998237 at *15-16.

76

We therefore credit the plaintiffs' account of the number of hours that they worked during the relevant time period. Thus we find that until sometime in 2011 they almost invariably worked at least 12 hours at a time, with far longer work days for some of them when they were assigned to catering jobs or worked in the Banquet Room on days when catering events were being conducted, and they typically worked at least six days a week except as indicated by their testimony, when they worked five or seven days in a given week. For these labors, until sometime in 2011 they were paid a set daily rate (except for the cook, who was paid a weekly rate), and those daily rates -- which ranged from $25.00 to $60.00 for waiters, about $46.00 to $65.00 for bussers, and $58.00 to $133.00 for the cook (calculated as a daily rate) -- did not vary with the number of hours worked.[50] As for the switch to an hourly rate in 2011 -- a change that excluded the two plaintiff bussers[51] -- the defendants paid the plaintiffs who were still employed there only

_____

[50] We note two apparent partial exceptions. Mr. Ju reported that when he worked in the Special Rooms past 10:30 p.m., he would be paid an additional $5.00 for each extra hour worked. (Ju Decl. ¶ 12). Also, Mr. Morales testified that since November 2013 his daily rate had been increased -- apparently by $8.00 -- when he worked after 10:30 p.m. (Morales Decl. ¶ 30).

[51] Mr. Chul Park also stated that, after the general switch to hourly pay, he continued to receive a daily rate (of $60 per day) when he worked in the Banquet Hall. (C. Park. Decl. ¶¶ 16, 20).

$5.00 per hour, which was well below minimum wage, and did so irrespective of whether the employee worked more than 40 hours a week.[52]

In sum, this pattern of work hours and payments reflects a consistent failure by defendants, throughout the relevant period, to pay the applicable minimum wage and the required overtime to each of the plaintiffs under both federal and state law.

D. Spread-of-Hours Compensation

Under New York law, if an employee's workday exceeds ten hours, he is entitled to an additional one hour of pay at the standard minimum wage rate. See N.Y.C.R.R. tit. 12 § 146-1.6 (2013); Shahriar v. Smith & Wollensky Rest. Group, 659 F.3d 234,

---

[52] For example, as noted, Mr. Park reported that he worked both in the Dining Hall and, when needed, in the Banquet Room. When his week consisted of work in both locations, he worked for an hourly wage of $5.00 per hour in the Dining Hall and a daily wage of $60.00 per day in the Banquet Hall. At a minimum -- often drastically exceeded -- Mr. Park would work for five days in the Dining Hall alone. His days lasted twelve hours, with (during the relevant period) breaks of up to three hours. Exclusive of breaks, Mr. Park received about $5.00 per hour for forty-five hours of work. Indeed, during busier weeks -- when he also received $60 per day for an additional two days of work in the Banquet Hall or at a catering event -- he was being paid the functional equivalent of significantly less than $5.00 per hour. (See C. Park Decl. ¶¶ 7-8, 10, 12, 14-16, 20).

241-42 (2d Cir. 2011).[53] For this purpose, the workday encompasses the entire period between the start and end of the day's work, "including both work time and non-working time." <u>Ke</u>, 595 F. Supp. 2d at 260 (citing <u>Chan v. Sung Yue Tung Corp.</u>, 2007 WL 313483, *21 (S.D.N.Y. Feb. 1, 2007) (quoting former N.Y.C.R.R. tit. 12 § 142-2.4)). <u>See</u> <u>also</u> N.Y.C.R.R. tit. 12 § 146-1.6.

In this case all of the plaintiffs were regularly required to work shifts of at least twelve hours, and yet were never paid for an extra hour, much less at the regular rate. Necessarily, then, they are owed those unpaid wages. Moreover, irrespective of whether their regular pay was legitimately subject to a tip credit -- which we have already held it was not -- the additional spread-of-hours payment is not subject to such a reduction. <u>Ke</u>, 595 F. Supp. 2d at 260 (quoting former N.Y.C.R.R.. tit. 12 § 137-1.7); N.Y.C.R.R. tit. 12 § 146-1.6(a) (restricting spread-of-hours payment to the "basic minimum hourly rate," defined at N.Y.C.R.R. tit. 12 § 146-1.2).

---

[53] The predecessor regulation, which was replaced effective December 29, 2010, imposed the same requirement. <u>See</u> <u>Shahriar</u>, 659 F.3d at 242 n.4 (citing N.Y.C.R.R. § 137-1.7).

E. Recovery of Misappropriated Tips

As noted, the restaurant managers diverted portions of the various tip pools from the waiters and bussers to the restaurant itself and to kitchen employees who had no contact with restaurant customers. This included appropriation by management of 8 to 10 percent of the credit-card tip pool from the Dining Hall, diversion of about $35.00 or $40.00 per night from the Dining Hall tip pool to pay the panchan worker, and allocation of $200.00 per week from the Banquet Hall tip pool to the banquet kitchen chef or banquet kitchen staff generally. Both federal and state law preclude the employer from engaging in these forms of diversion from tip pools, and thus allow the tipped employees to recover their share of the funds improperly so taken. 29 U.S.C. § 203(m); 29 C.F.R. § 531.52-53; N.Y. Labor Law § 196-d. Gunawan, 897 F. Supp. 2d at 89; Wicaksono, 2011 WL 2022644 at *5, *9.

In calculating the amount improperly taken from the Dining Hall credit-card tip pool, we note that the employer is entitled to deduct from that tip pool a sum reasonably calculated to cover credit-card processing fees. Myers v. The Copper Cellar Corp., 192 F.3d 546, 552-56 (6th Cir. 1999); Cao v. Wu Liang Ye Lexington Rest., 2010 WL 4159391, *3-4 (S.D.N.Y. Sept. 30, 2010); see also

James Lockhart, <u>Tips as Wages for Purposes of Federal Fair Labor Standards Act</u>, 46 A.L.R. Fed. 2d 23 ¶¶ 38-39 (2015) (citing cases). Nonetheless, it is the employer's burden to demonstrate the reasonableness of the deduction. <u>Myers</u>, 192 F.3d at 554-55 & n.15; <u>Reich v. Priba Corp.</u>, 890 F. Supp. 586, 595-96 (N.D. Tex. 1995). In this case defendants failed to demonstrate that the deduction of eight to ten percent from the Dining Hall credit-card tip pool was a reasonable amount to cover the restaurant's credit-card processing fees. Indeed, they offered no evidence of the amount of those fees.

Plaintiffs concede that a withholding of three percent of credit card tips is reasonable (Pls.' Mem. 18-19), and we agree. <u>See</u>, <u>e.g.</u>, <u>Myers</u>, 192 F.3d at 556; <u>Cao</u>, 2010 WL 4159391 at *4. Thus plaintiffs are entitled to recover the amount of the tips diverted from the credit-card tip pool less three percent.

As for the tips diverted from the Dining Hall tip pool to the panchan worker, that allocation is recoverable by the plaintiffs from the employer, since the panchan worker had no contact with customers and thus did not receive tips from them. <u>See</u>, <u>e.g.</u>, <u>Myers</u>, 192 F.3d at 548-49; <u>Schear v. Food Scope Am.</u>, 297 F.R.D. 114, 120, 132 (S.D.N.Y. 2014); <u>Hai Ming Lu v. Jing Fong Rest.</u>, 503

F. Supp. 2d 706, 711 (S.D.N.Y. 2007). Thus the plaintiffs will be awarded a sum based on their respective shares of the daily contribution to the panchan worker. Similarly, plaintiffs' shares of the payments out of the Banquet Hall tip pool to the banquet kitchen staff are recoverable by those plaintiffs who worked in the Banquet Hall.


   F. Liquidated Damages


   An employer who fails to pay the required minimum wage or overtime is liable under the FLSA for the amount of the underpayment. In addition, he will be liable for so-called liquidated damages in an amount equal to 100 percent of the underpayment, unless he establishes the applicability of an exception to that requirement. 29 U.S.C. §§ 216(b), 260. Specifically, he must demonstrate that he has acted in good faith and that he had reasonable grounds to believe that his actions did not violate the FLSA. 29 U.S.C. § 260. See, e.g., Ho, 2014 WL 1998237 at *17. That burden on the employer is heavy. As the Second Circuit has observed: "[T]he employer bears the burden of establishing, by plain and substantial evidence, subjective good faith and objective reasonableness. The burden . . . is a difficult one to meet, however, and double damages are the norm, single

damages the exception." <u>Reich</u>, 121 F.3d at 71 (citations and internal quote marks omitted). <u>See also Galeana v. Lemongrass on Broadway Corp.</u>, __ F. Supp. 2d __, 2014 WL 1364493, *7-8 (S.D.N.Y. Apr. 4, 2014).

Defendants utterly fail to satisfy either prong of their burden to avoid liquidated damages under the FLSA. As noted, they ran a large and sophisticated business for many years, they themselves professed to be aware of the legal requirements governing minimum wage and overtime, they systematically failed to comply with those requirements in spite of the fact that they were repeatedly found by the Labor Department to be in blatant violation of basic payment and notice requirements[54], they sought to conceal

_____

[54] Defendants, in one form or another, have been subject to three Department of Labor investigations. First, in January 2005, the Department of Labor found that the Manhattan restaurant had not been paying its employees properly or maintaining proper payroll records. The restaurant was made to pay a $137,000 fine in 2007 as a result. (Tr. 391; Pls.' Ex. 5). Additionally, in 2010, the Flushing restaurant was found to be in violation of child labor laws, resulting in a $4,000.00 fine. (Pls.' Ex. 5). Finally, as mentioned above, <u>supra</u> p. 10 n.12, the Manhattan restaurant was subject to another investigation covering mid-2005 through early-2010, which resulted in a finding that $555,973.03 in wages was owed to sixty-six employees. (Pls. Exs. 40-41; Pls. Mem. 4 & nn. 5-6). The Department of Labor imposed a damages award totaling $1,950,992.84 (<u>id.</u>), which was upheld on appeal to the New York State Industrial Board of Appeals during the pendency of this case. <u>See</u> State of New York Ind. Bd. of App., Resolution of Decision, Dkt. No. PR 11-174, at <u>http://labor.ny.gov/iba/decisions/pdf/pr-11-174.pdf</u>.

from their employees any information that would have alerted them to management's violations of their rights, and they committed fraud in the course of at least one of those Labor Department investigations by the creation of false time cards. They also threatened at least some of their employees upon learning that they were complaining about their treatment. (C. Park Decl. ¶ 27; J. Park Decl. ¶ 27). In sum, their violations were manifestly willful, and the plaintiffs are therefore entitled to an award of liquidated damages under the FLSA. See, e.g., Ho, 2014 WL 1998237 at *17; Chan, 2007 WL 313483 at *28.

During the period ending April 8, 2011, the New York Labor Law provided for comparable liability by employers for liquidated damages, but at a rate of 25 percent of the underpayment. Id. (quoting N.Y. Labor Law §§ 198(1-a) & 663(1)). Prior to November 24, 2009, the test for imposition of such additional damages was whether the conduct of the employer had been willful, a standard that paralleled the willfulness test under the FLSA. See, e.g., Kuebel, 643 F.3d at 366; Zubair v. EnTech Eng'q P.C., 900 F. Supp. 2d 355, 360 n.3 (S.D.N.Y. 2012). "Willfulness in this context constitutes either knowledge by the employer that his conduct is illegal or reckless disregard for whether it is statutorily prohibited." Ho, 2014 WL 1998237 at *18 (citing McLaughlin v.

84

Richland Shoe Co., 486 U.S. 128, 133 (1988)). Effective November 24, 2009, the Labor Law was amended to require imposition of such liquidated damages "unless the employer proves a good faith basis to believe that its underpayment of wages was in compliance with the law." N.Y. Labor Law § 663. Finally, as of April 9, 2011 the liquidated-damages award required under the Labor Law was increased to 100 percent of the underpayment. See, e.g., Ho, 2014 WL 1998237 at *18 n.2 (citing Wage Theft Prevention Act, 2010 Sess. Law News of N.Y. Ch. 564 § 8380 (McKinney's)); Zubair, 900 F. Supp. 2d at 360 n.3.

In this case, for reasons noted, plaintiffs amply justify an award of liquidated damages under the New York Labor Law, including under both the pre- and post-November 24, 2009 standards defined by the State statute. For reasons noted, we find that defendants' violation of the applicable laws was certainly willful. Moreover, defendants fail to meet their burden under the more recent standard to demonstrate that they had "a good faith basis" for believing that they were not in violation of applicable legal standards.

Finally, we also conclude that plaintiffs may recover liquidated damages under both the FLSA and the Labor Law. The

85

premise for that conclusion is the recognition that the two provisions serve "fundamentally different purposes." Ke, 595 F. Supp. 2d at 261-62. As the Second Circuit has noted, liquidated damages under the FLSA are "not a penalty exacted by the law, but rather compensation to the employee occasioned by the delay in receiving wages due caused by the employer's violation of the FLSA." Herman v. RSR Sec. Servs. Ltd., 172 F.3d 132, 142 (2d Cir. 1999); Reich, 121 F.3d at 71. In contrast, liquidated damages under the New York Labor Law are designed to be punitive. They "'constitute a penalty' to deter an employer's wilful withholding of wages due." Reilly v. NatWest Mkts. Group, Inc., 181 F.3d 253, 265 (2d Cir. 1999) (quoting Carter v. Frito-Lay, Inc., 74 A.D.2d 550, 551, 425 N.Y.S.2d 115, 116 (1st Dep't 1980)). Accord Rosas v. Subsational, 2012 WL 4891595, *7 (S.D.N.Y. Sept. 11, 2012). Because of the differing purposes of these two provisions, most courts have held that a plaintiff who satisfies both statutes may recover liquidated damages under both. See, e.g., Ho, 2014 WL 1998237 at *18-19 (quoting Reilly, 181 F.3d at 265 & citing cases); Lahcen v. Kiran Park Newsstand, Inc., 2014 WL 3887222, *5 (S.D.N.Y. Aug, 7, 2014); Ahmed v. Subzi Mandi, Inc., 2014 WL 4101224, *6 (E.D.N.Y. May 27, 2014); Eschmann v. White Plains Crane Serv., Inc., 2014 WL 1224247, *7-8 (E.D.N.Y. March 24, 2014); Gurung v. Malhotra, 851 F. Supp. 2d 583, 593-94 (S.D.N.Y. 2012); Lanzetta v. Florio's Enters.,

<u>Inc.</u>, 2011 WL 3209521, *5-6 (S.D.N.Y. July 27, 2011); <u>Wicaksono</u> 2011 WL 2022644 at *7; <u>Callier v. Superior Bldg. Servs.</u>, 2010 WL 5625906, *3 (E.D.N.Y. Dec. 22, 2010); <u>Ke</u>, 595 F. Supp.2d at 261-62; <u>Chan</u>, 2007 WL 313483 at *29.[55] Moreover, this conclusion is consistent both with the statutory language, <u>see</u>, <u>e.g.</u>, <u>Lanzetta</u>, 2011 WL 3209521 at *5, and, by analogy, with the reasoning of the Second Circuit in holding that prejudgment interest is not available under the FLSA if liquidated damages are awarded, since they serve the same purpose, and awarding interest would therefore amount to a duplicative remedy. <u>See</u>, <u>e.g.</u>, <u>Herman</u>, 172 F.3d at 142.[56]

---

[55] <u>Contra</u>, <u>e.g.</u>, <u>Li Ping Fu v. Pop Art Int'l, Inc.</u>, 2011 WL 4552436, *5 (S.D.N.Y. Sept. 19, 2011), <u>adopted on other gds</u>., 2011 WL 6092309 (S.D.N.Y. Dec. 7, 2011); <u>Chun Jie Yin v. Kim</u>, 2008 WL 906736, *7 (E.D.N.Y. April 1, 2008).

[56] Plaintiffs do ask for an award of pre-judgment interest on unpaid minimum wage and overtime if the court declines to apply equitable tolling. (Pls.' Mem. 26). For reasons to be noted below, however, we find equitable tolling to be appropriate. <u>See</u> <u>infra</u> pp. 95-114.

We note that plaintiffs also ask for interest on their spread-of-hours award. (Pls.' Damages St. 10). Granting both interest <u>and</u> liquidated damages on that award is proper since both fall within the ambit of the New York Labor Law, which awards liquidated damages for punitive purposes and, naturally, interest for compensatory purposes. <u>See</u>, <u>e.g.</u>, <u>Ahmed</u>, 2014 WL 4101224 at *7 (citing cases and granting both liquidated damages and interest for spread-of-hours pay); <u>Olvera v. New Ko-Sushi</u>, 2011 WL 724699, *5 (S.D.N.Y. Feb. 16, 2011) (same).

G. <u>Failure to Provide Pay Notices and Wage Statements</u>

Plaintiffs point to the fact that they never received either (a) a wage statement when they were paid or (b) written notice when they were hired, or thereafter, specifying their rate of pay, their regular pay day and their overtime rate of pay. Invoking New York Labor Law §§ 195(1) & (3) and §§ 198(1-b) & (1-d), they assert that as a result of these two forms of violation, they are entitled to liquidated damages as defined in section 198, which would amount to $150.00 ($50.00 for the failure to provide a weekly pay and $100.00 for the failure to provide the notice of pay at the time of hire or thereafter) for each week in which each form of violation occurred or continued, up to a combined total of $5,000.00 per employee. (Pls' Mem. 27-28). We agree, with the caveat -- as plaintiffs recognize (Pls.' Damages St. 11; Pls.' Mem. 27) -- that such damages can only begin to accrue as of April 9, 2011.

Prior to October 2009, section 195(1) required the employer to notify his employees at the time of hiring of the rate of pay and of the regular pay day designated by the employer. <u>See</u>, <u>Peroro v. Food Jungle, Inc.</u>, 2006 WL 2708055, *6 (E.D.N.Y. Aug. 7, 2006); <u>Pavia v. Around the Clock Grocery, Inc.</u>, 2005 WL 4655383, *5 (E.D.N.Y. Nov. 15, 2005). In 2009 this provision was amended to

88

require that this notice be in writing and be accompanied by a written acknowledgment from the recipient employees. See L.2009 ch. 270, § 1(2). That provision was stated to be effective October 26, 2009 and was to be applicable to "all employees hired on or after" that date. Id. at § 2.[57]

When amended again in 2011, this provision was greatly expanded, including an added requirement that the information be provided yearly on or before February of each subsequent year. In pertinent part, this version of the statute stated that the employer must:

> (a) provide his or her employees, in writing in English and in the language identified by each employee as the primary language of such employee at the time of hiring, **and on or before February first of each subsequent year of the employee's employment with the employer**, a notice containing the following information: the rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other; allowances, if any, claimed as part of the minimum wage, including tip, meal or lodging allowances; the regular pay day designated by the employer in accordance with section one hundred ninety-one of this article; the name of the employer; any "doing business as" names used by the employer; the physical address of the employer's main office or principal place of business and a mailing address if different; the telephone number of the employer; plus such other information as the commissioner deems material and necessary. . . .

---

[57] The 2011 version of the law eliminated the "hired on or after" qualification. Compare L.2009 ch. 270, § 2 with L.2010 ch. 564, § 17.

N.Y. Labor Law § 195(1) (2014) (emphasis added). Effective February 27, 2015, this statute was again amended, leaving all language unchanged save for the removal of the annual February notice requirement, delineated above in bold. See L.2014 ch. 537, § 1.

Section 195(3) -- in its original form, effective from October 26, 2009 to April 8, 2011 -- required the employer to "furnish each employee with a statement with every payment of wages, listing gross wages, deductions and net wages, and upon the request of the employee [he must] furnish an explanation of how such wages were computed." In 2010 this provision was strengthened as part of the Wage Theft Prevention Act, an enactment made effective April 9, 2011. See L.2010 ch. 564 § 3(3). Accord Sewell v. Bovis Lend Lease, Inc., 2013 WL 1316015, *3 (S.D.N.Y. March 29, 2013). Under the new terms, the employer was required to include additional details in every such wage , including "rates of pay and basis thereof; . . . ; gross wages; deductions; allowances, if any claimed as part of minimum wage; . . . net wages[;] [for employees entitled to overtime pay] the regular hourly rate . . . of pay; the overtime rate . . . of pay; the number of regular hours worked, and the number of overtime hours worked." L.2010, ch. 564 § 3.

90

Prior to enactment of the Wage Theft Prevention Act, the New York Labor Law did not include a provision explicitly giving employees a judicial remedy for violations of these two notice provisions. The remedies provision embodied in the previous version of section 198 offered certain forms of relief for an employee who succeeded in bringing a "wage claim", which appears to refer to a claim for unpaid wages, not for violation of the notice requirements.[58] See New York Labor Law § 198(1-a) (2010); Chu Chung v. New Silver Palace Rests., Inc., 272 F. Supp. 2d 314, 317 (S.D.N.Y. 2003); Gottlieb v. Kenneth D. Laub & Co., Inc., 82 N.Y.2d 457, 459, 605 N.Y.S.2d 213, 214-15 (1993). In the 2010 statute, effective April 9, 2011, this omission was addressed, with the remodeled section 198 now specifying that violation of section 195(1) would trigger entitlement to "damages of fifty dollars for each work week that the violations occurred or continue[d] to occur, but not to exceed a total of two thousand five hundred dollars, together with costs and reasonable

---

[58] Under the version of the statute effective until the passage of the Wage Theft Prevention Act, employees bringing "wage claims" in court were entitled to a "reasonable sum, not exceeding fifty dollars for expenses, . . . reasonable attorney's fees and, unless the employer proves a good faith basis to believe that its underpayment of wages was in compliance with the law, an additional amount as liquidated damages equal to twenty-five percent of the total amount of wages to be due." New York Labor Law § 198(1) &(1-a) (2010). This version made no mention of the notice and wage-statement provisions.

attorney's fees". N.Y. Labor Law § 198(1-b) (2014). By the same amendment the statute newly stated that any violation of section 195(3) would entitle the employee to an award of $100.00 for each work week in which the violation occurred or continued, but again with a ceiling of $2,500.00. N.Y. Labor Law § 198(1-d).[59]

Since enactment of the Wage Theft Prevention Act, which strengthened the protections of the Labor Law in a variety of aspects -- notably by increasing liquidated damages from 25 percent to 100 percent, see, e.g., Mejia v. East Manor USA Inc., 2013 WL 3023505, *6 n.8 (E.D.N.Y. April 19, 2013) -- the courts have repeatedly addressed the question of whether its provisions applied retroactively, that is, to events transpiring before the effective date of April 9, 2011. With only one exception (a New York State Supreme Court decision)[60], the reported decisions have held that these new provisions do not apply retroactively, and that consequently any asserted violations occurring before the

---

[59] Effective February 27, 2015, the weekly damage awards of $50.00 per week and $100.00 per week have been amended to daily awards of $50.00 per day and $250.00 per day, with respective ceilings of $5,000.00 each, for a total maximum of $10,000.00. See L.2014 ch. 537, § 2.

[60] See Ji v. Belle World Beauty, Inc., 2011 Misc. LEXIS 5032, *6 (Sup. Ct. N.Y. Cty. Aug. 24, 2011), discussed in Galeana, __ F. Supp. at __, 2014 WL 1364493 at *9.

effective date of the new law must be judged in accordance with the pre-existing statutory language. See, e.g., Azkour, 2015 WL 631377 at *10 n.5; Quintanilla v. Suffolk Paving Corp., 2012 WL 4086805, *3-5 (E.D.N.Y. Sept. 17, 2012); Zubair, 900 F. Supp.2d at 360 n.3; Maldonado v. La Nueva Rampa, Inc., 2012 WL 1669341, *9 n.19 (S.D.N.Y. May 14, 2012); McLean v. Garage Mgt. Corp., 2012 WL 1358739, *9-10 (S.D.N.Y. April 19, 2012); Benavidez v. Plaza Mexico, Inc., 2012 WL 500428, *8-9 (S.D.N.Y. Feb. 15, 2012); Chenensky v. New York Life Ins. Co., 2012 WL 234374, *2-3 (S.D.N.Y. Jan. 10, 2012); Wicaksono, 2011 WL 2022644 at *6 n.2.

   The reasoning of these decisions is plainly sound. Generally statutes are assumed to apply prospectively under both federal and New York precedent, and although that presumption is somewhat lessened in the case of remedial statutes, retroactivity is not to be inferred even for a remedial statute without some indication of legislative intent. See, e.g., CFCU Comm. Credit Union v. Hayward, 552 F.3d 253, 262 (2d Cir. 2009) (quoting inter alia Majewski v. Broadalbin-Perth Cent. School Dist., 91 N.Y.2d 577, 584, 673 N.Y.S.2d 966, 968 (1998) (quoting N.Y. Stat. Law § 321)). The pertinent language of the Wage Theft Prevention Act does not suggest any such intent, nor does the legislative history. See, e.g., Eschmann, 2014 WL 1224247 at 13 ("[T]he

statutory text, legislative history, and weight of authority support the conclusion that the WTPA does not apply retroactively."); Maldonado, 2012 WL 1669341 at *10 n.19. Indeed, the statutory specification that the Act was not to take effect until some months after its enactment (see L.2010 ch. 564, § 17) is affirmative evidence that the legislature was not intending sub silentio to impose penalties on employers for conduct undertaken long prior to its passage. Accord Lagano v. Chrysler Corp., 957 F. Supp. 36, 38 (E.D.N.Y. 1997) ("This conclusion is bolstered by comparing the language of immediate effectiveness with the effectiveness provisions of other portions of the statute.") (discussing the New York Workers' Compensation Law); People v. Basir, 141 A.D.2d 745, 842, 529 N.Y.S.2d 841, 842 (2d Dep't 1988) ("[T]he Legislature, by expressly providing that the amendment would take effect several months after its enactment, demonstrated an intent contrary to retroactive application.") (discussing New York Penal Law § 155.30).

In sum, we conclude that claims for denial of wage notices and statements under Labor Law §§ 195(1) and (3) must be limited to violations occurring on or after April 9, 2011. Since most of the plaintiffs continued to be employed by defendants after that date, and since their uncontradicted and credible testimony

demonstrates that defendants never complied with the statutory requirements that they provide both written notice of pay and other conditions and weekly wage statements, those plaintiffs are entitled to recover at the statutory rates for those violations.


H. <u>Defendants' Statute-of Limitations Defense</u>


Under the FLSA the statute of limitations for assertion of wage claims is two years unless the employer acted willfully, in which case the limitations period extends to three years. 29 U.S.C. § 255(a). The limitations period for such claims under the New York Labor Law is six years. N.Y. Labor Law §§ 198(3), 663(3). Plaintiffs assert that defendants acted willfully, thus triggering the three-year limitations period under the FLSA, and that in any event all of plaintiffs' claims, which arose as early as 1997, should be deemed viable by application of equitable tolling. (Pls.' Mem. 28-34). Defendants argue that they did not act willfully, and that the statutory provisions therefore preclude assertion of federal claims predating August 20, 2010 and state claims arising before August 20, 2006. (Defs.' Mem. 9-10). They also implicitly oppose any tolling.[61] We conclude that

---

[61] We note that defendants' post-trial memorandum of law does not explicitly address plaintiffs' arguments for such tolling. We

defendants' manifold violations were willful and, further, that in this case the plaintiffs' claims survive the limitations defense because equitable tolling is appropriate here.

There is no doubt that, tolling aside, plaintiffs are entitled to the benefit of a three-year statute of limitations under the FLSA, since they have established that defendants' violations were willful. "An employer willfully violates the FLSA when it 'either knew or showed reckless disregard for the matter of whether its conduct was prohibited by' the Act." Kuebel, 643 F.3d at 366 (quoting Young v. Cooper Cameron Corp., 586 F.3d 201, 207 (2d Cir. 2009) (quoting McLaughlin, 486 U.S. at 133)). Accord, e.g., Parada v. Banco Industrial De Venezuela, C.A., 753 F.3d 62, 71 (2d Cir. 2014). For reasons noted, we find that plaintiffs have amply proven that defendants' violations were willful. Given defendants' long and sophisticated experience in the restaurant industry, their serial violations of the requirements for payment of minimum wages and overtime, their own testimony that they were aware of these requirements, the repeated findings by the New York Labor Department that they were

---

infer defendants' opposition from their assertion that the statutes of limitations limit plaintiffs to recovery for only two and six years. (See Defs.' Mem. 9-10).

in violation, their failure -- despite these findings -- to bring themselves into compliance, their large-scale manufacturing of fraudulent records, their later concealment of those documents, and their persistent refusal to advise their own employees of the various rights that defendants were systematically violating, there can be no doubt that they knew of the legal requirements and chose to disregard them. Thus the three-year limitations period is applicable under the FLSA.

The more challenging question is whether plaintiffs have satisfied the requirements for invoking equitable tolling, so as to permit plaintiffs to assert claims going back as far as 1997. We conclude that, although the question is a closer one, plaintiffs have succeeded in justifying this step.

We start with a recent clarification by the Second Circuit as to what is required to invoke that doctrine. As the Court noted in distinguishing three concepts -- equitable tolling, fraudulent concealment of a cause of action, and equitable estoppel -- tolling may be invoked when the defendant has engaged in fraudulent concealment, but equitable tolling does not require such intentional concealment as a predicate:

Equitable tolling permits a plaintiff to avoid the bar of

the statute of limitations:

> if despite due diligence he is unable to obtain vital information bearing on the existence of his claim. Equitable tolling is frequently confused both with fraudulent concealment on the one hand and with the discovery rule -- governing . . . accrual -- on the other.  It differs from the former in that it does not assume a wrongful -- or any -- effort by the defendant to prevent the plaintiff from suing.

Valdez ex rel. Donely v. United States, 518 F.3d 173, 182 (2d Cir. 2008) (quoting Cada v. Baxter Heathcare Corp., 920 F.2d 446, 451 (7th Cir. 1990)). See also Pearl v. City of Long Beach, 296 F.3d 76, 81 (2d Cir. 2002). "The relevant question is not the intention underlying defendants' conduct, but rather whether a reasonable plaintiff in the circumstances would have been aware of the existence of a cause of action." Veltri v. Bldg. Serv. 32B-J Pension Fund, 393 F.3d 318, 323 (2d Cir. 2004). Accord Valdez, 518 F.3d at 183. In determining how to apply that principle, the Second Circuit has noted that, as a general matter, equitable tolling is an "extraordinary measure" and "applies only when plaintiff is prevented from filing despite exercising that level of diligence which could reasonably be expected in the circumstances." Veltri, 393 F.3d at 322. Accord Phillips v. Generations Family Health Ctr., 723 F.3d 144, 149-50 (2d Cir. 2013).

That said, the analysis of the circuit court in Veltri, more

recently reaffirmed in Valdez, is particularly pertinent in assessing the record in this case. In Veltri the plaintiff sued under the Employee Retirement and Income Security Act ("ERISA"), 29 U.S.C. § 1101 et seq., to challenge a decision by the defendant union pension fund authorizing a pension payment that was below the level to which Veltri contended he was entitled. 393 F.3d at 321-22. The District Court granted summary judgment for plaintiff, and in doing so it rejected the defendant's statute-of-limitation defense, which was premised on the fact that Veltri had filed suit eleven years after denial of his application, well past the four-year limitations period applicable to such ERISA claims. Id. at 322. In reaching its conclusion, the District Court held that the claim had not accrued at the time of denial of the plaintiff's challenge to the pension calculation because the pension fund had not given him notice of his right to pursue an appeal of that decision. Id.

On appeal the Second Circuit affirmed, and in doing so it offered a slightly different analysis. It declined to decide the accrual question, and instead held that equitable tolling was appropriate because the pension fund, in violation of a Department of Labor regulation, had failed to advise plaintiff in writing that he had the option to pursue an administrative appeal from the

original adverse decision, and, upon its denial, to seek review in the District Court. Veltri, 393 F.3d at 323 (quoting 29 C.F.R. § 2560.503-1(g)(1)). The panel rested its decision squarely on the existence of the regulation, which specified that the required notice of an adverse decision:

> shall set forth, in a manner calculated to be understood by the claimant–
> . . .
>
> (iv) A description of the plan's review procedures and the time limits applicable to such procedures, including a statement of the claimant's right to bring a civil action . . . .

Veltri, 393 F.3d at 323. The Court noted that this regulation was issued on the basis of the statutory mandate that ERISA plans "provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied", 29 U.S.C. § 1133(1), and that they "afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review." 29 U.S.C. § 1133(2). The Court further observed that Congress had made plain its concern about "the 'lack of employee information and adequate safeguards concerning' the operation of such plans" and its intention "to 'protect . . . the interests of participants . . . and their beneficiaries, by . . . establishing standards of conduct . . . for fiduciaries . . . and by providing for appropriate remedies . . .

and ready access to the Federal courts." Veltri, 393 F.3d at 323
(quoting 29 U.S.C. §§ 1001(a) & (b)).


    With this framework in mind, the Court noted that although the
pension plan had provided its Pension Fund booklet to Veltri, which
described his right to an administrative appeal, it had failed to
comply with the regulatory requirement of notice that he had a
right to sue after exhaustion of his administrative remedies.
Veltri, 393 F.3d at 324-25. According to the Court, that failure --
which the panel conceded was not "the kind of concealing activity
that would normally be held to mandate equitable tolling" -- "must
be viewed in light of the regulatory notice requirement and of
Congress's policy of protecting the interests of pension plan
participants by ensuring 'disclosure and reporting to participants'
and 'ready access to the Federal courts.'" Id. at 324. Given the
regulation and the "express policy" of Congress, the Court held
"that the failure to comply with the regulatory obligation to
disclose the existence of a cause of action to the plan participant
whose benefits have been denied is the type of concealment that
entitles plaintiff to equitable tolling of the statute of
limitations." Id. See also id. at 324-25 (citing cases).


    In so holding, the Court added the caveat that tolling would

101

not be appropriate if it were demonstrated that the plaintiff actually knew of his cause of action despite the failure of the defendant to provide notice. See Veltri, 393 F.3d at 325-26 (discussing I.V. Servs. of Am., Inc. v. Inn Dev. & Mgmt. Inc., 182 F.3d 51 (1st Cir. 1999). In this vein the Court noted that the defendant could invoke the defenses of laches and estoppel if it could establish that the plaintiff was guilty of an unreasonable lack of diligence with resultant prejudice to the defendant. Veltri, 393 F.3d at 326 (quoting King v. Innovation Books, 976 F.3d 824, 832 (2d Cir. 1992) (laches); Kosakow v. New Rochelle Radiology Assocs., P.C., 274 F.3d 706, 725 (2d Cir. 2001) (equitable estoppel)).

The Veltri Court did not clearly state whether -- assuming a failure of notice by defendant in violation of a regulation -- the burden of proof as to plaintiff's actual knowledge despite the presumption of ignorance embodied in the regulation would fall on plaintiff or the defendant; it did, however, refer to the regulation in question as premised on a presumed lack of knowledge by the plan participant absent notice by the plan. See Veltri, 393 F.3d at 323. In a later decision, in Valdez, the Court did not directly address this question either, though it could arguably be understood to imply that it was defendant's burden to show that the

application of tolling was inappropriate. Moreover, it applied
Veltri's holding that a lack of notice triggered tolling even in
the absence of a regulation mandating notice. See Valdez, 518 F.3d
at 183.

The plaintiff in Valdez was suing under the Federal Tort
Claims Act ("FTCA"), 28 U.S.C. § 2671 et seq., for medical
malpractice in connection with prenatal care and delivery. Valdez,
518 F.3d at 175-76. The negligence was allegedly attributable to a
doctor who worked at a community health center that was funded by
the Federal Government, a fact apparently unknown to the
plaintiff.[62] Id. at 176. Because plaintiff did not know of the
federal status of the clinic, she did not file the mandatory
administrative claim to preserve her FTCA cause of action before
suing, and then filed suit against the doctor and clinic in state
court, not in federal court, and only after the FTCA limitations
period for suit had expired. Id. The lawsuit was removed to federal
court, the United States was substituted as defendant, and
plaintiff thereafter filed an administrative claim. Id. The
District Court granted judgment for defendant based on the
plaintiff's failure to file a timely FTCA agency claim. Id.

---

[62] The suit was filed by the mother of the infant on her own
behalf and on behalf of her daughter. Valdez, 518 F.3d at 176.

On appeal the Circuit reversed. In doing so, it invoked Veltri, which it characterized as ruling that the failure of the ERISA plan to adhere to the regulation mandating notice "established a special circumstance warranting the doctrine of equitable tolling even though the failure to provide such notice would not otherwise 'normally be held to mandate equitable tolling.'" Valdez, 518 F.3d at 183 (quoting Veltri, 393 F.3d at 324). The Valdez panel went to state, in describing Veltri, that "[n]evertheless, we also held that a plaintiff, who would otherwise be entitled to rely 'on equitable tolling on the basis of defective notice,' could forfeit that right if he failed to exercise due diligence to the prejudice of the defendant." Valdez, 518 F.3d at 183 (citing Veltri, 393 F.3d at 326 (discussing laches and estoppel defenses)).

On the basis of Veltri and general notions of equity, the Valdez Court held that the failure of the Government to issue a regulation mandating notice of the federal status of such community health clinics also constituted a special circumstance justifying equitable tolling of the limitations period for filing suit. Valdez, 518 F.3d at 183. In this regard it observed that patients at such clinics were unlikely to know that the institution was federally funded, thus triggering FTCA coverage, and would likely

104

assume that the doctors were private practitioners and hence suable only under state common law. Id. The Court further surmised that the Federal Government was probably "aware of the consequences of its failure to disclose the material facts of federal employment by doctors" and that its silence about this fact was therefore at least as "problematic" as the conduct of the pension plan that had triggered tolling in Veltri. Id.[63]

Regardless of where the burdens of proof lie here with respect to knowledge and diligence, plaintiffs in this case have justified invocation of equitable tolling. We start with the fact that, as in Veltri, both federal and state law, by statute and regulation, mandate that employers provide various specific forms of written notice to employees of their rights under the FLSA and the New York Labor Law and their attendant regulations. See, e.g., 29 U.S.C. § 203(m); 29 C.F.R. § 531.59(b); New York Labor Law §§ 195(1) & (3); N.Y.C.R.R. tit. 12 § 146-1.3. See also Copantitla, 788 F. Supp. 2d at 287-91 (citing cases discussing notice requirements). These requirements are imposed precisely to offer protection to potentially exploited workers who are unlikely to be aware of their

---

[63] The Court also held that the failure of the plaintiff to file an administrative claim before removal of the case to federal court was not fatal to the lawsuit. Id. at 184-85 (discussing the Westfall Act, 28 U.S.C. § 2679(d)(5)).

many statutory rights under the pertinent legislation -- a body of law that imposes a thicket of requirements on employers, and that, at least until recently, was not likely to be within the ken of many low-wage employees, particularly in service industries that rely on low-paid and ill-educated labor for their work forces. See, e.g., Wolinsky v. Scholastic Inc., 900 F. Supp. 2d 332, 339 (S.D.N.Y. 2012) (discussing "Congress's intent both to advance employees' awareness of their FLSA rights and to ensure pervasive implementation of the FLSA in the workplace"); Martinez v. Ragtime Foods of New York, Inc., 2011 WL 5508972, *2 (E.D.N.Y. Nov. 10, 2011) (discussing "the legislative purpose of the FLSA and . . . the Department of Labor's regulatory effort to notify employees of their FLSA rights") (quoting Dees v. Hydradry, Inc., 706 F. Supp. 2d 1227, 1242 (M.D. Fla. 2010)).

    The statutory and regulatory requirements for detailed and repeated notice of rights are particularly salient in the urban restaurant industry, much of which not only relies on relatively poor and uneducated employees, but thrives on the hiring of immigrants who often have little or no English language skills, and who may live in communities of fellow immigrants who are similarly

isolated and disadvantaged.[64] <u>Accord</u> <u>Colella v. New York City</u> <u>Transit Auth.</u>, 2014 WL 7967835, *7 (S.D.N.Y. Dec. 2, 2014) ("[The FLSA] is designed to protect a vulnerable part of the work force."). Until recent greater outreach efforts by unions and other community-based and governmental organizations, <u>see</u>, <u>e.g.</u>, <u>Saigon</u> <u>Gourmet Rest., Inc.</u>, 2008 WL 449658, *§ II (N.L.R.B. Feb. 14, 2008), these individuals, many of whom are likely not documented aliens, could not have been expected to have sufficient knowledge of relevant legal norms, much less the technical legal requirements of governing labor laws, to know whether their rights have been violated, unless their employers complied with notice requirements.[65] We further note that to the extent that many of these individuals are here without required immigration papers, in

---

[64] <u>See</u> News Release, United States Department of Labor, Payton's Place restaurant in Duncan, Okla., agrees to pay servers nearly $85,000 in Back Wages Following US Department of Labor Investigation (Jan. 2, 2013), 2013 WL 29771, http://www.dol.gov/opa/media/press/whd/WHD20122444.htm ("Restaurant workers are among the most vulnerable in the work force.").

[65] In recent years the courts here have witnessed a growing volume of suits under the FLSA and New York Labor Law, many on behalf of restaurant workers. <u>See</u>, <u>e.g.</u>, <u>Fujiwara v. Sushi Yasuda</u> <u>Ltd.</u>, __ F. Supp. 3d __, __, 2014 WL 5840700, *1 & n.1 (S.D.N.Y. Nov. 12, 2014). <u>See</u> <u>also</u> Steven Greenhouse, <u>Study Finds</u> <u>Violations of Wage Law in New York and California</u>, N.Y. TIMES, Dec. 3, 2014, at http://www.nytimes.com/2014/12/04/business/study-finds-violations-of-wage-law-in-new-york-and-california.html?_r=0.

the past they were likely to be hesitant to pursue such legal rights even if they were vaguely aware of their existence, for fear of disclosure of their status, a circumstance that may be gradually altering in recent years. See, e.g., Colon v. Major Perry St. Corp., 987 F. Supp. 2d 451, 452-57 (S.D.N.Y. Dec. 19, 2013); Marquez v. Erenler, Inc., 2013 WL 5348457, *1-2 & n.1 (S.D.N.Y. Sept. 20, 2013); Angamarca v. Da Ciro, Inc., 303 F.R.D. 445, 446-48 (S.D.N.Y. 2012); Solis v. Cindy's Total Care, Inc., 2011 WL 6013844, *1-3 (S.D.N.Y. Dec. 2, 2011).[66]

The record in this case well illustrates this pattern. As noted, defendants not only persisted in paying these and other employees grossly substandard wages and diverting some of their tip income, but -- in violation of statutes and regulations -- they made sure to deny the workers any information that would disclose the violations of their rights, whether through the provision of a

---

[66] We note the frequency with which FLSA defendants seek in discovery or at trial to pursue questions of their employees' immigration status. See, e.g., Marquez, 2013 WL 5348457 at *1-2; Solis, 2011 WL 6013844 at *1-3. In fact, in this case defendants advertised their intention to pursue such an inquiry at trial, an effort that we rejected in granting plaintiffs in limine relief. See Kim v. Kum Gang, Inc., 2014 WL 2510576, *1-2 (S.D.N.Y. June 2, 2014). It bears mention that defendants pursued this effort despite the trial testimony of defendants Ji Sung Yoo and Chunsik Yu that the restaurant management always verifies immigration status as a condition of hiring. (J. Yoo Decl. ¶ 18; Yu Decl. ¶ 16). That assertion is plainly not credible.

date-of-hire notice of pay, the distribution of wage statements on pay day, the posting of required notices (much less posters in the employees' principal languages and in places used to communicate with the serving staff) or any other written or oral disclosure of minimum-wage and overtime requirements, tip-credit rules, and the consequences of an employer's violation of those rules. Moreover, the plaintiffs whom they victimized in this fashion were particularly vulnerable to this type manipulation. All were immigrants, none of whom spoke sufficient English to testify without either a Korean- or Spanish-language interpreter. Almost all worked for many years for meager wages in the same two restaurants. There was no evidence that any of them had specific, much less detailed, knowledge of their rights under the labor laws or of the defendants' violation of those rights until, at the very least, the end of the Labor Department investigation that concluded in 2011, if then. (See, e.g., Morales Decl. ¶ 37; Ventura Decl. ¶ 31; Song Decl. ¶ 21). See generally Leon v. Pelleh Poultry Corp., 2011 WL 4888861, *3 (S.D.N.Y. Oct. 13, 2011) (quoting Ramirez v. CSJ & Co., 2007 WL 1040363, *3 (S.D.N.Y. April 3, 2007)) ("[P]laintiffs, according to their complaint, are immigrant Latino manual workers routinely working longer than ten hours per day and forty hours per week. Their ability to learn of this and other legal rights 'under the complex web of labor and social legislation

that governs the modern workplace is not great.'").

Although defendants do not directly address this issue, we infer two possible arguments in opposition to equitable tolling. First, most of the plaintiffs did not themselves testify explicitly that they were ignorant of their rights throughout the relevant time period, although they implied as much, and defendants might be heard to urge that this constitutes a failure by them to carry their burden of proof. Second, in view of the fact that the Labor Department conducted three investigations of defendants between 2005 and 2011, they might argue that it would be reasonable to infer that plaintiffs should have become aware sometime during this period that they were being cheated of their lawful compensation. Neither hypothesized argument is persuasive.

Even if we assume that plaintiffs bear the burden of proof of ignorance even in the face of the employer's violation of statutes and regulations mandating notice, the record amply supports the inference. Indeed, a number of the plaintiffs specifically testified that they were unaware of legal requirements until sometime after the end of the last Labor Department investigation, and another noted that the investigators had not contacted him. (Morales Decl. ¶ 37; Ventura Decl. ¶ 31; J. Park Decl. ¶ 30; see

110

also Song Decl. ¶ 21). Moreover, the evidence as to the plaintiffs'
circumstances -- including their immigrant status, their marginal
economic situation, their lack of English language skills, their
relative isolation as they were required to spend the vast majority
of their waking hours at work at the restaurants -- amounts to very
persuasive circumstantial evidence that they did not know that they
had potentially viable legal claims against their employer until at
least 2011. Moreover, the extensive efforts of the defendants to
conceal from plaintiffs both the nature of their rights and
defendants' violation of them -- as well as the behavior of the
owner when he learned of the lawsuit (see J. Park Decl. ¶ 27; see
also C. Park Decl. ¶ 27) -- further supports the inference that the
plaintiffs lived in ignorance of their right to challenge their
employer and were, in any event, not lacking in reasonable
diligence.

As for the significance of the Labor Department
investigations, there is no meaningful evidence suggesting that
these inquiries led to any disclosure to the employees until at
least some time in 2011. Indeed, the tenor of the testimony of most
of the plaintiffs was that defendants never provided the required
wage and tip notices and that posters were not displayed in
appropriate places and languages until at least 2011, if ever.

111

Moreover, even after the end of the last investigation, defendants continued to pay sub-standard minimum wages and, for some of the most vulnerable employees, continued to pay a daily, rather than hourly, wage. It also does not appear that these investigations targeted payments to any of the plaintiffs or that any of them were interviewed by the Department (see, e.g., C. Park Decl. ¶ 30), a circumstance that might have led to their learning that their legal rights were being violated. It also bears emphasis that a general knowledge that labor laws offered some protections to employees is not itself sufficient to deem such workers so knowledgeable about their rights as to require prompt action by them. See, e.g., Lama v. Malik, __ F. Supp. 3d __, 2014 WL 5590785, *5 (E.D.N.Y. Nov. 3, 2014). Cf. Moreno v. 194 East Scond Street LLC, 2013 WL 55954, *2-3 (S.D.N.Y. Jan. 4, 2013) (disputed fact issues regarding plaintiff's knowledge); Saunders v. City of New York, 594 F. Supp. 2d 346, 363-64 (S.D.N.Y. 2008) (same). Thus, even if some of the plaintiffs were aware that the Department was conducting some sort of investigation, that would not preclude equitable tolling. Compare, e.g., Upadhyay v. Sethi, 2012 WL 3100601, *3 (S.D.N.Y. July 31, 2012) (plaintiff associated with group that educates members on wage-and-hour rights, had friends who had filed FLSA suits, and appeared in a workers' rights documentary); Ramos v. Platt, 2014 WL 3639194, *1, *4 (S.D.N.Y. July 23, 2014) (plaintiff admits he knew

of violations earlier).

In short, we have no reason to believe that plaintiffs knew of the violation of their rights until at least sometime in 2011. Hence their joint filing of a lawsuit in mid-2012 cannot be deemed so late as to suggest a lack of reasonable diligence.

Moreover, to the extent that defendants might be understood to assert sub silentio a defense of laches or equitable estoppel, that too would fail since they demonstrate no prejudice from whatever delay there may have been in plaintiffs' assertion of their claims. Indeed, if anything, that delay inured to defendants' benefit since it permitted them to conduct their business for many years with minimal, if unlawful, labor costs, thus fattening their profits. Moreover, defendants cannot argue that the delay led them to discard essential and favorable business records for the earlier period that they would have retained had suit been filed earlier; defendants never maintained legitimate records of hours, and there is no suggestion in the record that they disposed of pay records in the ordinary course of business.[67]

---

[67] As noted, defendants report that they no longer have records of gross revenue predating 2003, which would be pertinent to the question of whether they met the $500,000.00 FLSA threshold in those years. Given the testimony of Ji Sung Yoo,

Accordingly, we conclude that equitable tolling rescues plaintiffs' claims predating the FLSA and Labor Law statutes of limitations.

I. Individual Defendants' Liability

Plaintiffs have pursued their claims not only against the corporate defendant, which owns the two restaurants, but also against three individual defendants. All three are deemed employers and hence liable, in whole or in part, for the injuries suffered by plaintiffs.

Under both federal and New York law, personal liability may be imposed on "employers".[68] The FSLA defines an employer as "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). This term is to be

_____

however, that fact is not in genuine dispute. (See Tr. 372-73). Moreover, had it been in question, defendants would have been free to obtain copies of the corporate tax returns for those years from the Internal Revenue Service. They apparently chose not to do so, reflecting both the lack of a genuine dispute and the absence of any prejudice to them.

[68] Since New York law largely parallels that of the FLSA in defining the scope of the term "employer", e.g., Mejia, 2013 WL 3023505 at *3 (citing cases); Jiao v. Chen, 2007 WL 4944767, *9 n.12 (S.D.N.Y. Mar. 30, 2007), we focus on caselaw interpreting the FLSA.

114

broadly construed. As observed by the Second Circuit, "The Supreme Court has emphasized the 'expansiveness' of the FLSA's definition of employer. . . . Above and beyond the plain language . . . the remedial nature of the statute further warrants an expansive interpretation of its provisions so that they will have 'the widest possible impact' in the national economy." Herman, 172 F.3d at 139 (internal quotations omitted).

This test rests on the "economic reality" of the relationship between the individual defendant and the business. Id. Accord Irizzary v. Catsimatidis, 722 F.3d 99, 104 (2d Cir. 2013). The court must look to such matters as whether the defendant has the power to hire and fire the employees, whether he supervises or controls their work schedule and performance, whether he determines compensation and methods of payment, and whether he maintains employment records. Id. at 105; Herman, 172 F.3d at 139. These factors are not exclusive, and the plaintiff need not satisfy all of them to demonstrate that a particular defendant is an employer. See, e.g., Zheng v. Liberty Apparel Co., 355 F.3d 61, 71-72 (2d Cir. 2003).

In this case Ji Sung Yoo, who is the sole owner of Kung Gan, Inc., testified that he maintains active supervision of all aspects

the business (J. Yoo Decl. ¶¶ 3, 7, 8, 57), to the point that he works at his restaurants seven days a week (Tr. 377), and both he and defendant Yu, as well as various plaintiffs, confirmed that he has the authority to set policy regarding all principal elements of the restaurant operation. (E.g, Yu Decl. ¶¶ 15-16; J. Yoo Decl. ¶ 18; C. Park Decl. ¶ 38; Choi Decl. ¶¶ 7, 28; H. Kim Decl. ¶ 25; J. Park ¶¶ 13, 27-28, 32; Ju Decl. ¶ 27). Necessarily, then, he is properly deemed an employer. See, e.g., Irizzary, 722 F.3d at 103-05; id. at 109 (owner "must possess control over a company's actual 'operations' in a manner that relates to a plaintiff's employment").

According to numerous plaintiffs, the testimony of Ji Sung Yoo and Kyung Le Yoo, and partially by his own admission, Chunsik Yu was in charge of the personnel operations, particularly with regard to the wait staff, at the Flushing restaurant. This included the power to hire and fire employees (Tr. 124-25, 209-10, 245, 285, 339-40, 375-76; C. Park Decl. ¶ 39; Choi Decl. ¶ 29; J. Park Decl. ¶ 33; Ju Decl. ¶ 28; J. Song Decl. ¶ 25; T. Kim Decl. ¶ 27; Y. Kim Decl. ¶ 25), the initial authority to set wages (possibly subject to review by Kyung Le Yoo) (Tr. 127, 322-23, 376; Choi Decl. ¶ 29) and the responsibility to supervise the wait staff (Tr. 13, 92-92, 101, 144, 181, 234; Ju Decl. ¶ 28; Morales Decl. ¶¶ 30, 42; Y. Kim

116

Decl. ¶ 25; <u>see also</u> J. Yoo Decl. ¶¶ 7, 10-11[69]) and approve banquet contracts. (Tr. 168; C. Park Decl. ¶ 34). These roles suffice to justify deeming him an employer for these purposes. <u>See</u>, <u>e.g.</u>, <u>Ke</u>, 595 F. Supp. 2d at 264-65.

As for Kyung Le Yoo, until at least January 2012, he handled payroll, signed the pay checks, had final approval of pay raises, and kept a close watch over the running of the Flushing restaurant. (Tr. 126, 174, 311, 317; K. Yoo Decl. ¶ 9; H. Kim Decl. ¶ 27; Y. Choi Decl. ¶ 30; Morales Decl. ¶ 43). Moreover, he dealt with the Labor Department as the representative of the company and was directly involved in the creation of false time records. (Song Decl. ¶ 23; Tr. 237-40). These many roles amply justify deeming him an employer of the plaintiffs. <u>See</u>, <u>e.g.</u>, <u>Ramirez v. Riverbay Corp.</u>, 35 F. Supp. 2d 513, 521-22 (S.D.N.Y. 2014); <u>Ke</u>, 595 F. Supp. 2d at 264-65.

---

[69] While Mr. Ji Yoo's declaration states that Mr. Chunsik Yoo "does not hire and fire the employees at KGS" (J. Yoo Decl. ¶ 15), that testimony is clearly not credible in light of the overwhelming weight of contrary evidence and Mr. Ji Yoo's testimony at trial.

J. Measurement of Damages

Plaintiffs have provided a detailed breakdown of claimed damages in all categories for which they seek pecuniary relief, and they explain as well the assumptions that they made in performing these calculations. (Pls.' Damages St. 1-11 & accompanying charts).[70] With only a few exceptions -- relating to measurement of diverted tips -- defendants offer no quarrel with plaintiffs' calculations, although they of course dispute their liability for all of the categories of damages that plaintiffs are claiming. (See Defs.' Mem. 4-8).

Lacking any meaningful time or pay records from defendants, plaintiffs were required to rely on their own recollection of hours worked and pay received over a span of many years. (Pls.' Damages St. 2-3). Necessarily, then, they were compelled to rest their measurement of damages on estimates that lacked the precision that would have been available had defendants maintained and preserved contemporaneous records. (See Pls. Damages St. 2-3). That said,

---

[70] Plaintiffs' statement on damages appears in two parts in the record, first at docket no. 124 -- with attached charts for plaintiffs T. Kim, Ju, H. Kim, Choi, Y. Kim, and C. Park -- and then at docket no. 125 -- with attached charts for plaintiffs J. Park, Morales, Shen, Song, and Ventura.

such imprecision does not undermine the strength of plaintiffs' showing. See, e.g., Reich, 121 F.3d at 70 n.3. Moreover, we note that the testimony of the plaintiffs was fairly consistent and painted an adequate picture of the historical facts as to work hours and pay received, as well as the dating of material changes in management practices regarding lengths of shifts and the events relevant to determining when plaintiffs might have achieved sufficient notice of their rights and of defendants' violations. Furthermore, in calculating the amount of improper tip diversions to management, plaintiffs were able to access sufficient documentation from credit-card companies to permit a reasonable estimate of credit-card fees, which are permissibly deducted from the tip pool. (See Pls.' Mem. 19-20 & nn. 41-42; Pls. Reply Mem. [docket no. 127] 6-7). Moreover, in plaintiffs' many calculations, they relied on quite conservative assumptions when faced with uncertainties as to the specifics needed for computation of damages. (See, e.g., Pls. Damages St. 4-5). Hence, in the absence of any meaningful, much less persuasive, criticism by defendants of these calculations, we adopt them for purposes of determining the extent of relief to be awarded to plaintiffs.

We briefly note here the most salient assumptions invoked by plaintiffs. In calculating break times, plaintiffs assumed a 1.5

119

hour break during the weekdays and a one-hour break on weekends in the Dining Hall. (Pls.' Damages St. 3). This was quite consistent with the testimony of most plaintiffs, and indeed fairly conservative in light of a number of plaintiffs' testimony that they had even shorter, or no, breaks on the weekends. (See, e.g., H. Kim Decl. ¶ 12; Song Decl. ¶ 10). Similarly, plaintiffs' assumptions of 2.5 hour breaks on weekdays and 1.5 hour breaks on weekends in the Banquet Room (Pls.' Damages St. 3-4) are quite conservative in light of the testimony and fully justified.[71] (See, e.g., Ju Decl. ¶ 13; J. Park ¶ 16).

For the period after the change to hourly pay, plaintiffs assumed a break of 3.5 hours for all days in the Dining Hall. (Pls.' Damages St. 4). This assumption also is less generous to plaintiffs than would be justified by their testimony. (See, e.g., J. Park Decl. ¶ 15).

For meal breaks plaintiffs applied an across-the-board estimate of 15 minutes. (Pls.' Damages St. 4). This is the midpoint of the plaintiffs' varying accounts of having either ten or twenty

---

[71] The two bussers (Messrs. Morales and Ventura), the night-shift waiter (Mr. Y. Kim) and the cook (Mr. Shen) all had somewhat different schedules, and plaintiffs therefore used their own estimates of their non-meal breaks. (Pls.' Damages St. 4).

minutes for that break. (<u>See</u>, <u>e.g.</u>, Y. Kim Decl. ¶ 7; J. Park Decl. ¶ 15; Tr. 17, 137, 185-86, 233).  This too is fully justified.

As for the days worked, plaintiffs assumed that they all worked all weekend days, that is, Friday to Sunday. (Pls.' Damages St. 5). This too was consistent with the vast majority of the testimony. (<u>See</u>, <u>e.g.</u>, T. Kim Decl. ¶ 9; Y. Kim Decl. ¶ 6; Ju Decl. ¶ 10).[72]

As we have noted, the testimony as to when the restaurant shifted to an hourly pay system varied, with one or several plaintiffs recalling that this occurred sometime in 2010, the restaurants' accountant remembering the change having been instituted in 2012, and the majority of plaintiffs saying it happened in 2011. Faced with this uncertainty, plaintiffs assumed that it occurred in mid-March 2011. (Pls.' Damages St. 5). While it appears likely to have occurred later in 2011, plaintiffs'

---

[72] Plaintiffs, fairly, do not assume that each of them worked seven days per week. In the charts attached to their statement, they meticulously delineate an assumed number of days worked per week. (<u>See</u>, <u>e.g.</u>, pp. 26-31 of charts attached to Pls.' Damages St. [assumptions for plaintiff Ju]). The assumption that each plaintiff worked all weekend days simply reflects the fact that plaintiffs' respective days off typically did not fall on the weekend. (<u>See</u>, <u>e.g.</u>, T. Kim Decl. ¶ 9; Y. Kim Decl. ¶ 6; Ju Decl. ¶ 10).

assumption of an earlier date is entirely reasonable (and indeed more favorable to defendants).

In calculating hours worked, plaintiffs have omitted any of the excess hours attributable to the off-premises catering events. (Id. at 5-6). As noted, according to plaintiffs, assignments to these events, or working in the Banquet Room such days, could extend the shift to as much as 18 hours. (See, e.g., C. Park Decl. ¶ 12; H. Kim Decl. ¶ 18; J. Park ¶ 17).[73] Plaintiffs also exclude the additional hours, beyond twelve, that some of them worked when they were occasionally assigned to the Banquet Room or Special Rooms. (Pls.' Damages St. 6). Finally, as noted, they do not assert a claim for the time spent at the Sunday religious services. (Id.). In short, the calculation of total hours of work is entirely defensible.

As for pay received, plaintiffs used the daily wages attested to in the declarations (and the $5.00 per hour figure after the change to hourly wages, where relevant). (Pls.' Damages St. 7). If a given plaintiff's trial testimony "significantly varied" from that stated in his declaration, plaintiffs utilized the amount

---

[73] Even defendants conceded that shifts for those assignments could be as long as 16 hours. (J. Yoo Decl. ¶ 56).

asserted at trial. (<u>Id.</u>). Given the nature of cross-examination as
"the principal means by which the believability of a witness and
the truth of his testimony are tested," <u>Davis v. Alaska</u>, 415 U.S.
308, 316 (1974), this is an eminently reasonable approach -- even
if it results in the one area of plaintiffs' damages assumptions
that does not necessarily err on the side of conservative[74] -- and
especially in light of defendants' lack of any purported counter-
assumption in their post-trial submissions.

    The one set of measurements that defendants explicitly dispute
concerns the calculation of tips misappropriated by defendants.
(Defs.' Mem. 4-8). We briefly review plaintiffs' methodology for
determining tips taken by management and tips diverted to non-tip
employees, and then address the dispute. (<u>See</u> Pls.' Damages St. 9;
Pls. Mem. 18-22; Pls.' Reply Mem. 4-7).

    Based on the consistent testimony of plaintiffs that
management took for itself between 8 and 10 percent of credit-card

---

[74] The example used by plaintiffs in their damages statement
is that of Mr. Yoon C. Kim. (Pls. Damages St. 7). In his
declaration, he stated that -- subsequent to his first year as a
night shift waiter -- he "received approximately $55 to $60 per
day." (Y. Kim Decl. ¶ 15). When pressed at trial, he acknowledged
that he indeed never received more than $55 per day. (Tr. 141-
42).

tips from the Dining Hall, plaintiffs assume that the amount taken

was 8.5 percent. (Pls.' Mem. 19; Pls. Damages St. 9). They further

assume that a reasonable set-off for credit-card processing would

be three percent (id.), a figure that we have already found to be

reasonable, see supra pp. 80-81, and that defendants currently

utilize in distributing the credit card tip pool. (Tr. 342).[75] Thus

the presumed amount of tips misappropriated would be 5.5 percent of

the credit card tips.

To make an estimate of the credit card tips, plaintiffs rely

upon the defendants' accountant's journals for fiscal years 2011

and 2012, that is, from February 2010 through January 2012, which,

assuming a 15 percent average tip, reflected an average of about

$1,060.00 in credit card tips daily. (See Pls.' Mem. 19 n.42

(citing Pls.' Exs. 18 & 19)). If we assume an average of 17 waiters

on duty each day in the Dining Hall (See Pls.' Mem. 19 n.42 (citing

--------

[75] Plaintiffs note that, based on documents they received
from credit card companies (Pls. Exs. 12 & 14), the fees charged
by Visa, Mastercard and Discover to process payments to
defendants in the period 2011 to 2012 ranged from 2.2 to 2.5
percent. (Pls. Mem. at 19 n.41) (referring to id. at Attach. A).
They were unable to obtain comparable data from American Express.
(Id.) (referring to Amex website report of range of fees that was
somewhat higher).

124

T. Kim Decl. ¶ 16))[76], the per-worker tip share would be about $62.00, and the misappropriated 5.5 percent would be approximately $3.43. (See Pls.' Mem. Attach. B). Plaintiffs assume that this figure controls from 2006 to the commencement of the lawsuit (see Pls.' Mem. 20), an assumption that is conservative since Ji Sung Yoo testified that the restaurant had seen a decline in business and revenue from 2006 onward. (Tr. 373). For earlier years, plaintiffs started with the same figure but applied an inflation deflator, thus reducing the figure progressively each year, from $3.43 to $2.73 in 1997. (Pls.' Mem. 20).[77]

---

[76] Mr. Kim refers to 17 "waiters" on duty for dinner -- at least through 2011 -- although he leaves unclear whether this number includes the few bussers who worked the Dining Hall. (See T. Kim ¶ 16). In any event, this figure accords with that provided by Mr. Chul Park. (C. Park Decl. ¶ 22). This number contrasts slightly with that supplied by plaintiffs Ju, who estimated 12 waiters at lunch and 15 at dinner (Ju Decl. ¶ 19), and Song, who estimated about 13-15 waiters working in the Dining Hall on weekdays, and 22-24 on weekends. (Song. Decl. ¶ 17). This number also arguably conflicts with the number supplied by defendant Ji Sung Yoo, who reported that there were about 30 waiters in the Dining Hall, although this appears to refer to all shifts collectively. (J. Yoo Decl. ¶ 42). We rely on the estimate of 17 reported by Mr. Kim, since (a) we find plaintiffs' slightly varying estimates more plausible than that of Mr. Yoo and (b) defendants do not quarrel with plaintiffs' use of it for computational purposes.

[77] The annual numbers pre-2006 are as follows: 2005 - $3.32; 2004 - $3.21; 2003 - $3.13; 2002 - $3.06; 2001 - $3.01; 2000 - $2.93; 1999 - $2.83; 1998 - $2.77; and 1997 - $2.73. (Pls.' Mem. 20).

As for the portion of tips allocated to the panchan worker and the Banquet Room kitchen staff, plaintiffs assume that the panchan worker received $35.00 per shift from the Dining Hall wait staff (Pls. Mem. 20), which accords with the bulk of the testimony. Since such diversion of tips triggers liability by the employer, plaintiffs pursue recovery measured by the previously noted assumption of a wait staff of 17, and a resultant rounded figure of $2.00 owed per plaintiff. (Pls. Damages St. 9). For reasons noted, this calculation is entirely reasonable.

As for the sharing of the Banquet Room tip pool with the kitchen staff, plaintiffs relied on the documentation that they have for two months of banquet and catering events, covering January and February 2013. (See Pls.' Ex. 7; Pls. Mem. 21-22 & Attach. C). Those sheets reflect the total cost for all of the 28 Banquet Room events ($123,700.00),[78] and from that limited available

---

[78] In the interest of thoroughness, we note one apparent small error in plaintiffs' calculations here. Using their Exhibit 7, plaintiffs use only the cost of Banquet Room events to calculate diverted tips, even though the invoices included in this exhibit reflect both these events and outside catering jobs. While the total cost of all such events is $175,000.000, the total amount used by plaintiffs to calculate the diverted tips is based solely on in-restaurant events, for a total of $123,700.00. (See Attach. C to Pls. Mem.). This latter figure, however, appears to have (likely inadvertently) included one line-item from a catering event that took place at the Korean Presbyterian Church of Westchester. (Id. at p. 2 (citing Pls. Ex. 7 Bates no.

data, plaintiffs calculated an average total cost of such events ($4,418.00), assumed a 15 percent tip calculated based on that cost ($663.00), and then derived a figure -- premised on a diversion of 8 percent to the kitchen staff -- that represents the estimated amount of the diverted tips (see T. Kim Decl. ¶ 18; H. Kim Decl. ¶ 20; C. Park Decl. ¶ 24), which is subject to reimbursement by defendants ($53.00). (See Pls.' Mem. 21-22). They then divided that sum by six -- the number of wait staff who worked in the Banquet Room (see T. Kim Decl. ¶ 18; C. Park Decl. ¶ 24) -- yielding a daily diversion per employee of $8.84. (See Pls.' Mem. 21-22).

Finally, in calculating the amount of the proposed award that should be imposed on the individual defendants, plaintiffs have properly specified that the extent of their exposure is a product of the time periods when they were serving in capacities that amounted to their being employers of the plaintiffs. (Pls. Damages St. 10). Thus, they seek imposition of the full amount of their damages on Ji Sung Yoo, as he was the hands-on owner throughout the

---

1207)). The cost for this event was $5,600 (id.), meaning that the actual total cost of all Banquet Room events for this period was in fact $118,100.00. Accounting for this addition would ever-so-slightly unravel plaintiffs' calculations, a step we find unnecessary given their nature as estimates -- which are themselves generously conservative -- and the utter lack of an attempt by defendants to render their own calculations for plaintiffs' time worked.

127

relevant period. (J. Yoo Decl. ¶¶ 3-6). As for Chunsik Yu, he became the general manager of the Flushing restaurant in 2001, and he was absent because of a medical condition from December 2009 to January 2011. (Yu Decl. ¶¶ 6, 12). Accordingly, plaintiffs' calculation of damages against him excludes the period preceding 2001 and the time between December 2009 and January 2011. (Pls. Damages St. 10). As for Kyung Le Yoo, plaintiffs measure damages as against him for the period from 1997 through 2011. (Id.). That limitation is based on the evidence that he left the defendants' business as of 2012. (Tr. 311, 316; contra K. Yoo Decl. ¶ 10). These limitations are grounded in the evidence and are plainly justified.

In opposing aspects of plaintiffs' calculations, defendants assert three arguments. All are entirely meritless.

First, defendants argue that a mandatory "service charge" paid by banquet customers does not constitute a tip or part of a tip, and hence that plaintiffs overstated the amount of banquet tips because they included these sums in their calculations. (Defs.' Mem. 4-6). This is a non-starter.

The Labor Law provision that bars the employer from diverting

128

any tips intended for its employees states in pertinent part that
"no employer . . . shall demand or accept, directly or indirectly,
any part of the gratuities, received by an employee, or retain any
part of a gratuity or of any charge purported to be a gratuity for
an employee." N.Y. Labor Law § 196-d. See also Maldonado v. BTB
Events & Celebrations, Inc., 990 F. Supp. 2d 382, 389-91 (S.D.N.Y.
2013); Copantitla, 788 F. Supp. 2d at 282-83, 286-87. The New York
Court of Appeals has read section 196-d, insofar as it addresses
"any charge purported to be a gratuity", as covering mandatory
service charges if "it is shown that employers represented or
allowed their customers to believe that the charges were in fact
gratuities for their employees." Samiento v. World Yacht Inc., 10
N.Y.3d 70, 81, 854 N.Y.S.2d 83, 89 (2008). As the Court observed,
the pertinent test is based on "the expectation of the reasonable
customer." Samiento, 10 N.Y.3d at 79, 854 N.Y.S.2d at 87.[79]

---

[79] In contrast with the New York Labor Law's "reasonable
expectation" test, the FLSA includes a bright-line approach to
this issue. See Barenboim v. Starbucks Corp., 698 F.3d 104, 112
(2d Cir. 2012). Under the FLSA, "as a matter of law, a mandatory
charge cannot constitute a 'tip.'" Maldonado, 990 F. Supp. 2d at
388. Obligatory service charges are not tips under the FLSA,
despite the reasonable perceptions of the customers paying those
fees. Id. at 388. Accord Hart, __ F. Supp. 3d at __, 2014 WL
7183956 at *6-8. Nevertheless, the FLSA "is intended to be a
floor, not a ceiling on the amount an employee is entitled to
receive." Cao, 2010 WL 4159391 at *2 n.2.

Defendants concede that "[c]ustomers may assume that servers earn this fee as a tip." (Defs.' Mem. 6). That inference alone would be fatal to defendants' argument, since the required test looks to "how a reasonable customer would understand, in context, a particular surcharge." Maldonado, 990 F. Supp. at 389. Indeed, even without this concession, the record amply demonstrates that plaintiffs satisfy the relevant standard. In defendants' testimony they admitted that the service charge is intended as a gratuity. (Tr. 343-44; Pls. Ex. 20 at 136). As Mr. Yu testified, "the customer knows that [the service charge] is for tips." (Pls. Ex. 20 at 136). That observation confirms the obvious, since the banquet contracts refer to the service charge as "Minimum 15% [or 10%] service charge", plainly informing the customer that this charge is for tips and that the customer may increase the amount above the mandatory floor. (Pls. Exs. 7 & 38).

Second, defendants attack plaintiffs' estimate of credit-card fees, complaining that "[p]laintiffs fail[ed] to produce any Affidavits from the credit card companies stating the exact amount of the processing fees", and asserting that "American Express is known for charging considerably more in fees than other credit card companies." (Defs.' Mem. 5). Defendants go on to assert that "[t]he fee percentage stated in Attachment A is not accurate with regards

to American Express." (Id.).

This argument fails, if for no other reason, because it is the employer's burden to demonstrate that the amount that it subtracted from the employees' credit-card tip pool was a reasonable approximation of the credit-card processing fee. See, e.g., Myers, 192 F.3d at 555; Widjaja v. Kang Yue USA Corp., 2011 WL 4460642, *8 (E.D.N.Y. Sept. 26, 2011). Defendants offered not a shred of evidence as to their actual credit-card processing fees, and hence cannot complain about a lack of proof from plaintiffs. Furthermore, given the dearth of information supplied by defendants as to those expenses, plaintiffs were compelled to subpoena the pertinent records from the credit-card companies and the defendants' accountant. (See, e.g., Pls. Exs. 12 & 14). Those documents were admitted into evidence[80] and constitute competent evidence from which plaintiffs made their reasonable estimates. It also bears mention that plaintiffs conceded that a three-percent deduction was justifiable, even though defendants had failed to carry their burden, and that figure (which exceeds the demonstrated fee charged

---

[80] Defendants objected to these exhibits, and others similar to them, on relevancy grounds. (Tr. 199). We admitted them subject to connection to plaintiffs' damages calculations, which was plainly done in their post-trial and damages memoranda. (See Pls. Mem. 19 n.41 (citing Exs. 12 & 14 to arrive at approximate credit card processing fees for Visa, Discover, and MasterCard)).

to defendants by all of the credit card companies except American Express), has been found reasonable by other courts. See supra pp. 80-81.[81]

Third, defendants assert that plaintiffs failed to carry their burden in relying on the data of the general ledgers prepared by defendants' accountant (Pls.' Ex. 18) because they did not offer testimony to explain those ledgers. (Defs.' Mem. 7-8). The short answer here is that the ledgers were admitted into evidence[82] with authentication provided by the accountant's declaration (Pls.' Ex. 35), and they were sufficiently comprehensible and detailed to permit the use of the relevant data from them to assist in arriving at the calculations that the plaintiffs have proffered to the court.

---

[81] We further note that defendants carefully avoid arguing that this fee level is too low for any credit-card company other than American Express (Defs.' Mem. 5), an implicit concession as to the accuracy of plaintiffs' calculation that the other fees were in the range of 2.2 to 2.5 percent. (See Pls. Mem. 19 n.41).

[82] At trial, defendants objected to Exhibit 18 on the grounds of authenticity, suggesting that -- despite the content of the accountant's declaration -- defendants believed these ledgers to have been "prepared by an employee of the restaurant and not the accountant." (Tr. 201). We overruled that objection, finding the declaration sufficient to demonstrate admissibility. (Id. at 202). Indeed, in their post-trial memorandum, defendants appear to have abandoned this objection. (Defs.' Mem. 7 ("The only individual with firsthand knowledge [of the ledger] is accountant Kuang Youl Lee.")).

In sum, we conclude that plaintiffs' calculations of their damages are adequately documented and are premised on entirely reasonable assumptions. Since those assumptions were compelled by reason of defendants' failure to maintain or to produce required financial and other records, the fact that the resulting figures represent estimates rather than precisely proven damages is not a basis for rejecting them.

K. <u>Damages Awarded</u>

We delineate below the categories and respective totals of damages plaintiff-by-plaintiff, in the same order in which we described their working conditions above, <u>supra</u> pp. 13-58. By way of introduction, here, we simply provide the total amounts awarded to each plaintiff (meaning, the maximum exposure of (a) the entity defendant, (b) Ji Sung Yoo -- the only defendant against whom all plaintiffs can seek the full amount of their damages -- and, where applicable,[83] (c) one or both of the remaining individual defendants): (1) Tae Ho Kim: $467,846.78; (2) Young Mi Choi: $192,709.30; (3) Dong M. Ju: $129,672.31; (4) Hong Sik Kim:

---

[83] Meaning, if the full period of the particular plaintiff's employment coincided with the supervision of Chunsik Yu and/or Kyung Yoo.

$387,191.38; (5) Yoon C. Kim: $121,526.37; (6) Chul Gon Park: $391,931.68; (7) Jin H. Park: $337,127.90; (8) Eutemio Morales: $227,116.21; (9) Jong H. Song: $106,641.63; (10) Zhe Y. Shen: $102,271.59; and (11) Rosalino Julian Ventura: $208,622.15.

The total for all plaintiffs, as against those defendants that are fully liable, is $2,672,657.30.

1. <u>Tae Ho Kim</u>

We award Mr. Kim a total of $467,846.78, all of which is collectable from Kum Gang Inc. and/or Ji Sung Yoo. Mr. Chunsik Yu is jointly and severally liable for $345,820.34 of this award, and Mr. Kyung Le Yoo is jointly and severally liable for $450,966.88 of this award.

This $467,846.78 figure includes the following: (1) New York Labor Law wages of $160,963.59; (2) a New York Spread-of-Hours payment of $25,153.25; (3) FLSA wage- and overtime-related liquidated damages of $146,359.37; (4) New York Labor Law wage- and overtime-related liquidated damages of $49,235.97; (5) New York Spread-of-Hours liquidated damages of $8,316.50; (6) Prejudgement interest on owed Spread-of-Hours of $19,598.86; (7) Diverted

credit-card tips of $11,602.77; (8) FLSA credit-card tip-related liquidated damages of $11,602.77; (9) New York Labor Law credit-card tip-related liquidated damages of $3,680.16; (10) Diverted panchan tips of $7,138.00; (11) FLSA panchan tip-related liquidated damages of $7,138.00; (12) New York Labor Law panchan tip-related liquidated damages of $2,239.00; (13) Diverted Banquet Room tips of $5,268.64; (14) FLSA Banquet Hall tip-related liquidated damages of $5,268.64; (15) New York Labor Law Banquet Hall tip-related liquidated damages of $1,781.26; and (16) Notice-provision damages of $2,500.[84]

2. <u>Young Mi Choi</u>

We award Ms. Choi a total of $192,709.30, all of which is collectable from Kum Gang Inc., Ji Sung Yoo, and/or Kyung Le Yoo. Mr. Chunsik Yu is jointly and severally liable for $158.475.22 of

---

[84] For defendant Chunsik Yu's exposure of $345,820.34, these sixteen categories are broken down as follows: (1) $119,527.10; (2) $20,027.75; (3) $100,853.30; (4) $38,876.85; (5) $7,035.12; (6) $13,943.43; (7) $9,562.05; (8) $9,562.05; (9) $3,169.98; (10) $5,814.00; (11) $5,814.00; (12) $1,908.00; (13) $3,005.60; (14) $3,005.60; (15) $1,215.50; and (16) $2,500.00.  For defendant Kyung Yoo's exposure of $450,966.88, these categories are broken down as follows: (1) $157,132.27; (2) $24,102.00; (3) $142,528.05; (4) $45,404.66; (5) $7,265.25; (6) $18,779.75; (7) $11,139.72; (8) $11,139.72; (9) $3,217.11; (10) $6,868.00; (11) $6,868.00; (12) $1,969.00; (13) $5,180.24; (14) $5,180.24; (15) $1,692.86; and (16) $2,500.00.

this award.

This $192,709.30 figure includes the following: (1) New York Labor Law wages of $78,501.56; (2) a New York Spread-of-Hours payment of $9,641.00; (3) FLSA wage- and overtime-related liquidated damages of $60,707.44; (4) New York Labor Law wage- and overtime-related liquidated damages of $19,625.39; (5) New York Spread-of-Hours liquidated damages of $2,410.25; (6) Prejudgement interest on owed Spread-of-Hours of $5,232.29; (7) Diverted credit-card tips of $4,657.94; (8) FLSA credit-card tip-related liquidated damages of $4,657.94; (9) New York Labor Law credit-card tip-related liquidated damages of $1,164.49; (10) Diverted panchan tips of $2,716.00; (11) FLSA panchan tip-related liquidated damages of $2,716.00; and (12) New York Labor Law panchan tip-related liquidated damages of $679.00.[85]

### 3. Dong M. Ju

We award Mr. Ju a total of $129,672.31, all of which is

---

[85] For defendant Chunsik Yu's exposure of $158,475.22, these twelve categories are broken down as follows: (1) $65,505.88; (2) $8,009.75; (3) $47,547.13; (4) $16,335.31; (5) $2,002.44; (6) $5,232.29; (7) $3,886.19; (8) $3,886.19; (9) $971.55; (10) $2,266.00; (11) $2,266.00; and (12) $566.5.

collectable from Kum Gang Inc., Ji Sung Yoo, and/or Kyung Le Yoo. Mr. Chunsik Yu is jointly and severally liable for $113,513.32 of this award.

This $129,672.31 figure includes the following: (1) New York Labor Law wages of $50,773.53; (2) a New York Spread-of-Hours payment of $9,349.45; (3) FLSA wage- and overtime-related liquidated damages of $34,193.48; (4) New York Labor Law wage- and overtime-related liquidated damages of $12,693.38; (5) New York Spread-of-Hours liquidated damages of $2337.3625; (6) Prejudgement interest on owed Spread-of-Hours of $5,275.78; (7) Diverted credit-card tips of $4,222.59; (8) FLSA credit-card tip-related liquidated damages of $4,222.59; (9) New York Labor Law credit-card tip-related liquidated damages of $1,055.65; (10) Diverted panchan tips of $2,466.00; (11) FLSA panchan tip-related liquidated damages of $2,466.00; and (12) New York Labor Law panchan tip-related liquidated damages of $616.50.[86]

---

[86] For defendant Chunsik Yu's exposure of $113,513.32, these twelve categories are broken down as follows: (1) $45,429.75; (2) $8,167.70; (3) $28,849.70; (4)$11,357.44; (5) $2,041.93; (6) $4,608.93; (7) $3663.5; (8) $3663.5; (9) $915.875; (10) $2140.00; (11) $2140.00; and (12) $535.00. We note that there is a scrivener's error in plaintiffs' "totals" page for Mr. Ju, in that the stated numbers for what Mr. Chunsik Yu owes for the Spread-of-Hours payment and the New York Labor Law wage- and overtime-related liquidated damages are flipped. (See Attach. 4 p. 7 to docket no. 124). They write there that Mr. Yu owes

4. <u>Hong Sik Kim</u>

We award Mr. H. Kim a total of $387,191.38, all of which is collectable from any and all defendants.

This $387,191.38 figure includes the following: (1) FLSA wages of $158,163.21;[87] (2) a New York Spread-of-Hours payment of $13,537.45; (3) FLSA wage- and overtime-related liquidated damages of $158,163.21; (4) New York Labor Law wage- and overtime-related liquidated damages of $19,407.91; (5) New York Spread-of-Hours liquidated damages of $3,384.36; (6) Prejudgement interest on owed Spread-of-Hours of $11,178.97; (7) Diverted credit-card tips of $7,332.81; (8) FLSA credit-card tip-related liquidated damages of $7,332.81; (9) New York Labor Law credit-card tip-related liquidated damages of $1,833.20; (10) Diverted panchan tips of $1,598.00; (11) FLSA panchan tip-related liquidated damages of

---

$11,357.44 for Spread-of-Hours and $8,167.70 for New York liquidated damages. (<u>Id.</u>). The more detailed chart for Mr. Ju, however, and the attached summary at the bottom of that chart, reveal that these figures need to be switched (<u>id.</u> at p. 6) -- a fact that is also obvious from the reality that Mr. Yu could not logically owe <u>more</u> for his portion on Spread-of-Hours than Messrs. Ji Sung Yoo and Kyung Yoo.

[87] Unlike plaintiffs Tae Kim, Choi, and Ju, Mr. Hong Kim's unpaid wages under FLSA were not exceeded by those under the New York Labor Law, which amounted to $77,631.63. (<u>See</u> Attach. 5 p. 9 to docket no. 124).

$1,598.00; (12) New York Labor Law panchan tip-related liquidated damages of $399.50; (13) Diverted Banquet Room tips of $1,449.76; (14) FLSA Banquet Hall tip-related liquidated damages of $1,449.76; and (15) New York Labor Law Banquet Hall tip-related liquidated damages of $362.44.

### 5. Yoon C. Kim

We award Mr. Kim a total of $121,526.37, all of which is collectable from Kum Gang Inc. and/or Ji Sung Yoo. Mr. Chunsik Yu is jointly and severally liable for $25,322.46 of this award, and Mr. Kyung Le Yoo is jointly and severally liable for $121,100.63 of this award.

This $121,526.37 figure includes the following: (1) FLSA wages of $35,390.15;[88] (2) a New York Spread-of-Hours payment of $8,849.80; (3) FLSA wage- and overtime-related liquidated damages of $35,390.15; (4) New York Labor Law wage- and overtime-related liquidated damages of $6,580.21; (5) New York Spread-of-Hours

---

[88] Like Mr. Ju, see supra p. 138 n. 87, Mr. Yoon Kim's back FLSA wages exceeded his back New York Labor Law wages, which amounted to $26,320.85 with respect to defendant Ji Sung Yoo and $25,767.79 with respect to defendant Kyung Yoo. (See Attach. 9 p. 10 to docket no. 124).

liquidated damages of $2,212.45; (6) Prejudgement interest on owed Spread-of-Hours of $8,840.96; (7) Diverted credit-card tips of $8,727.40; (8) FLSA credit-card tip-related liquidated damages of $8,727.40; (9) New York Labor Law credit-card tip-related liquidated damages of $2,181.85; (10) Diverted panchan tips of $2,056.00; (11) FLSA panchan tip-related liquidated damages of $2,056.00; and (12) New York Labor Law panchan tip-related liquidated damages of $514.00.[89]

### 6. Chul Gon Park

We award Mr. Park a total of $391,931.68, all of which is collectable from Kum Gang Inc. and/or Ji Sung Yoo. Mr. Chunsik Yu is jointly and severally liable for $279,323.05 of this award, and Mr. Kyung Le Yoo is jointly and severally liable for $359,157.51 of this award.

---

[89] For defendant Chunsik Yu's exposure of $25,322.46, these twelve categories are broken down as follows: (1) $3,314.55 [representing New York Labor Law Wages, not FLSA wages, which -- with respect to Mr. Yu -- amounted to a lesser $3,277.27]; (2) $3,576.35; (3) $3,277.27; (4) $828.64; (5) $894.09; (6) $2,101.42; (7) $5,035.62; (8) $5,035.62; (9) $1,258.91; (10) $0.00; (11) $0.00; and (12) $0.00. For defendant Kyung Yoo's exposure of $121,100.63, all figures are the same as for defendant Ji Sung Yoo, except for the following: (2) $8,711.05; (7) $8,609.85; (8) $8,609.85; (9) $2,152.46; (10) $2,046.00; (11) $2,046.00; and (12) $511.50.

This $391,931.68 figure includes the following: (1) New York Labor Law wages of $121,743.18; (2) a New York Spread-of-Hours payment of $23,218.20; (3) FLSA wage- and overtime-related liquidated damages of $113,691.94; (4) New York Labor Law wage- and overtime-related liquidated damages of $39,221.72; (5) New York Spread-of-Hours liquidated damages of $7,294.42; (6) Prejudgement interest on owed Spread-of-Hours of $19,353.48; (7) Diverted credit-card tips of $6,468.31; (8) FLSA credit-card tip-related liquidated damages of $6,468.31; (9) New York Labor Law credit-card tip-related liquidated damages of $1,851.175; (10) Diverted panchan tips of $4,276.00; (11) FLSA panchan tip-related liquidated damages of $4,276.00; (12) New York Labor Law panchan tip-related liquidated damages of $1,205.50; (13) Diverted Banquet Room tips of $17,176.12; (14) FLSA Banquet Hall tip-related liquidated damages of $17,176.12; (15) New York Labor Law Banquet Hall tip-related liquidated damages of $6,011.20; and (16) Notice-provision damages of $2,500.[90]

---

[90] For defendant Chunsik Yu's exposure of $279,323.05, these sixteen categories are broken down as follows: (1) $90,009.125; (2) $16,413.9; (3) $72,184.45625; (4) $31,288.20313; (5) $5,593.35; (6) $13,681.77; (7) $3,001.60; (8) $3,001.60; (9) $984.4975; (10) $1,850.00; (11) $1,850.00; (12) $599.00; (13) $15,399.28; (14) $15,399.28; (15) $5,566.99; and (16) $2,500. For defendant Kyung Yoo's exposure of $359,157.51, these categories are broken down as follows: (1) $114,588.6125; (2) $21,782.70; (3) $104,037.3813; (4) $32,044.22344; (5) $5,853.6125; (6) $18,156.92; (7) $6,286.52; (8) $6,286.52; (9)

7. <u>Jin H. Park</u>

We award Mr. Park a total of $337,127.90, all of which is collectable from Kum Gang Inc. and/or Ji Sung Yoo. Mr. Chunsik Yu is jointly and severally liable for $291,108.96 of this award, and Mr. Kyung Le Yoo is jointly and severally liable for $311,102.78 of this award.

This $337,127.90 figure includes the following: (1) FLSA wages of $116,351.48;[91] (2) a New York Spread-of-Hours payment of $15,897.30; (3) FLSA wage- and overtime-related liquidated damages of $116,351.48; (4) New York Labor Law wage- and overtime-related liquidated damages of $36,430.05; (5) New York Spread-of-Hours liquidated damages of $5,920.95; (6) Prejudgement interest on owed Spread-of-Hours of $8,270.95; (7) Diverted credit-card tips of $4,571.04; (8) FLSA credit-card tip-related liquidated damages of $4,571.04; (9) New York Labor Law credit-card tip-related

---

$1,665.9725; (10) $4,170.00; (11) $4,170.00; (12) $1,097.00; (13) $15,894.32; (14) $15,894.32; (15) $4,729.4; and (16) $2,500.

[91] The FLSA wages owed to Mr. Jin Park exceed New York Labor Wages with respect to all individual defendants. For defendant Ji Sung Yoo, the New York Labor Law figure is $91,600.76, for defendant Chunsik Yu, the New York Labor Law figure is $78,934.11, and for defendant Kyung Yoo, the New York Labor Law figure is $84,592.36. (<u>See</u> Attach. 1 p. 7 to docket no. 125).

liquidated damages of $1,855.38; (10) Diverted panchan tips of $2,848.00; (11) FLSA panchan tip-related liquidated damages of $2,848.00; (12) New York Labor Law panchan tip-related liquidated damages of $1,156.00; (13) Diverted Banquet Room tips of $7,620.08; (14) FLSA Banquet Hall tip-related liquidated damages of $7,620.08; (15) New York Labor Law Banquet Hall tip-related liquidated damages of $2,316.08; and (16) Notice-provision damages of $2,500.00.[92]


### 8. Eutemio Morales


We award Mr. Morales a total of $227,116.21, all of which is collectable from Kum Gang Inc. and/or Ji Sung Yoo. Mr. Chunsik Yu is jointly and severally liable for $226,748.99 of this award, and Mr. Kyung Le Yoo is jointly and severally liable for $185,124.46 of this award.

---

[92] For defendant Chunsik Yu's exposure of $291,108.96, these sixteen categories are broken down as follows: (1) $99,179.57; (2) $13,555.55; (3) $99,179.57; (4) $33,268.39; (5) $5,335.51; (6) $7,052.60; (7) $3,752.49; (8) $3,752.49; (9) $1,638.71; (10) $2,338.00; (11) $2,338.00; (12) $1,021.00; (13) $7,018.96; (14) $7,018.96; (15) $2,159.17; and (16) $2,500.00.  For defendant Kyung Yoo's exposure of $311,102.78, these categories are broken down as follows: (1) $109,343.07; (2) $14,889.55; (3) $109,343.07; (4) $29,421.64; (5) $4,913.20; (6) $7,746.65; (7) $4,201.89; (8) $4,201.89; (9) $1,474.19; (10) $2,618.00; (11) $2,618.00; (12) $918.50; (13) $7,407.92; (14) $7,407.92; (15) $2,097.29; and (16) $2,500.00.

This $227,116.21 figure includes the following: (1) New York Labor Law wages of $97,209.87; (2) a New York Spread-of-Hours payment of $15,852.05; (3) FLSA wage- and overtime-related liquidated damages of $79,316.70; (4) New York Labor Law wage- and overtime-related liquidated damages of $15,852.05; (5) New York Spread-of-Hours liquidated damages of $9,181.76; (6) Prejudgement interest on owed Spread-of-Hours of $7,203.78; and (7) Notice-provision damages of $2,500.00.[93]

9. Jong H. Song

We award Mr. Song a total of $106,641.63, all of which is collectable from Kum Gang Inc. and/or Ji Sung Yoo. Mr. Chunsik Yu is jointly and severally liable for $69,361.77 of this award, and Mr. Kyung Le Yoo is jointly and severally liable for $104,998.56 of this award.

This $106,641.63 figure includes the following: (1) FLSA wages

---

[93] For defendant Chunsik Yu's exposure of $227,116.21, these seven categories are broken down as follows: (1) $83,038.37; (2) $15,285.30; (3) $65,145.20; (4) $45,261.13; (5) $8,572.76; (6) $6,946.23; and (7) $2,500.00. For defendant Kyung Yoo's exposure of $185,124.46, these categories are broken down as follows: (1) $74,847.43; (2) $13,118.80; (3) $57,734.73; (4) $26,382.55; (5) $4,579.26; (6) $5,961.69; and (7) $2,500.00.

of $36,154.38[94]; (2) New York Spread-of-Hours payment of $6,011.75; (3) FLSA wage- and overtime-related liquidated damages of $36,154.38; (4) a New York Labor Law wage- and overtime-related liquidated damages of $12,081.91; (5) New York Spread-of-Hours liquidated damages of $2,780.75; (6) Prejudgement interest on owed Spread-of-Hours of $1,799.57; (7) Diverted credit-card tips of $2850.33; (8) FLSA credit-card tip-related liquidated damages of $2850.33; (9) New York Labor Law credit-card tip-related liquidated damages of $1317.12; (10) Diverted panchan tips of $1,662.00; (11) FLSA panchan tip-related liquidated damages of $1,662.00; (12) New York Labor Law panchan tip-related liquidated damages of $1,317.12; and (13) Notice-provision damages of $2,500.00.[95]

---

[94] The FLSA wages owed to Mr. Song exceed New York Labor Wages with respect to all individual defendants. For defendant Ji Sung Yoo, the New York Labor Law figure is $31,650.93, for defendant Chunsik Yu, the New York Labor Law figure is $18,654.93, and for defendant Kyung Yoo, the New York Labor Law figure is $30,858.71. (See Attach. 7 p. 4 to docket no. 125).

[95] For defendant Chunsik Yu's exposure of $69,361.77, these thirteen categories are broken down as follows: (1) $20,955.53; (2) $3,887.50; (3) $20,955.53; (4) $8,832.91; (5) $2,249.69; (6) $1,163.69; (7) $1,845.34; (8) $1,845.34; (9) $1,250.24; (10) $1,590.00; (11) $1,590.00; (12) $696.00; and (13) $2,500.00. For defendant Kyung Yoo's exposure of $104,998.56, these categories are broken down as follows: (1) $35,261.47; (2) $5,750.75; (3) $35,261.47; (4) $11,289.69; (5) $2,519.75; (6) $1,721.44; (7) $2,726.85; (8) $2,726.85; (9) $1,364.28; (10) $1,590.00; (11) $1,590.00; (12) $696.00; and (13) $2,500.00.

10. Zhe Y. Shen

We award Mr. Shen a total of $102,271.59, all of which is collectable from Kum Gang Inc., Ji Sung Yoo, and/or Kyung Yoo. Mr. Chunsik Yu is jointly and severally liable for $94,979.34 of this award.

This $102,271.59 figure includes the following: (1)FLSA wages of $43,758.28[96]; (2) a New York Spread-of-Hours payment of $1,761.30; (3) FLSA wage- and overtime-related liquidated damages of $43,758.28; (4) New York Labor Law wage- and overtime-related liquidated damages of $10,939.57; (5) New York Spread-of-Hours liquidated damages of $440.33; and (6) Prejudgement interest on owed Spread-of-Hours of $1,613.83.[97]

---

[96] In the chart representing the "totals" owed to Mr. Shen, plaintiffs represent that $43,758.28 is owed under the FLSA. (Attach. 6 to docket no. 125). This number, in fact, represents equivalent back overtime payments under both the FLSA and the New York Labor Law, as Mr. Shen was paid more than the minimum wage for the entirety of his employment. (See Attach. 5 to docket no. 125).

[97] For defendant Chunsik Yu's exposure of $94,979.34, these six categories are broken down as follows: (1) $41,066.62; (2) $772.50; (3) $41,066.62; (4) $10,266.65; (5) $193.13; and (6) $1,613.83.

146

11. <u>Rosalino Julian Ventura</u>

We award Mr. Ventura a total of $208,622.15, all of which is collectable from Kum Gang Inc. and/or Ji Sung Yoo. Mr. Chunsik Yu is jointly and severally liable for $201,384.55 of this award and Mr. Kyung Rae Yoo is jointly and severally liable for $165,165.85 of this award.

This $208,622.15 figure includes the following: (1) New York Labor Law wages of $85,749.83; (2) a New York Spread-of-Hours payment of $17,272.45; (3) FLSA wage- and overtime-related liquidated damages of $70,019.36; (4) New York Labor Law wage- and overtime-related liquidated damages of $17,272.45; (5) New York Spread-of-Hours liquidated damages of $7,481.80; (6) Prejudgement interest on owed Spread-of-Hours of $8,326.27; and (7) Notice-provision damages of $2,500.00.[98]

---

[98] For defendant Chunsik Yu's exposure of $201,384.55, these seven categories are broken down as follows: (1) $72,158.89; (2) $14,792.95; (3) $56,428.43; (4) $39,814.85; (5) $8,558.43; (6) $7,131.01; and (7) $2,500.00. For defendant Kyung Yoo's exposure of $165,165.85, these categories are broken down as follows: (1) $65,776.95; (2) $12,445.20; (3) $50,853.68; (4) $23,239.71; (5) $4,351.05; (6) $5,999.27; and (7) $2,500.00.

L. Adjustment of Prejudgment Interest

We note that, for purposes of calculating prejudgment interest on plaintiffs' Spread-of-Hours awards, we employed the figures provided by plaintiffs in their damages statement. See supra pp. 87-88 n.16. Plaintiffs' metric for the calculation of prejudgment interest looks appropriately to the midpoints of their respective periods of employment, as determined by their start and end dates. (Pls. Damages St. 10-11). Accord Ahmed, 2014 WL 4101224 at *8. These dates provide "single reasonable intermediate date[s]" from which interest may be calculated. CPLR § 5001. Interest is calculated at nine percent per annum, CPLR § 5004,[99] and, on that basis, plaintiffs undertook calculations for the periods stretching from their employment midpoints to the filing of their damages statement, on June 18, 2014. (Pl. Damages St. 10-11).

Plaintiffs, however, are also entitled to interest from June 18, 2014 until judgment is entered in this matter. See, e.g., Ahmed, 2014 WL 4101224 at *8; Galeana, __ F. Supp. at __, 2014 WL

---

[99] New York law controls prejudgment interest calculations since interest is being awarded solely on the New York law claim for spread of hours.

1364493 at *12. The per-day[100] interest figures for all plaintiffs are as follows: (1) Tae Ho Kim: $6.20[101]; (2) Young Mi Choi: $2.38[102]; (3) Dong M. Ju: $2.31[103]; (4) Hong Sik Kim: $3.39[104]; (5) Yoon C. Kim $2.18[105]; (6) Chul Gon Park: $5.73[106]; (7) Jin H. Park: $3.92[107];(8) Eutemio Morales: $3.91[108]; (9) Jong H. Song: $1.48[109]; (10) Zhe Y. Shen: $0.44[110]; (11) Rosalino Julian Ventura: $4.26[111].

As with all of the damages assessments, the defendants are each liable for their respectively applicable portions of this

---

[100] This calculation was undertaken by multiplying each Spread-of-Hours award by nine percent, then dividing this total by 365 and rounding to the nearest cent. Accord Ahmed, 2014 WL 4101224 at *8; Galeana, __ F. Supp. at __, 2014 WL 1364493 at *12.

[101] ($25,153.25 x 0.09)/365 = $6.20.

[102] ($9,641.00 x 0.09)/365 = $2.38.

[103] ($9,349.45 x 0.09)/365 = $2.31.

[104] ($13,537.45 x 0.09)/365 = $3.39.

[105] ($8,849.80 x 0.09)/365 = $2.18.

[106] ($23,218.20 x 0.09)/365 = $5.73.

[107] ($15,897.30 x 0.09)/365 = $3.92.

[108] ($15,852.05 x 0.09)/365 = $3.91.

[109] ($6,011.75 x 0.09)/365 = $1.48.

[110] ($1,761.30 x 0.09)/365 = $0.44.

[111] ($17,272.45 x 0.09)/365 = $4.26.

additional interest payment.


CONCLUSION


For reasons noted, and in accordance with the above considerations, judgment will enter in favor of plaintiffs as delineated. Plaintiffs are to submit a proposed judgment within seven days.


Dated:    New York, New York
          March 19, 2015


_____
          MICHAEL H. DOLINGER
          UNITED STATES MAGISTRATE JUDGE


150

Copies of the foregoing Memorandum and Order have been mailed today to:

**Bethany Yue-Ping Li, Esq.**
**Kenneth Kimerling, Esq.**
Asian American Legal Defense
99 Hudson Street
New York, NY 11355

**Henry Sabath Weisburg, Esq.**
**Joanna Shally, Esq.**
Shearman & Sterling LLP (NY)
599 Lexington Avenue
New York, NY 10022

**Jackson Chin, Esq.**
Puerto Rican Legal Defense and Education Fund, Inc
99 Hudson Street 14th Floor
New York, NY 10013

**Katie E Ambroziak, Esq.**
**Robert Giusti, Esq.**
Robert Giusti, Esq. & Associates, PLLC
42-40 Bell Blvd., Suite 601
Bayside, NY 11361